No. 21-12314

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. ET AL.,
*Appellants*,

v.

RICK SWEARINGEN, in his official capacity as Commissioner of the Florida
Department of Law Enforcement,
*Appellee*.

---

On Appeal from the United States District Court for the Northern District of
Florida, No. 4:18-cv-00137-MW-MAF

---

## BRIEF OF *AMICUS CURIAE* NRA CIVIL RIGHTS DEFENSE FUND IN
## SUPPORT OF APPELLANTS

---

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Jeffrey M. Harris
  *Counsel of Record*
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

Dated: September 16, 2021

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Per Rule 26.1 and 11th Cir. R. 26-1.1, *amicus curiae* certifies that the following persons have an interest in the outcome of this appeal:

1. Baum, Christopher J. (Counsel for Appellee)

2. Bell, Daniel (Counsel for Appellee)

3. Blair, Connor M. (Counsel for Appellants)

4. Bradley Arant Boult Cummings LLP (Law Firm Representing Appellants)

5. Fant, Radford (Appellant)

6. Fitzpatrick, Martin A., Hon. (Magistrate Judge Below)

7. Golembiewski, Kevin (Counsel for Appellee)

8. Nardone, Marc A. (Counsel for Appellants)

9. National Rifle Association of America, Inc. (Appellant)

10. Newhall, Timothy (Counsel for Appellee)

11. Percival, James H. (Counsel for Appellee)

12. Porter, James W. (Counsel for Appellants)

13. Swearingen, Rick, in his official capacity as Commissioner of the Florida Department of Law Enforcement (Appellee)

14. Sweeney, John Parker (Counsel for Appellants)

i

15. Teegen, Elizabeth (Counsel for Appellee)

16. Walker, Mark E., Hon. (Chief United States District Judge below)

17. Whitaker, Henry (Counsel for Appellee)

*Amicus* NRA Civil Rights Defense Fund has no parent company. No publicly held company owns 10% or more of its stock. However, members of the National Rifle Association of America elect the trustees of the NRA Civil Rights Defense Fund.


Dated: September 16, 2021          Respectfully submitted,

*/s/ Jeffrey M. Harris*

ii

## **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...........................................................1

STATEMENT OF THE ISSUES ...............................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................2

ARGUMENT .........................................................................................5

    I.    The Second Amendment protects an individual, fundamental right that is as deserving of the courts' protection as any other right...........................................5

    II.   The district court wrongly held that states have free rein, under all circumstances, to ban the purchase of firearms by individuals up to age 21.......12

        A. The district court's historical analysis dismissed ratification-era evidence in favor of more recent, and less relevant, examples. ..........................................14

        B. The district court stretched dicta from *Heller* to create an irrebuttable presumption that §790.065(13) was constitutional. .............................................15

        C. Young adults, as a class, are not comparable to other individuals who have been convicted of crimes or adjudicated to be dangerous. ...........................18

CONCLUSION ....................................................................................20

CERTIFICATE OF COMPLIANCE ........................................................21

CERTIFICATE OF SERVICE................................................................21

iii

# TABLE OF CITATIONS

## CASES

*Application of Gault*,
    387 U.S. 1 (1967)...................................................................................8, 9

*Brown v. Bd. of Educ. of Topeka*,
    347 U.S. 483 (1954)....................................................................................9

*Cook v. Randolph County, Ga.*,
    573 F.3d 1143 (11th Cir. 2009) ................................................................10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)....................................................................................2

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...........................................................................passim

*Doe v. State*,
    217 So.3d 1020 (Fla. 2017)......................................................................19

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012)..................................................................5

*Goss v. Lopez*,
    419 U.S. 565 (1975)....................................................................................9

*Haley v. State of Ohio*,
    332 U.S. 596 (1948)....................................................................................9

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
    5 F.4th 407 (4th Cir. 2021) ...............................................................passim

*Hodgkins ex rel. Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ...................................................................7

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) .......................................................................19, 20

*Mahanoy Area School District v. B. L. by and through Levy*,
141 S.Ct. 2038 (2021)....................................................................................7

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)...........................................................................2, 6, 10, 16

*McKeiver v. Pennsylvania*,
403 U.S. 528 (1971)......................................................................................9

*National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
714 F.3d 334 (5th Cir. 2013) ....................................................................passim

*National Rifle Association of America, Inc. v. Swearingen*,
2021 WL 2592545 (N.D. Fla. 2021)............................................................passim

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985).....................................................................................8

*Planned Parenthood of Central Mo. v. Danforth*,
428 U.S. 52 (1976).......................................................................................9

*Reproductive Health Services v. Strange*,
3 F.4th 1240 (11th Cir. 2021) ......................................................................10

*Roper v. Simmons*,
543 U.S. 551 (2005).....................................................................................10

*Safford Unified School Dist. No. 1 v. Redding*,
129 S.Ct. 2633, 557 U.S. 364 (2009)..........................................................8

*Tinker v. Des Moines Independent Community Sch. Dist.*,
393 U.S. 503 (1969).....................................................................................7

v

*Tyler v. Hillsdale Cnty. Sheriff's Dep't,*
    837 F.3d 678 (6th Cir. 2016) ............................................................13

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943)..........................................................................7

**STATUTES**

Fla. Stat. §790.065(13) ...........................................................................11

**OTHER AUTHORITIES**

Callie Marie Rennison, *Intimate Partner Violence and Age of Victim, 1993-99*
    (BJS Oct. 2001), https://bjs.ojp.gov/content/pub/pdf/ipva99.pdf .......................12

Centers for Disease Control and Prevention, 10 Leading Causes of Death by Age
    Group, United Sates – 2018, https://www.cdc.gov/injury/images/lc-
    charts/leading_causes_of_death_by_age_group_2018_1100w850h.jpg.............12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. IV .............................................................................7
U.S. Const. art. I, sec. 2 ...........................................................................10
U.S. Const. art. II....................................................................................10

## INTEREST OF AMICUS CURIAE

*Amicus curiae* is the NRA Civil Rights Defense Fund. Although originally founded by the NRA in 1978, it exists now as a separate and independent trust, governed by its own board of trustees and recognized by the Internal Revenue Service as a 501(c)(3) tax-exempt entity.[1] The Fund was established in 1978 to assist in the preservation and defense of the human, civil, and constitutional rights of the individual to keep and bear arms in a free society. Today, the Fund provides legal and financial assistance to individuals and organizations defending their right to keep and bear arms. The Fund sponsors legal research and education on a wide variety of issues, including the meaning of the Second Amendment, and has participated as amicus in numerous other cases implicating the right to keep and bear arms.

The Fund has a compelling interest in the Court's resolution of this case because the challenged statute prohibits a broad swath of adults in Florida from exercising their fundamental constitutional right to procure and bear arms on no basis other than their age. No other fundamental constitutional right is treated this

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than amicus, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. Amicus consulted with the parties before filing this motion; both consented to Amicus's participation in this case.

way; to the contrary, the freedom of speech, press, assembly, and a panoply of criminal procedural rights apply to *minors*, let alone adults aged 18-21. And if adopted, the district court's expansive application of dicta from *Heller* regarding presumptively lawful gun regulations would only further hollow out the Second Amendment right, according it "second-class" status compared to the rest of the Constitution. That is contrary to the mission of the Fund, created to protect the fundamental right of all law-abiding Americans to possess and carry a firearm for lawful purposes, including self-defense.

## STATEMENT OF THE ISSUES

Whether the Second and Fourteenth Amendments preclude Florida from banning all firearm purchases by law-abiding, responsible young adults.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Thirteen years ago, the Supreme Court confirmed that the Second Amendment protects an ancient and individual right of self-defense. *See District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). Just like every other Bill of Rights guarantee, the Second Amendment secures a fundamental right, not "a second-class right, subject to an entirely different body of rules." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). Nothing in *Heller* or *McDonald* suggests that broad segments of the adult population who have committed no crime or otherwise been adjudged a danger to others can nonetheless be completely denied the protection of the Second

2

Amendment. But that is what Fla. Stat. §790.065(13) does. The district court upheld §790.065(13)'s nearly total ban on firearms purchases by young adults on the dubious grounds that *Heller*—despite being entirely silent on matter—freely permits states to bar the sale of guns to individuals under age 21 in all circumstances.

This decision cannot stand in the face of the Supreme Court's admonishment against treating the right to keep and bear arms as a second-class right. Indeed, the Supreme Court has long made clear that *other* constitutional rights apply to individuals under the age of 21. Minors and young adults unquestionably enjoy the protections guaranteed by the First Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth Amendment, the Eighth Amendment, and the Fourteenth Amendment. Courts should not treat the Second Amendment any differently, and certainly have no basis to conclude that young *adults* who are expected to serve on juries, vote, enlist in the military, serve as police officers and firefighters, and otherwise undertake the full duties of the citizenry can nonetheless be denied their fundamental individual right.

The district court held otherwise, reasoning that because a few states have in the past banned the sale of firearms to 18-, 19- and 20-year-olds, and because young adults are analogous to other categories of people considered "dangerous with firearms," Florida's ban is *per se* constitutional. This is wrong on two fronts. *First,*

3

the sparse historical practice relied on by the state long postdates the enactment of the Second Amendment and does not provide any foundation for a carve-out from the right announced in *Heller* and applied to the states in *McDonald. Second*, to the extent that the past provides any presumption that such restrictions are consistent with the Second Amendment, that presumption cannot be irrebuttable. And the evidence here is extremely lopsided as to the ineffectiveness of Fla. Stat. §790.065(13) in achieving any important state interest, especially given the cost its broad ban imposes on the rights of hundreds of thousands of law-abiding young adults.

Nor does the district court's decision find any support in the analogy it drew with other, more limited restrictions that this Court previously upheld. Felons and domestic violence offenders, for example, have been adjudicated with due process to have engaged in illegal conduct. And individuals who present a threat of harm to themselves or others have also been subject to an individualized assessment and determination of that fact. But Fla. Stat. §790.065(13) walls off handgun purchases from a substantial share of Florida's population without any such individualized determination, on the basis of only their age. We would never tolerate a similar ban on 18 to 20 year-olds from publishing a newspaper, marching in the streets, or confronting their accusers at trial. These young adults are likewise entitled to arm

4

and protect themselves. The Constitution guarantees no less. The decision below should be reversed.

## **ARGUMENT**

### I.    **The Second Amendment protects an individual, fundamental right that is as deserving of the courts' protection as any other right.**

In *Heller,* the Supreme Court recognized "that the Second Amendment 'codified a pre-existing' individual right to keep and bear arms." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1259 (11th Cir. 2012) (citing *Heller*, 554 U.S. at 592). The Supreme Court in *Heller* conducted an extensive survey of the history of the Second Amendment, its public meaning at the time of ratification, and its post-ratification treatment before concluding that there was "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* 554 U.S. at 595. Among other pieces of evidence, the Court noted that the Second Amendment's reference to the "right of the people to keep and bear Arms," tracked language from other Amendments that unquestionably guarantee individual rights, including "the First Amendment's Assembly–and–Petition Clause and … the Fourth Amendment's Search–and–Seizure Clause." *Heller*, 554 U.S. at 579, 595. Having determined that the Second Amendment protected an individual right, the Court invalidated the District of Columbia's broad

5

ban on handgun ownership, finding it inconsistent with the "core lawful purpose of self-defense." *Id*. at 630.

Two years later, in *McDonald*, the Court made the "Second Amendment binding on the States and their subdivisions" by incorporating the right through the Due Process Clause of the Fourteenth Amendment. *McDonald,* 561 U.S. at 783. The *McDonald* decision again conducted an exhaustive historical analysis that made it "clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. The Court thus rejected what it saw as Chicago's plea "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." *Id.* at 780.

*McDonald*'s instructions to treat the Second Amendment right the same as any other constitutional right has important ramifications for this Court's analysis. Are there any constitutional protections set forth in the Bill of Rights that fully apply to most adults, but simply do not apply *at all* to those aged 18 to 20? The answer is "no." Indeed, the Bill of Rights unmistakably applies to *minors* as young as elementary school, as the Supreme Court has held time and time again in a variety of contexts:

6

*First Amendment.* The Supreme Court has long held that the First Amendment applies and protects even very young children from compelled speech. It thus held that a local law requiring elementary schoolchildren to salute the flag and recite the pledge of allegiance "transcends constitutional limitations on [government] power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 506 (1969) (upholding non-disruptive anti-war speech of 13 to 16-year old students). Just this year, the Supreme Court affirmed that even vulgar speech about school activities is protected under the First Amendment. *Mahanoy Area School District v. B. L. by and through Levy*, 141 S.Ct. 2038, 2048 (2021). "In short, minors have First Amendment rights worthy of protection." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1055 (7th Cir. 2004).

*Fourth Amendment.* Young people are not excluded from the constitutional right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. In *New Jersey v. T.L.O.*, 469 U.S.

7

325 (1985), the Supreme Court declared it "indisputable" that "the Fourteenth Amendment protects the rights of students against encroachment by public school officials," including the Fourth Amendment. *Id*. at 334. School officials thus have no power to conduct invasive searches of children without adequate suspicion. *Id.; see also Safford Unified School Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2642, 557 U.S. 364, 375 (2009). "The Fourth Amendment protects the rights of all persons, including minors." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 422 (4th Cir. 2021).

*Fifth and Sixth Amendments.* Nobody doubts that minors tried as adults in the criminal justice system are entitled to the criminal procedural protections set forth in the Bill of Rights. Indeed, the Supreme Court has held that these rights apply even to juvenile delinquency proceedings that differ substantially from the ordinary penal system. *Application of Gault*, 387 U.S. 1 (1967). Reasoning that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone," the Court held that juvenile offenders facing confinement in state custody are entitled to notice of the charges against them, the right against self-incrimination under the Fifth

8

Amendment, and the right to counsel, and to confront and cross-examine witnesses against them. *Id.* at 31-57 (1967).[2]

*Fourteenth Amendment.* Again, no one doubts that the Fourteenth Amendment's enumerated rights of equal protection and due process apply regardless of age. In *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954), the Court famously held that segregated schools "deprive[d] the children of the minority group of equal educational opportunities." *Id.* at 493. See *also Haley v. State of Ohio*, 332 U.S. 596, 601 (1948) ("Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law"); *Gault*, 387 U.S. at 12-13; *Goss v. Lopez*, 419 U.S. 565, 574 (1975).

Even the unenumerated rights that courts have found to be secured by the Fourteenth Amendment apply to minors. In *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52 (1976), the Supreme Court enjoined a law requiring parental consent before a minor can obtain an abortion, since "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." *Id.* at 74. *See also Reproductive Health Services v. Strange*, 3 F.4th

---

[2] Although the Supreme Court has held that not all juvenile delinquency proceedings are subject to the Sixth Amendment's right to a jury trial, *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971), "many state laws end the jurisdiction of juvenile courts at age 17, with a few at age 16 and just recently one at age 18." *Hirschfeld*, 5 F.4th at 423. No one contends that that 18 to 20-year-olds retain anything less than the full protection of the Fifth and Sixth Amendments.

9

1240, 1261 (11th Cir. 2021) (finding that state abortion regulation "constitutes an undue burden because it places a substantial obstacle on a 'large fraction' of unemancipated minors who seek to obtain a court order authorizing an abortion without the consent of their parent or guardian").

Even when the Supreme Court has treated minors differently from adults for purposes of the Constitution, it has drawn the line at the age of 18. *See, e.g., Roper v. Simmons*, 543 U.S. 551, 574 (2005) (noting that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest").[3] There is no reason to treat the Second Amendment rights of those aged 18 to 20 any differently. To do so directly contravenes the instructions of *McDonald* that the right to keep and bear arms not be accorded "second-class" status. 561 U.S. at 783. And, as the district court noted, there is no evidence that Americans—including the drafters of the Second Amendment—would have believed that the right to keep and bear arms did not extend to young adults. *See National Rifle Association of America, Inc. v.*

---

[3] Moreover, when the founders saw fit to specify a minimum age for the exercise of fundamental civil rights, they did so expressly. *E.g.* U.S. Const. art. II, sec. 1 (citizens must be at least 35 years old to be eligible for the presidency); art. I, sec. 2 (citizens must be at least 25 years old to serve in the House of Representatives). *Cf. Cook v. Randolph County, Ga.*, 573 F.3d 1143, 1157 (11th Cir. 2009) ("Voting rights and the right to run for public office are core constitutional rights.").

10

*Swearingen*, 2021 WL 2592545, at *6 (N.D. Fla. 2021) (noting that "this Court has found no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms"); *see also Hirschfeld*, 5 F.4th 407 at 421 ("The militia laws in force at the time of ratification uniformly required those 18 and older to join the militia and bring their own arms"); *National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissenting from rehearing) (the "relevant historical materials [] couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history.").

Nor does any other principle of logic support uniquely denigrating the Second Amendment rights of young adults. Floridians who have attained the age of 18 can serve in our armed forces. They can marry and raise families. They can vote. They serve as first responders—and can even, under Florida law, purchase a gun for work purposes but nor for their personal protection. Fla. Stat. §790.065(13). Under Florida's reasoning, "the same 18-to 20-year-old men and women we depend on to protect us in the armed forces and who have since our Founding been trusted with the most sophisticated weaponry should nonetheless be prevented from purchasing a [gun] for their own protection at home." *Hirschfeld*, 5 F.4th at 446-47.

11

And most importantly, young adults have no immunity from the threat of violence necessitating the ability to defend themselves. A U.S. Bureau of Justice Statistics report in 2001 found that "[y]ounger women generally had higher rates of intimate partner violence than older women," and that "[b]etween 1993 and 1999, an intimate was responsible for 32% homicides of women age 20-24." Callie Marie Rennison, *Intimate Partner Violence and Age of Victim, 1993-99* (BJS Oct. 2001), *available at* https://bjs.ojp.gov/content/pub/pdf/ipva99.pdf. In 2018, homicide was the third leading cause of death for Americans aged 15-24. Centers for Disease Control and Prevention, 10 Leading Causes of Death by Age Group, United Sates – 2018, *available at* https://www.cdc.gov/injury/images/lc-charts/leading_causes_of_death_by_age_group_2018_1100w850h.jpg. There is simply no basis to assume that young adults, as a class, are somehow less worthy of "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 552 at 628.

## II. The district court wrongly held that states have free rein, under all circumstances, to ban the purchase of firearms by individuals up to age 21.

The district court recognized that that there was "no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms." *Swearingen*, 2021 WL 2592545, at *6.

12

And it agreed (with some quibbles) that 18 to 21-year-olds were widely allowed or expected to serve in the militia (and thus obtain arms). *Id.* And the district court noted that other circuits have held that "[t]he government bears the burden at step one to conclusively demonstrate that the challenged statute burdens persons historically understood to be unprotected." *Id.* at *9 (quoting *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 689 (6th Cir. 2016)).

But the court ultimately decided not to hold the government to *any* burden in justifying §790.065(13) simply because, beginning in the second half of the nineteenth century, a handful of states began to impose some restrictions on the transfer of handguns to minors. *See Swearingen*, 2021 WL 2592545, at *9-*10. And this, the district court ultimately concluded, was of comparable length to *other* restrictions—such as laws against possession by felons and the mentally ill, or restrictions on carrying in certain places—that the *Heller* court suggested in dicta might survive its decision. *Id.* at *12-*14. More notably, the district court opined that "courts generally find restrictions analogous when they target groups thought to be especially dangerous with firearms"—which the district court accepted was also true of 18 to 20-year-olds. *Id.* at *15. *See also id.* ("*Heller*'s listed regulations are similar to restrictions on the purchase of firearms by 18-to-20-year-olds; all target specific groups that are thought to be especially dangerous with firearms.").

13

Where to begin with this approach? The flaws are evident and numerous, as Appellant describes more fully. Amicus here focuses on three of the most notable errors in the district court's analysis.

### A. The district court's historical analysis dismissed ratification-era evidence in favor of more recent, and less relevant, examples.

*First,* the district court placed far too much emphasis on the late nineteenth and early twentieth century developments with respect to minors. But *Heller* makes clear that "[t]ext, structure, and contemporary drafting indications are the primary historical sources for originalist inquiry." *National Rifle Ass'n, Inc.*, 714 F.3d at 337 (Jones, J., dissenting). Indeed, *Heller* itself specifically noted that post-Civil War discussions about the right to bear arms "do not provide as much insight into its original meaning as earlier sources." 554 U.S. at 614. Whatever the historical value of showing that *some* states prohibited transfers of *some* firearms (*i.e.*, handguns) more than a half-century after the Second Amendment was drafted is far outweighed by the strong evidence *at the time of ratification* that the states and federal government expected that those under 21 were authorized to procure and bear arms, including as part of the militia. *See Swearingen*, 2021 WL 2592545, at *6-*7; *see also Hirschfeld,* 5 F.4th at 427 ("At the time of ratification, there were no laws restricting minors' possession or purchase of firearms"). "Consequently, a government entity that seeks significantly to interfere with the Second Amendment

14

rights of an entire class of citizens bears a heavy burden to show, with relevant historical materials, that the class was originally outside the scope of the Amendment." *National Rifle Ass'n, Inc.*, 714 F.3d at 339 (Jones, J., dissenting).

**B.    The district court stretched dicta from *Heller* to create an irrebuttable presumption that §790.065(13) was constitutional.**

*Second*, the district court's search for analogies to the examples listed in the *Heller* court dicta went far afield. Setting aside the fact that it is dicta in the first place, the *Heller* decision's list of presumptively valid prohibitions contains no reference to restrictions on the purchase of firearms by those under the age of 21:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27.[4] Although the *Heller* court acknowledged in a footnote that this was a non-exclusive list, *id.* n.26, it also prefaced the statement with an

---

[4] The ban on purchases by 21-year-old is not a "condition or qualification of sale" under *Heller.* The text of Fla. Stat. §790.065(13) begins by regulating those under the age of 21, flatly prohibiting them from purchasing a firearm. "A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *Hirschfeld*, 5 F.4th at 416. Moreover, "the substance" of §790.065(13) operates as "a functional prohibition on buyers, not a mere condition or qualification on sellers" because it "ban's] an entire group of adult, law-abiding citizens from purchasing handguns from licensed dealers, substantially burdening the group's rights." *Id.* Even the district court recognized this point. *Swearingen*, 2021 WL 2592545, at *2  ("for most 18-to-20-year-olds, the Act is a total ban on the purchase of any firearm from any source").

acknowledgement that it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* And the Court repeated this dicta in *McDonald,* again declining to say anything (even in dicta) about purchases by those under the age of 21. 561 U.S. at 786. Given this silence, the district court should at least have paused before concluding that there was "no meaningful difference" between these categories. *Swearingen*, 2021 WL 2592545, at *15. At a minimum, the Court should have applied appropriate constitutional scrutiny to the State's justification of the law. Instead, it determined that a category of firearms regulation never mentioned or alluded to in *Heller* was not only presumed to be valid, but was *per se* constitutional.[5]

That leap is especially problematic here, because Fla. Stat. §790.065(13)'s broad prohibition on all firearms purchases could not survive any meaningful scrutiny. It is a blunt instrument, prohibiting purchases of both handguns and long guns by those under 21—no matter how responsible, mature, law-abiding, or trained in firearms handling an individual may be. As the district court itself asked: "Why should the 20-year-old single mother living on her own be unable to obtain a firearm for self-defense when a 20-year-old living with their parents can easily obtain one?"

---

[5] As Appellants point out, the district court's analysis was premised on an overreading of this Court's prior cases, almost all of which arose in the context of individuals who had been convicted of a felony or dangerous misdemeanor. *See* Appellant Br. 26-27.

*Swearingen*, 2021 WL 2592545, at \*18. And again, the Fourth Circuit recently noted the "irony" that "the same 18-to 20-year-old men and women we depend on to protect us in the armed forces and who have since our Founding been trusted with the most sophisticated weaponry should nonetheless be prevented from purchasing a handgun … for their own protection at home." *Hirschfeld*, 5 F.4th at 447. Finally, the state's justification for the Fla. Stat. §790.065(13) is dubious at best; truly dangerous young adults have other ways to obtain firearms (both legally and illegally), leaving substantial reasons to doubt "how much the Act does to prevent tragedies like the one at Marjory Stoneman Douglas High School." *Swearingen*, 2021 WL 2592545, at \*18.

It follows, then, that §790.065(13) could not survive scrutiny any standard other than overly deferential one applied by the district court. *See, e.g., National Rifle Ass'n, Inc.*, 714 F.3d at 347 (Jones, J., dissenting) (arguing that ban on sale young adults "seriously interfered with this age group's constitutional rights because of a class-based determination that applies to, at best, a tiny percentage of the lawbreakers among the class"); *Hirschfeld*, 5 F.4th at 452 (holding that federal prohibition on sale *was "*both over- and under-inclusive" and "lack the reasonable fit required to pass intermediate scrutiny"). *See also* Appellant Br. 35-43.

17

### C.    Young adults, as a class, are not comparable to other individuals who have been convicted of crimes or adjudicated to be dangerous.

That leads to a third, and particularly troubling, flaw in the district court's analysis: its suggestion that §790.065(13) shares a common pedigree with prohibitions on possession by felons and the mentally ill because, like these categories, young adults are "especially dangerous with firearms." *Swearingen*, 2021 WL 2592545, at *15. That is simply not true for the vast majority of young adults in this group. Certainly, the district court provided no evidence for this proposition. And one federal court recent observed that "less than 1%, of the 13 million young adults [ages 18-21] commit [violent] crimes." *Hirschfeld,* 5 F.4th at 444-45. Appellant presented similar evidence below. *See Kleck Dec*., D.Ct. ECF No. 108-6 ¶¶ 7-8 (explaining that [v]iolent crime rates among young adults age 18-20 are very low" but that "[y]oung adults have the highest rates of violent crime victimization and thus are especially likely to need effective means of self-protection"). And although the Florida legislature contended that the challenged act aimed to reduce the danger of violence by young adults, it relied upon no studies or statistics in making that declaration. In sum, there is no basis at all to support the district court's suggestion that every 18 to 20-year-old in Florida, or even a significant percentage of them, are "especially dangerous with firearms."

18

There is of course is another major difference between young adults and individuals who have been convicted of a felony or other serious crime, or found to be seriously mentally ill. The latter categories of individuals have had the opportunity to contest their designation, with the protections of due process. *See, e.g., Doe v. State*, 217 So.3d 1020, 1025 (Fla. 2017) (recognizing that "deprivation of liberty by commitment to a mental institution cannot be accomplished without due process of law.") (citations and quotation marks omitted).

The restriction on their right to bear firearms does not kick in until they have been adjudicated to have committed a crime or (in the case of the mentally ill) to constitute a threat to themselves or others. These laws do not sweep an undifferentiated mass of people into a category based on one criteria—age—over which they have no control. "[D]rawing analogies between this age group and felons and the mentally ill is not only offensive but proves too much." *National Rifle Ass'n, Inc.*, 714 F.3d at 343 (Jones, J., dissenting).

That is not to say that individuals subject to the "longstanding prohibitions" may not have successful Second Amendment rights. There is good reason to question whether *all* felons can be deprived of their right to bear arms. "History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019)

19

(Barrett, J., dissenting). "But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Id.* But whatever the reasons that might weigh in favor of upholding restrictions on such persons—history, their inclusion in the *Heller* dicta, the fact that they at same point evidenced a propensity to break the law—those reasons do not apply to the entire population of young adults—numbering in the hundreds of thousands—that is expressly targeted by §790.065(13). No other sweeping exclusion from a fundamental constitutional right would survive scrutiny, and this blatant and overbroad infringement on the Second Amendment should fail here.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court and remand with instructions to enter judgment for Appellants.


Patrick N. Strawbridge          Jeffrey M. Harris
CONSOVOY MCCARTHY PLLC             *Counsel of Record*
Ten Post Office Square          James F. Hasson
8th Floor South PMB #706        CONSOVOY MCCARTHY PLLC
Boston, MA 02109                1600 Wilson Boulevard
(617) 227-0548                  Suite 700
patrick@consovoymccarthy.com    Arlington, VA 22209
                                (703) 243-9423
                                jeff@consovoymccarthy.com


Dated: September 16, 2021       *Counsel for Amicus Curiae*

20

## **CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7)(B) because it contains 4753 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: September 16, 2021                    */s/ Jeffrey M. Harris*

## **CERTIFICATE OF SERVICE**

I filed this certificate with the Court via ECF, which will email everyone requiring notice.

Dated: September 16, 2021                    */s/ Jeffrey M. Harris*