**John P. Sweeney**
Partner
jsweeney@bradley.com
202.719.8216 direct



May 12, 2023

<u>**VIA CM/ECF**</u>

United States Court of Appeals for the Eleventh Circuit
David J. Smith
Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W. Atlanta, Georgia 30303

Re:    *National Rifle Association of America, Inc. v. Bondi*, No. 21-12314, Citation
of Supplemental Authorities under Fed. R. App. P. 28(j)

Dear Mr. Smith:

*Fraser v. ATF*, No. 3:22-CV-410 (E.D. Va. May 10, 2023) ("Order"), struck down the federal ban on 18-to-20-year-olds purchasing handguns from licensed firearm dealers. *Fraser* confirms that the panel Opinion in this case is contrary to Supreme Court precedents.

*Fraser* confirms that evidence from the Founding Era is more probative than evidence from the Reconstruction Era to determine if a law violates the Second Amendment, reiterating the Supreme Court's mandate to "be wary of '[h]istorical evidence that long predates' 1791 and [to] 'guard against giving postenactment history more weight than it can rightly bear.' The further the evidence is removed from 1791, in either direction, the less salient the evidence becomes." Order, 15 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130, 2136 (2022)).

Unlike the panel Opinion, *Fraser* correctly discounted the few post-1850 laws that restricted 18-to-20-year-olds' ability to purchase firearms. Order, 59. Those laws "are not helpful in determining the situation at and around the Founding" because they "'contradict[] earlier evidence'" that 18-to-20-year-olds were permitted to purchase firearms. Order, 59 (quoting *Bruen*, 142 S. Ct. at 2154 n.28); *see also* Order, 40–55 (finding no "evidence of age-based restrictions on the purchase or sale of firearms from the colonial era, Founding, or Early Republic").

Although *Fraser* considered a federal law, it held that "[t]he Fourteenth Amendment did nothing to affect the meaning of the Second Amendment when adopted" and noted that the panel Opinion's reliance on only Reconstruction Era laws "will be tested on appeal." Order, 41 n.21 & 59 n.44.

*Fraser* also confirms that laws directed at a general societal problem that has persisted since the 18th century but lack a distinctly similar historical regulation addressing that problem are unconstitutional. Like the ban here, the federal law addressed the "time immemorial . . . general societal problem of teenage impetuousness and rashness," but "the Government has not demonstrated that the Founders dealt with this problem in a 'distinctly similar' way," which "demonstrates" the law's unconstitutionality. Order, 60 (quoting *Bruen*, 142 S. Ct. at 2131).

Respectfully submitted,

/s/ John Parker Sweeney
John Parker Sweeney
*Counsel for Plaintiffs-Appellants*

cc:     All Counsel (Certificate of Service attached)

Enclosure: Order, *Fraser v. ATF*, No. 3:22-CV-410 (E.D. Va. May 10, 2023).

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2023, I filed the foregoing with the Clerk of

the Court via CM/ECF, which will provide electronic service to all counsel of record.


Respectfully submitted,

/s/ John Parker Sweeney
John Parker Sweeney
*Counsel for Plaintiffs-Appellants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



JOHN COREY FRASER, et al., on behalf
of themselves and all others
similarly situated as a Class,

      Plaintiff,

v.                          No. 3:22-cv-410

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.,

      Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (ECF No. 21) and
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 28).

For the reasons set forth below, the DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (ECF No. 21) will be
denied and PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 28)
will be granted.

## BACKGROUND

### *Factual Background*[1]

Plaintiffs John "Corey" Fraser, Joshua Clay McCoy, Tyler Dalton McGrath, and Ian Fletcher Shackley ("Plaintiffs") want to buy handguns. First Amended Complaint ("FAC") at ¶ 54 (ECF No. 18). All four men are over the age of 18 but less than 21. FAC at ¶¶ 41-44. Federal law prohibits them from purchasing handguns from Federal Firearm Licensed Dealers ("FFL") solely because of their age. FAC ¶ 49. They "are all law-abiding, responsible adult citizens who are otherwise qualified to own a handgun and but for the laws at issue, they would purchase a new handgun and handgun ammunition from a federally-licensed firearm dealer." Id.

In May 2022, Fraser attempted to purchase a Glock 19x handgun from an FFL. FAC ¶ 50. Because of Fraser's age and in accordance with federal law, the FFL refused to allow Fraser's putative purchase. FAC ¶¶ 50-51. The other three Plaintiffs—McCoy, McGrath, and Shackley—"also desire to purchase a similar handgun from an FFL" but "have not attempted to make such a purchase due to their awareness of the laws at issue and the inevitable futility of such an exercise as seen by Mr. Fraser." FAC ¶ 53. Plaintiffs are

---

[1] The analysis of the motion to dismiss under Fed. R. Civ. P. 12(b)(6) necessitates that the alleged facts be taken as established. As for the summary judgment motion, the alleged material facts are not disputed.

challenging the federal laws as violative of the Second Amendment
(Count I) and the Due Process Clause of the Fifth Amendment (Count
II). FAC at 13-14.

Also, they sue on behalf of other similarly situated members
of a class defined as:

> Natural persons and citizens of the United
> States of America who have attained the age of
> eighteen but who are not yet twenty-one and
> who have not been convicted of a felony, who
> are not fugitives from justice, have not been
> discharged from the Armed Forces under
> dishonorable conditions, are not unlawful
> users of or addicted to any controlled
> substances, have not been adjudicated as
> mental defectives or committed to a mental
> institution, are not on parole or probation,
> are not under indictment or restraint.

FAC ¶ 20. So, they are also requesting class certification. FAC ¶¶
20-22.

### *Procedural Background*

Fraser originally filed this action in June 2022 (ECF No. 1).
The Court held an initial pre-trial conference on November 16,
2022. On the same day, Plaintiffs filed the FAC (ECF No. 18). On
November 30, the Government filed a Motion to Dismiss the FAC (ECF
No. 21). On December 15, 2022, the Plaintiffs filed a Motion for
Summary Judgment (ECF No. 28). There are two amicus briefs, one
from the Brady and Gifford Law Center to Prevent Gun Violence
("Brady and Gifford Amicus Br.") (ECF No. 25) and one from
Everytown for Gun Safety ("Everytown Amicus Br.") (ECF No. 26),

3

both in support of the Government. The Court heard oral argument
on February 8, 2023, Minute Entry (ECF No. 37), and thereafter
ordered the parties to file replacement briefs and responses to
address the issues as required by controlling law and to respond
to questions raised during oral argument, ORDER (ECF No. 38).

*Laws at Issue*

Plaintiffs challenge the constitutionality of an
interlocking collection of federal law and regulations that
prevent 18-to-20-year-olds from purchasing handguns from FFLs. The
legal prohibitions begin with 18 U.S.C. § 922(a)(1)(A) which
specifies that anyone who "engage[s] in the business of importing,
manufacturing, or dealing in firearms, or in the course of such
business to ship, transport, or receive[s] any firearm in
interstate or foreign commerce" is required to obtain a federal
firearms license.

Then, 18 U.S.C. § 922(a)(5) specifies that only FFLs are
allowed to engage in the interstate transfer of firearms and
ammunition. And, it is:

> <u>unlawful</u> for any licensed importer, licensed
> manufacturer, licensed dealer, or licensed
> collector <u>to sell or deliver</u> . . . any <u>firearm</u>
> or ammunition to any <u>individual</u> who the
> licensee <u>knows or has reasonable cause to</u>
> <u>believe is less than eighteen years of age</u>,
> and, <u>if</u> the firearm, or ammunition is <u>other</u>
> <u>than a shotgun or rifle</u>, or ammunition for a
> shotgun or rifle, <u>to any individual who</u> the

4

licensee knows or has reasonable cause to
believe is <u>less than twenty-one years of age</u>.

18 U.S.C. § 922(b)(1) (emphasis added).

Plaintiffs also challenge several derivative regulations
which mirror and implement those statutes. Those regulations are:
27 C.F.R. §§ 478.99(b)(1); 478.102; 4.78.124(a), (c)(1)-(5), (f);
and 478.96(b). FAC at 15.

In 1983, the Chief Counsel of the Bureau of Alcohol, Tobacco,
and Firearms ("ATF") issued a written opinion clarifying the
Government's interpretation of those federal gun control statutes
and regulations as applied to 18-to-20-year-olds. In pertinent
part, that opinion states:

> Federal firearms licensees are <u>prohibited from
> selling or delivering handguns to person under
> the age of 21</u>. However, a minor or juvenile is
> <u>not prohibited</u> by Federal law from <u>possessing,
> owning, or learning the proper usage of</u>
> firearms since any firearm that the parents or
> guardian desire the minor to have can be
> obtained by the parents or guardian.

"Purchasing, possession of firearms by minors," 23362.0 ATF (Dec.
5, 1983) ("ATF Opinion") at 1-2 (emphasis added) (ECF No. 22-1).

In sum, these federal laws and regulations preclude the "sale
of handguns and handgun ammunition" to the Plaintiffs – indeed,
anyone aged 18-to-20 is prohibiting from purchasing a handgun from
an FFL. FAC ¶ 39. This is a blanket age-based restriction. The
Government does not contend otherwise.

### DISCUSSION

#### I. *The Standing Issue*

The Government first posits that the Plaintiffs do not have standing to bring this action because they failed to plead a sufficient injury in fact. In Lujan v. Defenders of Wildlife, the Supreme Court of the United States articulated the three canonical, irreducible requirements for standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized. . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560-61 (1992) (emphasis added) (cleaned up). The burden is on the Plaintiff(s) to prove standing. Id. at 561. The Government challenges only the first facet of the test—whether Plaintiffs have successfully pled an injury in fact.[2]

Plaintiffs take the view that they have suffered an "injury in fact" because all of them wish to, but are prohibited from,

---

[2] Gov. Memo in Supp. of Motion to Dismiss at 8-10 (ECF No. 22); Gov. Op. to Pls. Motion for Summary Judgment at 3-4 (ECF No. 30).

purchasing handguns from FFLs. Compl. ¶¶ 50, 53-54. And, of course,
Fraser has attempted to purchase a pistol from an FFL and has been
turned down. The Government argues that this is not an injury
because Plaintiffs can legally receive and possess handguns as
gifts from parents or guardians. Gov. Memo in Supp. of Motion to
Dismiss at 8.[3]

For their part, the Plaintiffs acknowledge that, according to
the ATF Opinion, 18-to-20-year-olds can obtain a new handgun from
an FFL purchased by their parent or guardian. Pl. Replacement Br.
at 24 (ECF No. 44). But, they say, that is simply not the point.
Eighteen-to-twenty-year-olds *themselves* cannot purchase the
handguns from an FFL dealer. And, it is undisputed that parents or
guardians may, for whatever reason, decide not to buy an 18-to-
20-year-old a handgun. It is also undisputed that there is no
recourse from such a parental refusal.

It is beyond question that the deprivation of a right
conferred by the Constitution is an injury in fact. So, if, as
they allege, the Plaintiffs have a right under the Second Amendment
to buy handguns, and if the challenged laws and regulations

_____

[3] Under the ATF Opinion and the Government's argument, one of the
Plaintiffs could supply the entirety of the purchase money to a
parent or guardian who could buy the handgun at the FFL's store
and walk outside and hand it to the Plaintiff. That is otherwise
known as a "straw purchase," and is, but for the ATF Opinion,
illegal. 18 U.S.C. § 922(a)(6).

7

infringe that right, they are injured. It is of no moment that a parent, as a matter of grace, might help the Plaintiffs to skirt the statutory and regulatory prohibition.

The Government's argument assumes that requiring an adult, law-abiding citizen to exercise the claimed right through, and at the grace of, a third-party is not an infringement of the alleged right. The Government, however, cited no decision that has gone so far. Nor do there appear to be any.[4] And, indeed, in Brown v. Entertainment Merchants Association, 564 U.S. 786, 802 (2011) the Supreme Court rejected a similar argument on the merits in the First Amendment context, wherein the Supreme Court struck down a California law prohibiting the sale (but not the possession) of violent video games to children under the age of 18. Like this statute, the California law allowed parents (or aunts and uncles) to purchase and provide the games to children. Id. Yet, the Supreme Court found that this prohibition on the sale of games implicated children's First Amendment rights and proceeded to strike down the regulation under a strict scrutiny analysis. Id. at 805.

---

[4] In fact, the Government's briefing on the standing issue is bereft of any decision on the topic except for a citation setting forth the standing factors and a decision commenting generally on an effort to manufacture standing.

Furthermore, the Government's argument is predicated on a limited, and erroneous reading, of the fundamental right protected by the Second Amendment. As explained infra, Discussion § II(A)(1), the Second Amendment protects the right to *purchase*, not just to *possess*, a firearm. So, even though an 18-to-20-year-old can possess a gun given by a parent, the constitutional right of the 18-to-20-year-old to purchase that gun would still be implicated by the regulations.

The Government next attempts to downplay the significance of the infringement wrought by the challenged laws. Rather surprisingly, the Government alternatively suggests that the Plaintiffs lack standing to challenge the laws and regulations governing the right to purchase new handguns (which are safe and warranted by the manufacturer) because the Plaintiffs could buy used handguns from a private person or at a gun show. While "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned," Bell v. Wolfish, 441 U.S. 520, 540 n.21 (1979) (citation and quotation marks omitted), that concept does not come into play as part of the standing analysis. Instead, it is considered at the merits stage of the analysis. See e.g. United States v. Jacobsen, 466 U.S. 109, 125-26 (1984) (finding that any intrusion on defendant's privacy interests was *de minimis* and constitutionally reasonable but not questioning

9

plaintiff's standing). In any event, that concept is not implicated in this case, because, as explained infra, Plaintiffs are subject to an age-based, blanket prohibition from buying a certain type of gun and the challenged statutes and regulations present more than a de minimis intrusion on the right to "keep and bear arms." U.S. Const. amend. II.

Moreover, there are well-reasoned decisions that support a finding that these Plaintiffs have standing. For example, in Reese v. ATF, the court addressed the same argument made by the Government here. __ F.Supp.3d __, No. 6:20-cv-1438, 2022 WL 17859138 (W.D. La. Dec. 21, 2022). Citing a decision of the United States Court of Appeals for the Fifth Circuit, the district court in Reese found that the plaintiffs there had adequately satisfied the injury in fact requirement by alleging that, "but for the challenged laws, they would be eligible to purchase handguns from FFLs and would in fact do so." Id. at *3.

In National Rife Ass'n v. ATF, 200 F.3d 185, 191-92 (5th Cir. 2012), the Fifth Circuit held that the plaintiffs there, who were similarly situated to the Plaintiffs here, had standing. On that point, the Fifth Circuit explained that, "by prohibiting FFLs from selling guns to 18-to-20 year-olds, the laws cause those persons [18-to-20-year-olds] a concrete particularized injury-i.e., the injury of not being able to purchase handguns from FFLs." Id. at

10

191-92. In so doing, NRA, like Reese, rejected precisely the parental gifting and purchasing at a gun show (or from a private seller) arguments on which the Government bases its standing position in this case.

The reasoning in NRA and Reese are persuasive, and, considering that the Government cites no authority to the contrary, NRA and Reese stand unopposed.[5] The decision of the Fourth Circuit in Lane v. Holder, 703 F.3d 668 (4th Cir. 2012), is informative. In Lane, the Court of Appeals considered the question of standing in the Second Amendment context. Although the Court of Appeals held that the Lane plaintiffs (would-be firearms purchasers) had no standing, it reached the conclusion by contrasting the regulations in question there with regulations that would burden consumers "directly." Id. at 672. The statute and regulations here at issue do just that.

Furthermore, there is no requirement that, to have standing, Plaintiffs must attempt to purchase the guns and risk criminal penalties. A plaintiff does not first need to "expose himself to actual arret or prosecution to be entitled to challenge a statute

_____

[5] Mindful that standing is a jurisdictional doctrine that should be raised by a court sua sponte, it is significant that the Fourth Circuit did not raise the issue in Hirschfeld v. ATF, 5 F.4th 407 (4th Cir. 2021), vacated as moot, 14 F.4th 322, 328 (4th Cir. 2021).

11

that he claims deters the exercise of his constitution rights." Susan B. Anthony List v. Direhaus, 573 U.S. 149, 158 (2014) (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)). In this case, as shown by Fraser's attempt to purchase a handgun, there has been "past enforcement against the same conduct" which is "good evidence that the threat of enforcement is not 'chimerical.'" Id. at 164. There thus "exists a credible threat of prosecution" if an under-aged Plaintiff attempts to purchase a handgun when age-based prohibitions are fixed by law. Id. at 159 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)). For that additional reason, the Plaintiffs have satisfied the imminence requirement of injury in fact. See also Worth v. Harrington, __ F.Supp.3d __, No. 21-cv-1348, 2023 WL 2745673, at *19 (D. Minn. March 31, 2023).

For the foregoing reasons, the Plaintiffs have suffered an injury in fact that is "concrete and particularized" and "actual or imminent." Lujan, 504 U.S. at 560-61. And, they have met all of the other Lujan requirements. Accordingly, they have standing to bring this action and the Court has subject matter jurisdiction to decide the pending motions.

## II. Second Amendment

The Second Amendment to the Constitution of the United States provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the

> people to keep and bear Arms, shall not be
> infringed.

U.S. Const. amend. II. In District of Columbia v. Heller, 554 U.S.
570 (2008) and McDonald v. Chicago, 561 U.S. 742 (2010), the
Supreme Court "recognized that the Second and Fourteenth
Amendments protect the rights of ordinary, law-abiding citizens to
possess a handgun in the home for self-defense." N.Y. State Rifle
& Pistol Associations, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2021).
In Bruen, the Supreme Court held, "consistent with Heller and
McDonald, that the Second and Fourteenth Amendments protect an
individual's right to carry a handgun for self-defense outside the
home." Id.[6]

And, importantly for today's case, the Supreme Court in Bruen
clarified the proper framework for analyzing asserted violations
of the Second Amendment caused by regulatory statutes.
Specifically, Bruen explains:

> We reiterate that the standard for applying
> the Second Amendment is as follows: When the
> Second Amendment's plain text covers an
> individual's conduct, the Constitution
> presumptively protects that conduct. The
> government must then justify its regulation by
> demonstrating that it is consistent with the
> Nation's historical tradition of firearm

---

[6] In so doing, the Supreme Court invalidated a state law that
conditioned the exercise of the Second Amendment right on
satisfaction of a state licensing regime which infringed the Second
Amendment. N.Y. State Rifle & Pistol Associations, Inc. v. Bruen,
142 S. Ct. 2111, 2122 (2021).

> regulation. Only then may a court conclude
> that the individual's conduct falls outside
> the Second Amendment's 'unqualified command.'

142 S. Ct. at 2129-30 (emphasis added).[7]

In other words, Bruen requires two distinct analytical steps. First, it must be determined if "the Second Amendment's plain text covers an individual's conduct." Bruen, 142 S.Ct. at 2126 (citation and quotation marks omitted). If it does, "the Constitution presumptively protects that conduct." Id. Second, if the conduct is presumptively protected, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. To do so, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127.

When establishing that analytical construct, Bruen explicitly prohibited courts from engaging in any means-end scrutiny. The Supreme Court also "expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other

---

[7] As explained in Bruen, that standard is consistent with how the Supreme Court has protected other constitutional rights under the First and Sixth Amendments. 142 S.Ct. at 2129-30.

important governmental interests." Bruen, 142 S.Ct. at 2129 (cleaned up). Bruen marks a sea-change in Second Amendment law, throwing many prior precedents into question. See United States v. Rahimi, 61 F.4th 443, 450 (5th Cir. 2023) ("Bruen clearly fundamentally changed our analysis of laws that implicate the Second Amendment") (cleaned up).

When determining if federal regulations are "consistent with the Nation's historical tradition of firearm regulation," Bruen instructs courts first to look to evidence from the Founding-era because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" Bruen, 142 S.Ct. at 2130, 2136 (quoting District of Columbia v. Heller, 554 U.S. 570, 634-35 (2008)). In the Second Amendment context, that necessitates an examination of evidence from (and around) 1791 when the Second Amendment was adopted. Moreover, when evaluating the scope of the right at issue, the Court must be wary of "[h]istorical evidence that long predates" 1791 and "guard against giving postenactment history more weight than it can rightly bear." Id. The further the evidence is removed from 1791, in either direction, the less salient the evidence becomes. In other words, the strongest evidence concerning the scope of the right here at issue comes from the late-eighteenth and early-nineteenth centuries.

15

To uphold its burden, the Government must "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Bruen, 142 S.Ct. at 2133. When determining if the Government's proffered analogous restrictions pass constitutional muster, the analysis considers "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id.

Mindful of these instructions from Bruen, the following analysis proceeds in the format that Bruen specified.[8]

---

[8] It is also well to remain mindful that, in Heller, the Supreme Court explained that:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27. This list from Heller was not reiterated in Bruen. So, it is not clear how these "longstanding prohibitions" fit within the Bruen framework. 554 U.S. 570, 626-67 (2008). But, the absence of this list from Bruen does not mean that the "longstanding prohibitions" mentioned in Heller were removed by Bruen. Infra Discussion, § II(C); see Bruen, 142 S.Ct. at 2162 (Kavanaugh, J. concurring); at 2189 (Breyer, J. dissenting).

## A) Does The Restricted Conduct Falls Within the Text of the Second Amendment?

The first step of the Bruen analytical framework is to determine if the relevant conduct falls within the plain text of the Second Amendment. In this case, that question is a two-fold one:

(1) Does the right to "keep and bear arm" include the right to purchase arms? and

(2) Are law abiding 18-to-20-year-olds part of the "the people" protected by the Second Amendment?

### 1. The Right to Keep Arms Includes the Right to Purchase Arms

Plaintiffs argue that the right to *purchase* or *receive* a handgun falls within the Second Amendment's textual right to "keep and bear arms." Pl. Replacement Br. at 12 (ECF No. 44). According to Plaintiffs, "[t]he plain meaning of the verbs 'have' or 'possess' inherently include the act of receipt." Id. The Government, however, takes the view that the right to "keep and bear" arms does not include "a right to *purchase* arms, let alone the right to purchase a handgun from a particular source." Gov. Replacement Br. at 13 (ECF No. 43). "This conclusion," says the Government, "is consistent with *Heller*, which held that 'laws imposing conditions and qualification on the commercial sale of arms' are 'presumptively lawful.'" Id. at 14 (quoting District of Columbia v. Heller, 554 U.S. 570, 626-27, n.26 (2008)).

When conducting a textual interpretation of the Amendment, courts "are guided by the principle that. . . its words and phrases were used in their normal and ordinary as distinguished from technical meaning." District of Columbia v. Heller, 554 U.S. 570, 576 (2008) (citation and quotation marks omitted). Based on this guiding principle, the Supreme Court concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons'" and to "bear arm" means "simply the carrying of arms." Id. at 582, 589. At its core, the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." Id. at 592.

Commonsense and logic tell us that, unless one is a maker of guns, the right to "keep"/have a gun necessarily means that one must purchase it, steal it, be given it by another, or find one that another has lost. That, of course, includes a handgun which was the subject "arms" in Heller. 554 U.S. at 628. Thus, given its ordinary, commonsense, and logical meaning the right to "keep arms" (the right to "have") of necessity includes the right, inter alia, to purchase arms. That then puts an end to the textual inquiry with the conclusion that the conduct at issue is protected by the plain text of the Second Amendment.

However, it must be acknowledged that the text of the Second Amendment does not specifically contain the word "purchase."

18

Several courts have held that, to determine whether the textural phrase "keep and bear arms" in the Second Amendment includes a right to purchase, it is appropriate to consider other parts of the text of the Second Amendment and assess whether that text supports a right to purchase. See Joseph E. Sitzmann, "High-Value, Low-Value, and No-Value Guns: Applying Free Speech Law to the Second Amendment," 86 U. Chi. L. Rev. 1981, 2015-16 (Nov. 2019).

The Second Amendment accords protection of "the right of the people to keep and bear Arms," by providing that the right "shall not be infringed." U.S. Const. Amend. II (emphasis added). The Second Amendment is unique in its use of "infringed" for the word does not appear anywhere else in the Constitution. Despite its uniqueness, the term "infringed" has received little attention by scholars or courts. However, Heller took the view that "infringed" "implicitly recognizes the pre-existence of the right." 554 U.S. at 592. As articulated in Heller, the Second Amendment does not serve to grant a right but rather preserves a right that the people already possessed. Therefore, to "keep and bear" serves to *identify* the right protected, not to *define* the right in the first instance.

The definition of "infringe" further supports the conclusion that the pre-existing right includes a right to purchase. "Infringe" is defined in modern dictionaries as "to encroach upon in a way that violates law or the rights of another." "Infringe,"

19

Merriam-Webster.com. "Encroach," in turn, has two definitions: "to enter by gradual steps or by stealth into the possessions or rights of another" and "to advance beyond the usual or proper limits." "Encroach," Merriam-Webster.com. Those words have possessed the same meaning since the sixteenth century and the Founders would have understood them in the same way.[9] Not simply protecting the heartland of the preserved right, the Second Amendment protects the environs surrounding it to prevent any encroachment on the core protections. Thus, by virtue of the word "infringed," the Second Amendment's protective textual embrace includes the conduct necessary to exercise the right ("to keep and bear") and that, as explained above, includes the right to purchase arms so that one can keep and bear them.

This is fully consistent with discussions of numerous federal courts of appeal which, when ascertaining the textual reach of the Second Amendment, "have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." Teixeira v. Cnty. of Alameda, 873 F.3d 670, 677 (9th Cir. 2017). Among these rights is "the ability to acquire arms." Id. at 677-78 (citing to Ezell v. City

---

[9] Merriam-Webster identifies the first use of "infringe" in 1513 with the meaning as defined above. "Encroach" was first used in 1528 with the meaning defined first above. "Infringe" and "Encroach," Merriam-Webster.com.

of Chicago, 651 F.3d 684, 704 (7th Cir. 2011)); but see Nat'l Rifle Assoc. v. Bondi, 61 F.4th 1317, 1324-25 (11th Cir. 2023) (declining to decide the question). So too have district courts. United States v. Quiroz, __ F.Supp.3d __, PE:22-CR-00104-DC, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022); Ill. Ass'n of Firearms Retailers v. City of Chi., 961 F.Supp.2d 928, 930 (N.D. Ill. 2014).[10] As the Northern District of Illinois concluded, "the ban on guns sales and transfers prevents [individuals] from fulfilling. . . the *most fundamental* pre-requisite of legal gun ownership—that of simple acquisition." Ill. Ass'n of Firearms Retailers, 961 F.Supp.2d at 938.

The Fourth Circuit has not explicitly ruled on this question, but its precedent supports a finding that the right to purchase a firearm is corollary to the right to keep a firearm. In United States v. Hosford, 843 F.3d 161, 166 (4th Cir. 2016), the Fourth Circuit found that the Second Amendment does not include a right to sell firearms. Citing to the four "longstanding" Heller exceptions, the Fourth Circuit determined in Hosford that the "the prohibition against unlicensed firearm dealing is a longstanding

---

[10] State courts have reached the same conclusion. Andrews v. State, 50 Tenn. 165, 178 (1871); Elhert v. Settle, 105 Va. Cir. 544, CL20000582, at *3 (2020) (unpublished) ("The lack of a right to buy and sell arms would negate the right to keep arms") (interpretating the Virginia constitutional right which is co-extensive with the federal Second Amendment).

condition or qualification on the commercial sale of arms and is thus facially constitutional." Id. But, the Fourth Circuit did not extend its holding to the purchasing of firearms. And, notably, the oft-quoted language of Heller, on which Hosford relied, extends only to the commercial sale, not the commercial purchase, of arms. Hosford also distinguished the constitutional regulations in question, governing the commercial sale of firearms, from regulations infringing on individuals' ability to "purchase or sell firearms owned for personal, self-defensive use." Id. at 168. This teaches that the Fourth Circuit too considers the right to purchase a firearm corollary to the right to keep one. One able commentator has reached that conclusion. Sitzmann, "High-Value, Low-Value, and No-Value Guns," 86 U. Chi. L. Rev. at 2023 ("the Fourth, Ninth, and Seventh Circuits all support a single, underlying message: there is no individual right to sell a firearm conferred by the Constitution, even though there is a right to acquire and use one").

For the foregoing reasons and, consistent with the text and logic of the Second Amendment, the Court finds that the right to purchase a gun falls within the Second Amendment's plain text.

22

## 2. Eighteen to Twenty-One-Year-Olds Fall Within "the people" the Second Amendment Protects

The Second Amendment protects the right of "the people" to keep and bear arms. U.S. Const. amend. II. But, who are the people to whom this right extends?

Plaintiffs argue that "[l]aw abiding citizens who are eighteen and older fall within the 'the [sic] people' due to their unqualified presence as law-abiding adults within the body-politic and political community." Pl. Replacement Br. at 4. According to Plaintiffs, the "age of majority" is the determinative factor for whether an individual is one of "the people" and that, in many contexts, 18 is the age of majority today. Id. at 4-5. The Government, on the other hand, argues that "individuals under the age of 21 are not included in the phrase 'the people' within the meaning of the Second Amendment." Gov. Replacement Br. at 11. This, says the Government, is because, at the time of the Founding, 21—not 18—marked the divide between minority and majority. Id. at 16.

Although the Supreme Court "has not precisely defined" the meaning of "the people" in the Second Amendment, it has provided guidance as to the reach of the term as used in the Constitution. United States v. Jackson, No. ELH-22-141, 2023 WL 2499856, at *6 (D. Md. March 13, 2023). Thus, in United States v. Verdugo-Urquidez, the Supreme Court explained that:

23

> "the people" protected by the <u>Fourth
> Amendment</u>, and by the <u>First</u> and <u>Second</u>
> Amendments, . . . refers to a class of persons
> who are <u>part of a national community</u> or who
> have otherwise <u>developed sufficient
> connection with this country to be considered
> part of that community.</u>

494 U.S. 259, 265 (1990) (emphasis added). Moreover, in <u>Heller</u>,

the Supreme Court began its analysis "with a strong presumption

that the Second Amendment right is exercised individually and

belongs to <u>all Americans</u>." <u>District of Columbia v. Heller</u>, 554

U.S. 570, 581 (2008) (emphasis added). Further, citing <u>Verdugo-

Urquidez</u>, the Supreme Court in <u>Heller</u> instructed that the term

"the people" "unambiguously refers to all members of the political

community, not an unspecified subset." <u>Id.</u> at 580. <u>Heller</u> also

identifies Second Amendment rightsholders as "all Americans,"

"citizens," "Americans," and "law-abiding citizens" at various

points. Pratheepan Gulasekaram, "'The People'" of the Second

Amendment: Citizenship and the Right to Bear Arms," 85 N.Y.U. L.

Rev. 1521, 1530-31 (2010) (<u>quoting</u> <u>Heller</u>, 128 S.Ct. at 2790, 2791,

2815 n.24, 2816, 2818).

Even with this language, <u>Heller</u> does not settle the inquiry

because the definition of the "political community" is no more

specific than that of "the people." Dictionaries provide no help

on the inquiry because the term "political community" is not

24

defined by Merriam-Webster, the Oxford English Dictionary or any other contemporary dictionary.

In its telling, Bruen does not provide much further guidance. Nor does Bruen contain a thorough discussion of the definition of "the people." But, Bruen does deem it "undisputed" that "ordinary, law-abiding, adult citizens" are part of "the people." N.Y. State Rifle & Pistol Assoc. v. Bruen, 142 S.Ct. 2111, 2134 (2022).[11]

Taken as a whole, Supreme Court precedent teaches that "the people" comprise all "members of the political community," Heller, 554 U.S. at 580, which includes, at a minimum, all "ordinary, law-abiding, adult citizens," Bruen, S.Ct. at 2134. See also Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 159 (2007) (the Founding generation "attempt[ed] to preserve the connection between the right to keep arms and membership in the body politic"). With the foregoing in mind, the inquiry turns to whether ordinary, law-

---

[11] In his Bruen concurrence, Justice Alito noted "[the Bruen decision] does not expand the categories of people who may lawfully possess a gun, and federal law generally. . . bars the sale of a handgun to anyone under the age of 21." 142 S.Ct. at 2157-58. However, in so stating, Justice Alito did not conduct a historical analysis. Because that observation is in a concurrence and is a cursory comment at that, the Court notes it but gives it no analytical weight.

25

abiding 18-to-20-year-olds are considered part of the "political community."

### a) What is the "Political Community"

The first task in determining who is a member of the "political community" is to determine at which point in time to base the analysis—in 1791 (the date the Second Amendment was adopted) or 2023.

At its base, the position taken by the Government and amicus Everytown for Gun Safety requires the Court to consider the definition of "the people" at the time of Founding. The Government argues that Congress has the authority to select the minimum age to directly purchase a handgun and it is within Congress's authority to vest this right at 21 because "[t]he Constitution established only one right that vests at the age of 18: voting." Memo. in Supp. of Motion to Dismiss at 10 (ECF No. 22). To support its conclusion, the Government argues that 21 was the age of majority at the time of Founding and, that therefore, the Second Amendment allows for the regulation of the sale of firearms to those under that age. Id. at 10-11. Though the Government does not explicitly make this point, it is, in effect, asking the Court to apply Founding-era principles in determining to whom the Second Amendment applies. Everytown does too, stating "those younger than

21 are [not] considered part of 'the people' covered by the Amendment's text." Everytown Amicus Br. at 9.

The Plaintiffs, on the other hand, urge the Court to adopt today's understanding of 18 as the age of majority. Pl. Response in Opp. to Motion to Dismiss at 6 (ECF No. 27). Under this view, "the people" applies to everyone considered part of the political community today, not just those considered part of it in 1791.

Without exploring the full implications of the argument, other courts have accepted some version of the Government's argument. The Fifth Circuit tentatively suggested, but refused to hold, that the Second Amendment did not protect the ability of 18-to-20-year-olds to purchase handguns citing to the fact that 21 was the age of majority at the Founding. Nat'l Rifle Ass'n. v. ATF, 700 F.3d 185, 201, 203 (5th Cir. 2012).[12] After Bruen, a district court reiterated this determination in 2022. Reese v. ATF, __ F.Supp.3d __, No. 6:20-cv-014382022, WL 17859138, at *10 (W.D La. Dec. 21, 2022).

Evaluating a state law, the Western District of Pennsylvania also determined that "age-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures. . . evading

---

[12] See Appendix A.

Second Amendment scrutiny" and pointed to a "strong consensus" among lower courts "that such restrictions fall outside the scope of the rights protected by the Second Amendment." Lara v. Evanchick, 534 F.Supp.3d 478, 489, 491 (W.D. Pa. 2021). Having so found, those courts concluded that such regulations are not subject to any further scrutiny.

While Reese and Lara are informative, they certainly are not dispositive. Other district courts have come to the opposite conclusion and have held that 18-to-20-year-olds are part of "the people." For instance, the Northern District of Texas held that law-abiding 18-to-20-year-olds are part of the national community and thus part of "the people." Firearms Policy Coalition v. McCraw, __ F.Supp.3d __, No. 4:21-cv-1245, 2022 WL 3656996, at *4 (N.D. Tex. August 25, 2022). And, earlier this year, the District of Minnesota determined that those aged 18 and up are part of the people. Worth v. Harrington, __ F.Supp.3d__, No. 21-cv-1348, 2023 WL 2745673, at *7, *9 (D. Minn. March 31, 2023). Worth looked to the "normal and ordinary meaning of 'the people'" and determined it "includes all Americans who are part of the national community." Id. at *7. The analysis in Worth is an especially well-reasoned approached.

No federal appellate court, much less the Supreme Court, has squarely determined that the Second Amendment's rights vest at age

28

21. To date, three circuits, the Fifth, Seventh, and Eleventh, have looked at this question head-on and have declined to answer it. Nat'l Rifle Ass'n., 700 F.3d at 203-04; Horsley v. Trame, 808 F.3d 1126, 1131 (7th Cir. 2015); Nat'l Rifle Assoc. v. Bondi, 61 F.4th 1317, 1324 (11th Cir. 2023). Both the Fourth and the Ninth Circuit held that 18-to-20-year-olds are part of "the people" protected by the Second Amendment. Hirschfeld v. ATF, 5 F.4th 407 (4th Cir. 2021), vacated by 14 F.4th 322 (4th Cir. 2021); Jones v. Bonta, 34 F.4th 704 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022). Hirschfeld and Bonta were decided before Bruen. Hirschfeld was vacated as moot because the plaintiff turned 21 when the case was on appeal. 14 F.4th 322 at 326-27. Bonta was vacated and remanded to the district court because of Bruen. 47 F.4th at 1124.

The analysis of the issue in Hirschfeld is especially instructive. After reviewing the use of "the people" in rights enumerated in the First and Fourth Amendments and less analogous rights, such as due process, equal protection, and to be free from cruel and unusual punishment, the Fourth Circuit expressed the view that "it is hard to conclude that 18-to-20-year-olds have no Second Amendment rights where almost every other constitutional right affords them that protection." Hirschfeld, 5 F.4th at 424. Although that decision has been vacated and thus is neither binding

29

nor of precedential effect, the analysis of the issue is sound and logically persuasive on the point. And, the analyses and the conclusions are the views compelled by the record here.

Nor has any district court within the Fourth Circuit decided this question. Thus, the only decisions determining whether 18-to-20-year-olds fall outside, or within the protection of, the Second Amendment are out-of-circuit district courts. The decisions in McCraw and Worth are more persuasive and better-reasoned on the point so the Court here follows their lead.

Moreover, their view is in keeping with what the Supreme Court has done not to restrict the analysis of the term "the people" to the Founding-era. That is because: (1) taken to its logical extent, the Government's argument would remove Second Amendment protections for vast swaths of the American population; and (2) Heller and Bruen support adopting a modern understanding of the definition of "the people."

First, taken to its full extent, the Government's argument leads to a constitutionally untenable result. It is no secret that the American political community has not always been as inclusive as it is today. Throughout our Nation's history, the definition of "the people" has evolved and changed—for the better. See generally A.E. Dick Howard, "Who Belongs: The Constitution of Virginia and the Political Community," 37 J. Law & Pols. 99 (2022) (evaluating

30

this question in the context of the Virginia Constitution). Also, "if 'members of the political community' is taken to mean 'eligible voters' — which is not an unreasonable definition, though certainly not the only one," the political community at the time of the Founding only included white, landed men – the lauded independent (white, male) yeoman farmers. "The Meaning(s) of 'The People' in the Constitution," 126 Harv. L. Rev. 1078, 1085 (2013).[13]

It is well to recall that, since the early days of the Republic, we have gone from a Nation whose Supreme Court firmly declared that the free descendants of slaves were not citizens, Dred Scott v. Sandford, 60 U.S. 393, 406 (1857), to one that bestows citizenship regardless of race, U.S. Const. amend. XIV. We have also gone from a Nation where a husband's legal status subsumed his wife's to one where women are treated as full and equal members of society. Blackstone, 1 Commentaries, ch. 15, at

---

[13] See also Sanford Levinson, "The Embarrassing Second Amendment," 99 Yale L.J. 637, 647 (1989); Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America," 25 Law & Hist. Rev. at 156, 166 (2007) (arguing that the right extended to all free white men, regardless of property status); but see Op. of Judge Appleton, 44 Me. at 523 (determining that minors and married women are members of the political community despite "labor[ing] under numerous disabilities of person and property" and lacking suffrage and observing "Were the right of suffrage necessary to constitute citizenship, three-fourths of the free people of the country would, by reason of age, sex, or the poverty of their condition, be disfranchised").

430 ("the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs everything"); Hargaves & Butler, 2 First Part of the Institutes of the Laws of England, Notes on Lord Coke's First Institute, Or Commentary Upon Littleton, ch. 11 § 183; Saul Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Records," 40 Yale L. & Pol'y Rev. 1, 21 (Fall, 2021). In fact, at the time of the Founding, as one scholar—ironically arguing in favor of a 1791 interpretation of the meaning of "the people"-noted, "[i]n many respects, the situation of minors under twenty-one resembled that of married women under coverture." Cornell, "'Infants" and Arms Bearing in the Era of the Second Amendment," at 9. Membership in the political community has grown to include numerous groups—women, minorities, and minors—that were denied inclusion at the time of the Founding.

This observation is not to disparage the Founders or their times. Instead, it is a testament to the ideals engrained in our Constitution by the Founders that our Nation has greatly expanded its definition of "the people" in the 232 years since the adoption of the Second Amendment. Tara Smith, "Originalism's Misplaced Fidelity: Original Meaning is Not Objective," 26 Const. Comment.

32

1, 13-14 (2009) ("[T]he 'will of the people' [as articulated in the Constitution] at best reflects the will of some people, but far from all"). But it is to say that, if the Court were to accept the Government's position of limiting the definition of "the people" to those understood to fall within it at the time of the Founding, the Second Amendment would exclude protections for vast swaths of the American population who undoubtably are members of the political community today.[14]

The Supreme Court's language in Heller and Bruen further reinforces this conclusion. When Heller used the term "the people," it did not limit "the people" to only the members of the political community at the time of Founding. Instead, Heller clarified that the term included "all members. . . not an unspecified subset." Heller, 554 U.S. at 580. The Court specifically rejected limiting the political community to those who were members of the militia, a group consisting of "free able-bodied white male citizens [within the ages of 18 and 45]," that may loosely map on to the Founding-era understanding of political community. Id. at 596. Instead,

---

[14] This is neither the time nor place to thoroughly define and discuss each contour of "the people" at the time of the Founding. But, it appears that, at the minimum, all those of African descendent (many of whom were still enslaved), Native Americans, and likely many white married women would not be included. Though this is doubtlessly not the Government's intent, this is the logical end of the Government's argument, and it is a view to which the Court simply cannot subscribe.

Heller held that there is a "strong presumption that the Second Amendment right. . . belongs to all Americans." Id. at 581 (emphasis added).

In Bruen, the Supreme Court did not conduct a historical analysis of the meaning of "the people." It treated the question as a simple one and concluded that, at least, the term applied to all "adult citizens," and the Court did not make any attempt to determine if the petitioners in question would have been considered "adult citizens" at the time of the Founding. Bruen, 142 S.Ct. at 2134. The approach manifest in Heller and Bruen supports a finding that today's understanding of "the people" is appropriate when considering the reach of the Second Amendment in the context presented by the motions under consideration.[15]

## b) Eighteen-to-Twenty-year-olds are Members of the Political Community

With that conclusion in mind, the analysis now turns to whether, under today's standards, 18-to-20-year-olds are members of the political community.

___

[15] There is, of course, a logical inconsistency in applying an Originalist understanding of "keep and bear arms" and a modern understanding of "the people." But, fealty to the teachings of Heller and Bruen and the need to avoid the unacceptable reach of the Government's position warrants the result reached here.

34

The text of the Constitution does little to guide the inquiry
because the Second Amendment itself includes no reference to age.
U.S. Const. amend. II. And the Constitution "does not set forth an
age of majority." Horsley v. Trame, 808 F.3d 1126, 1130 (7th Cir.
2015).

Of course, the Founders made reference in the Constitution to
age and, in so doing, made age a criterion for enjoyment of rights.
For example, they imposed age limits on the right to hold offices.[16]
Later amenders twice referenced age in terms of voting. U.S. Const.
amend. XIV § 2 (granting the right to vote to male citizens over
the age of 21); amend. XXVI (granting the right to vote to all
citizens over the age of 18). From these facts, we know that, when
they thought it necessary to do so, the Founders used age to
regulate access to important rights. That the Founders choose not
to so circumscribe access to the Second Amendment rights to keep
and bear arms is probative of their intent as to the age limit (or
lack thereof) on the access to the right itself. However, that is
certainly not dispositive of the issue. Therefore, it is necessary
to look beyond the text of the Constitution itself.

---

[16] The Constitution set forth the minimum age for holding certain
offices: 25 for members of the House of Representatives, U.S.
Const. art. 1, § 2; 30 for Senators, U.S. Const. art. 1, § 3; and
35 for President, U.S. Const. art. II, § 1.

It is true that the age of 18 is an arbitrary age to determine adulthood and the full vesting of the rights of citizenship. This has always been true. Blackstone himself admits that the age of majority is "merely arbitrary." 1 Blackstone Commentaries, ch. 17, at 452; see also In re Dewey, 11 Pick. 265, 271 (Mass. 1831) ("The age of maturity or full age is a matter of arbitrary regulation"); United States v. Blakeney, 3 Gratt. 405, 415 (Va. 1847) (op. of Baldwin, J.) ("It is a matter of substance and not of form; and a man has as much dicretion [sic] at the age of twenty years, eleven months and twenty-five days, as he has at the full age of twenty-one"). But, "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." Roper v. Simmons, 543 U.S. 551, 574 (2005).

Today, many of the rights and responsibilities of citizenship fall upon the shoulders of 18-year-olds. At 18, individuals receive the franchise, the most fundamental symbol of membership in the political community. U.S. Const. amend. XXVI. Voting is a key right of citizenship but, with it, come various obligations. When young men turn 18, they are required to register with the Selective Service. 50 U.S.C. § 3802(a). Eighteen is also the age that individuals are eligible to enlist in the military without their

36

parents' or guardians' permission. 10 U.S.C. § 505(a).[17] Likewise,
individuals become eligible for federal jury duty at 18. 28 U.S.C.
§ 1865(b)(1). And, at 18, they lose the Eighth Amendment's shield
from the death penalty and become fully answerable for their crimes
as adults. Roper, 543 U.S. at 574. These examples teach that, upon
achieving their eighteenth birthday, individuals have gained
admittance into the political community.

It is, of course, true that some privileges of citizenship
are denied to individuals under the age of 21. To the continued
consternation of college students across the country, the drinking
age remains 21. See South Dakota v. Dole, 483 U.S. 203, 205-06
(1987). And, Congress recently raised the age to purchase tobacco
products to 21. 21 U.S.C. § 387(f)(d)(5).

These delayed privileges of citizenship are distinguishable
from the right to keep and bear arms because that right is
enshrined in the Constitution. There is no similar constitutional
right to consume alcohol or to use tobacco. Therefore, when it
comes to controlled substances and health, legislatures
constitutionally may regulate these matters within reason and
their determinations are due significant judicial deference. In
contrast, in the Second Amendment context, "judicial deference to

---

[17] Individuals may join the military at 17 with their parents' or
guardians' permission. 10 U.S.C. § 505(a).

legislative interest balancing. . . is not deference that the Constitution demands." <u>N.Y. State Rifle & Pistol Assoc. v. Bruen</u>, 142 S.Ct. 2111, 2131 (2022). "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." <u>Id.</u> (<u>quoting</u> <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008)). This accords the Second Amendment the same respect as other constitutional rights.

If the Court were to exclude 18-to-21-year-olds from the Second Amendment's protection, it would impose limitations on the Second Amendment that do not exist with other constitutional guarantees. It is firmly established that the rights enshrined in the First, Fourth, Fifth, Eight, and Fourteenth Amendments vest before the age of 21. <u>See</u> <u>Firearms Policy Coal. Inc. v. McCraw</u>, __ F.Supp.3d __, No. 4:21-cv-1245-P, 2022 WL 3656996 at *4-5 (<u>finding</u> that the Second Amendment includes 18-to-20-year-olds because the First, Fourth, Fifth, Eight, and Fourteenth Amendments apply to all Americans regardless of age) (<u>citing to</u> <u>W. Va. State</u> <u>Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943) (free exercise); <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506, (1969) (free speech); <u>New Jersey v. T.L.O.,</u> 469 U.S. 325, 334 (1985) (Fourth Amendment); <u>Fisher v. Univ. of Tex.</u>, 579 U.S. 365

38

(2016) (equal protection); Goss v. Lopez, 419 U.S. 565, 574 (1975)
(due process); Kent v. Dulles, 357 U.S. 57, 65-66 (1958) (travel);
Roper v. Simmons, 543 U.S. 551, 574 (2005) (Eighth Amendment);
Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954) (equal educational
opportunities)); see also Worth v. Harrington, __ F.Supp.3d__, No.
21-cv-1348, 2023 WL 2745673, at *7 (D. Minn. March 31, 2023)
("Although one can find certain limitations upon the rights of
young people secured by both the First and Fourth Amendments,
neither has been interpreted to exclude 18-to-20-year-olds from
their protections"); Carey v. Pop. Servs. Internat'l., 431 U.S.
678, 692 n.14 (1977).

Like these other rights, the Second Amendment's protections
apply to 18-to-20-year-olds.[18] By adopting the Second Amendment,
the people constrained both the hands of Congress and the courts
to infringe upon this right by denying ordinary law-abiding
citizens of this age the full enjoyment of the right to keep and
bear arms unless the restriction is supported by the Nation's
history.[19] That is what Bruen tells us. To that inquiry, we now
turn.

_____

[18] This, of course, does not mean that the Second Amendment applies
to individuals under the age of 18 who have not yet attained full
admittance into the political community.

[19] Furthermore, it is not at all clear that the age of majority at
the Founding is the appropriate measure for measuring the reach of

39

**B) *Prohibitions on the Rights of 18-to-20-year-olds to Purchase Handguns are not Supported by our Nation's History and Tradition***

Having determined that the conduct in question, the purchasing of handguns by individuals between the ages of 18-to-20-years, is covered by the Second Amendment, the next step is to determine if the regulating statute and implementing regulations are "consistent with this Nation's historical tradition." <u>N.Y. State Rifle & Pistol Assoc. v. Bruen</u>, 142 S.Ct. 2111, 2135 (2022). The burden is on the Government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Id.</u> at 2127.[20] The Government has not met its burden.

---

the Second Amendment. On that score, it should be kept in mind that the Second Amendment, although not confined to the militia did nonetheless consider the militia as a factor prompting its enhancement. <u>Heller</u>, 554 U.S. at 582-83. And, as explained below in, Discussion § II(B)(1), the age of 18, not the age of 21, was the relevant age for membership in the militia. That fact cuts against a finding that the age of majority was what the Founders had in mind as a limitation on the reach of the Second Amendment.

[20] As many of our sister courts have done, the Court "pause[s] to note the challenges created by <u>Bruen's</u> assignment." <u>United States v. Jackson</u>, No.: ELH-22-141, 2023 WL 2499856, at *10 (D. Md. March 13, 2023); <u>see for example</u> <u>Nat'l Rifle Assoc. v. ATF</u>, 700 F.3d 185, 204 (5th Cir. 2012) ("we face institutional challenge in conducting a definitive review of the relevant historical record"); <u>Worth v. Harrington</u>, __ F.Supp.3d __, No. 21-cv-1348, 2023 WL 2745673, at *9 (D. Minn. March 31, 2023); <u>Bruen</u>, 142 S.Ct. at 2177 (Breyer, J. dissenting). The Court is staffed by lawyers who are neither trained nor experienced in making the nuanced historical analyses called for by <u>Bruen</u>. There is a reason that historians attend years of demanding schooling and that their

When determining if a regulation is part of our Nation's historical tradition, "not all history is created equal." Bruen, 142 S.Ct. at 2136. The Court must most heavily credit the historical sources from around the time of the ratification of the Second Amendment (1791).[21] Id. at 2135-36; see also id. at 2163

---

scholarship undergoes a rigorous peer-review process before publication. And, history is a vocation itself. The analytical construct specified by Bruen is thus a difficult one for non-historians. Of course, Bruen lessens the difficulty to some extent by requiring the parties to assemble the historical record. Bruen, 142 S.Ct. at 2130 n.6. But, that approach is itself problematic because, as this case shows, important parts of the historical record can be overlooked or ignored by the parties. And, of course, the role of advocate is not conducive to objective presentation of what counsel considers to be the historical record. Nevertheless, Bruen clearly prescribes the approach to be taken, and the Court will proceed as instructed.

[21] Amicus Everytown for Gun Safety argues that 1868, when the Fourteenth Amendment was adopted, is the correct focus for Second Amendment analysis. Everytown Amicus Br. at 5. It argues that the ratification of the Fourteenth Amendment requires courts to apply an "updated 1868 understanding of the Bill of Rights" even when considering federal law. Id. (quoting Kurt T. Lash, "Respeaking the Bill of Rights: A New Doctrine of Incorporation," 97 Ind. L.J. 1439, 1441 (2022)). But, because this case concerns federal law, the Court is bound, under Bruen, to give the most weight to Founding-era evidence. The Fourteenth Amendment did nothing to affect the meaning of the Second Amendment when adopted. Unlike when considering the constitutionality of state laws, the Court does not need to assess the understanding of the Second Amendment at the time of the passage of the Fourteenth Amendment. Bruen, 142 S.Ct. at 2136; see Nat'l Rifle Assoc. v. Bondi, 61 F.4th 1317, 1321-22 (11th Cir. 2023) (considering Reconstruction-era laws when discussing the Second Amendment as applied to the states) in contrast to United States v. Rahimi, 61 F.4th 443, 456 (5th Cir. 2023) (considering Founding-era laws when discussing the Second Amendment as applied to the federal government).

(Barret, J. concurring) ("today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights"); United States v. Rahimi, 61 F.4th 443, 456 (5th Cir. 2023).

The analysis now proceeds on the basis of the record created by the parties: (1) militia laws and (2) laws regulating the age of purchasing handguns.[22]

## 1. Militia Laws

The militia laws in the record do not support a finding that prohibiting the purchase of handguns by individuals between the ages of 18 and 20 comports with our Nation's history and traditions.

Although District of Columbia v. Heller determined that, textually, "the right to 'keep Arms'...[is] unconnected with militia service," 554 U.S. 570, 582 (2008), the age of militia enrollment is relevant in helping to determine the history and tradition of firearms regulations. The fact that an individual could, or was required to, serve in the militia indicates that society believed that he lawfully could, and should, keep and bear

---

[22] In collecting these sources that Court has mostly, but not exclusively, relied on the historical sources compiled by the parties. Bruen, 142 S.Ct. at 2130 n.6.

arms. Furthermore, because militiamen generally were responsible

for providing their own firearms, it is logical to conclude that

18-to-20-year-olds were not prohibited from purchasing them.

The Government rightly points out that possessing guns in a

militia setting is not identical to having the constant use of

them. Gov. Memo in Supp. of Motion to Dismiss at 17 n.17. The Court

is also cognizant of the Eleventh Circuit's admonition not to

confuse the legal *obligation* to perform militia service with the

*right* to bear arms. Nat'l Rifle Assoc. v. Bondi, 61 F.4th 1317,

1331 (11th Cir. 2023); see also Worth v. Harrington,

__ F.Supp.3d __, No. 21-cv-1348, 2023 WL 2745673, at *8 (D. Minn.

March 31, 2023). Therefore, militia laws are not the sole source

to be considered. But, they are important circumstantial evidence

in understanding society's view of armed 18-to-20-year-olds.

The Government has presented numerous examples of militia

laws from around the time of the Founding.[23] But, notwithstanding

the volume of that historical material, the Government has failed

---

[23] See Exhibits C (states enrolling in their militias only
individuals over 21) (ECF No. 30-3), D (states requiring parental
consent for individuals under 21 to serve in the militia) (ECF No.
30-4), E (early New Jersey and Virginia militia laws) (ECF No. 30-
5), F (states requiring parents to furnish minors enrolled in the
militia with arms) (ECF No. 30-6), and G (early state militia laws
allowing those younger than 18-years-old to serve) (ECF No. 30-
7); Notice of Supplemental Authority on State Militia Laws (ECF
No. 36; Exhibits 1-22) (state militia laws).

43

to demonstrate that 21 was the age for militia service. Instead, the historical sources show that, at the time surrounding ratification of the Second Amendment, 16 or 18 was the age of majority for militia service throughout the nation. See Exhibits C, D, & E (ECF Nos. 30-3, 30-4, 30-5); Notice of Supplemental Authority on State Militia Laws ("Notice of Supp. Authority") (ECF No. 36-1).

Further, the Government's cited statutes show that, during the colonial and Revolutionary periods, the age of militia service dipped down to 16 in many states. Exhibit G; Notice of Supp. Authority; see also United States v. Blakeney, 3 Gratt. 405, 441 (Va. 1847) (opinion of Brooke, J.) ("During the war of the revolution, sixteen was the military age").[24] According to the historical record provided by the Government, see ECF No. 36-1, and stipulated to by the Plaintiffs, see ECF No. 39, on June 8, 1789 (the date Congress proposed the Second Amendment to the states), 10 of the 13 states[25] specify 16 as the age for militia

---

[24] It is also relevant to note that many of these laws were adopted in the midst of the Revolutionary War, a war fought on American soil and requiring additional manpower. Adopting 16 as the age for militia service may be more of a reaction to the necessities of war than anything else.

[25] Vermont became a state in 1791. When the Amendment was proposed, Vermont's age of militia service was 16. "An Act Regulating the Militia of the State of Vermont" § 1 in Statues of the State of Vermont 94, 94 (George Hugh & Alden Spooner, 1787).

duty.[26] ECF No. 36-1. The other three states began militia duty at

18. ECF No. 36-1.[27]

In the five years before 1789, only two states altered their

---

[26] These states are Connecticut, Georgia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, and South Carolina. "An Act for Forming, Regulating, and Conducting the Military Force of this State" in 1 Acts and Laws of the State of Connecticut, in America 144, 144 (Elisha Babcock, 1786); "An Act for Regulating the Militia of the State, and for Repealing the Several Laws Heretofore Made for that Purpose" (August 1786) at manuscript page 2, https://llmc.com/docDisplay5.aspx?set=39343& volume=1786&part=080 (Georgia); "An Act for the Better Security of the Government," (Oct. Sess. 1777) in Laws of Maryland Made and Passed at a Session Assembly ch. 20 (Frederick Green); "An act for regulating and governing the Militia of the Commonwealth of Massachusetts, and for repealing all laws heretofore made for that purpose" (1784), in Acts and Resolves of Massachusetts, 1784-1785, ch. 55, 140, 140 (Wright & Potter Printing Company); "An Act for Forming and Regulating the Militia Within this State, and for Repealing All the Laws Heretofore Made for that Purpose" § 2 (1786) in Temporary Acts and Laws of New Hampshire, 408, 408 (Daniel Fowle), https://heinonline.org/HOL/P?h=hein.ssl/ssnh0079&i=15; "An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State" § 10 (1781) in Acts of the Fifth General Assembly of the State of New Jersey 39, 42 (Collins, 1781); "An Act to Regulate the Militia," (1786) in 2 Laws of the State of New York, Ninth Session, ch. 25, 220, 220 (Weed, Parson and Company, Printers, 1886); "An Act to Establish a Militia in this State" § 2 (1777), in Clark, Walter, ed., 24 Act of the North Carolina General Assembly, 1777 1, 1 (1905); "The Act for Better Forming, Regulating and Conducting the Military Force of this State," (1779) in Rhode Island Sessions Laws (Oct. 1779 Reg. Sess.) 29, 31-32, https://heinonline.org/HOL/P?h+hein.ssl/ssri0435&i=29; "An Act for the Regulation of the Militia of this State," (Feb. Sess. 1782) in Acts Passed at a General Assembly Begun and Holden at Jacksonburgh, South Carolina, ch. 12 20, 20-24 (John Dunlap).

[27] The other three states are Delaware, Pennsylvania, and Virginia. "An Act for Establishing a Militia Within This State," (1782) in

age of militia service. In 1785, Virginia joined the minority of states by moving from a militia age of 16 to one of 18. Notice of Supp. Authority (Virginia) (ECF Nos. 36-21, 36-22).[28] Vermont passed the last of the pre-ratification laws establishing 16 as the date of militia duty in 1787, only four years before the Ratification of the Second Amendment. Notice of Supp. Authority

_____

Del. Acts, Jan. Adjourned Sess. 1782, 1, 1 https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0069&collect ion=ssl&id=1&startid=1&endid=16; "An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania" § 6 (1780) in The Statutes at Large of Pennsylvania From 1682 to 1801, ch. CMII 144, 146 (Wm. Stanley Ray, 1904); "An Act to Amend and Reduce into One Act, the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections" § 3 (1785) in 12 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, ch. 1., 9, 10-12 (William Waller Hening, 1823).

[28] "An Ordinance for Raising and Embodying a Sufficient Force, for the Defence and Protection of this Colony" (1775), in 9 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, 9, 16-17 (William Waller Hening, 1821) (establishing 16 as the age of militia service) in contrast to "An act to amend and reduce into one act, the several laws for regulating and disciplining the militia, and guarding against invasions and insurrections," §3 (1785) in 12 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, 9, 16-17 (William Waller Hening, 1823) (establishing 18 as the age of militia service).

46

(Vermont) (ECF No. 36-20).[29]

In the decade following the ratification of the Second Amendment, however, Congress and every state then in the Union passed a militia law requiring almost all able-bodied white men between the ages of 18 and 45 to serve in the militia. Within a few months of the ratification of the Second Amendment, the Second Congress passed the Second Militia Act of 1792. 1 Stat. 271 (1792). The Militia Act required:

> every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years and under the age of forty-five (except as herein exempted) shall severally and respectively be enrolled in the militia.

Second Militia Act of 1792 § 1.[30] The Militia Act further required every member of the militia to "provide himself with a good musket or firelock. . . or with a good rifle." Id. Over the next few years, every state revised its existing militia laws to conform with the federal statute. In each of these state statutes, the

---

[29] "An Act Regulating the Militia of the State of Vermont," § 1(Feb. & Mar. Sitting 1787) in Statutes of the State of Vermont, Passed by the Legislature in February and March 1787, 94, 94 (George Hough & Alden Spooner, 1788).

[30] Exempted individuals included civil government officials and members of professions necessary in a time of war. Second Militia Act of 1792 § 2. The states adopted similar lists of exempted individuals.

47

states adopted a militia age of 18 and required militiamen to arm themselves.[31]

───────────

[31] "An Act for establishing the militia in this state" §§ 1-2 (June 18, 1793), in 2 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, Ch. XXXVI, 1134-47 (only requiring the service of individuals between the ages of 18-to-21-years-old "in cases of rebellion, or an actual or threatened invasion of this or any of the neighbouring [sic] states"); "An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania," §§ 1-2 (April 11, 1793) in James T. Mitchell, et al. Compilers, 14 Statutes at Large of Pennsylvania from 1682 to 1801, Ch. MDCXCVI 454-481, (same); "An Act for the regulation of the militia of New-Jersey" § 1 (June 13, 1799), in William Paterson, 1 Laws of the State of New-Jersey, 436-48; "An Act to revise and amend the militia law of this State, and to adapt the same to the act of the Congress of the United States, passed the eighth day of May, one thousand seven hundred and ninety-two, entitled 'An act more effectually to provide for the national defence by establishing an uniform militia throughout the United States'" § 1 (December 14, 1792), in Robert Watkins, Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799, 458-67; "An Act for forming and conducting the Military Force of this State, conformable to the Act of Congress, passed the eighth Day of May, A. D. 1792, which is as follows: 'An Act more effectually to provide for the National Defence, by establishing an uniform Militia throughout the United States'" § 2 (October 1792), in Acts and Laws of the State of Connecticut, in America, 298-311 (exempting college students); "An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, and for repealing all Laws heretofore made for that Purpose, excepting an Act, entitled, 'An Act for establishing Rule and Articles for governing the Troops stationed in Forts and Garrisons within this Commonwealth, and also the Militia when called into actual Service,'" (June 22, 1793) in 2 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 579-98, (same); Herty, Thomas, Digest of the Laws of Maryland, Being an Abridgment, Alphabetically Arranged, of All the Public Acts of Assembly Now in Force, and of General Use, 367-73 (1799) (citing to 1793, c. 53); "An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act

It is true that five of these Founding-era militia laws required parents or guardians to supply arms to their minor sons. See e.g. Delaware, Pennsylvania, Massachusetts, New Hampshire, and Vermont.[32] Two other states levied fines on the parents or guardians of 18-to-20-year-old militiamen who failed to report to muster with the proper firearms. See e.g. New Jersey and Rhode Island.

---

Of Congress," (May 10, 1794) in Thomas Cooper; McCord, David, eds, 8 Statutes at Large of South Carolina, 485-501 (1836-1873) (exempting college students); "An Act for forming and regulating the militia within the State, and for repealing all the laws heretofore made for that purpose," (December 28, 1792) in Constitution and Laws of the State of New-Hampshire; Together with the Constitution of the United States, 251-60 (1805); "An Act for regulating the Militia of this Commonwealth," (December 22, 1792) in Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force, Ch. CXLVI, 293-301 (1794) (creating an annex to each militia battalion for young men between the age of eighteen to twenty-five and providing an exception for college students); "An Act to organize the Militia of this State" § 1 (March 9, 1793), in Thomas Greenleaf, 3 Laws of the State of New-York, 16th Session, Ch. XLV, 58-68; "An act to revise and amend the Militia Law," (1793) in Iredell, James, Martin, & Francois-Xavier, 2 Public Acts of the General Assembly of North-Carolina, ch. 1, 36 (1804); "An Act to organize the Militia of this State" (1798) in 1 The public laws of the state of Rhode-Island and Providence Plantations: as revised by a committee, 424-44 (1798) (providing an exception for students at Rhode Island College); "An Act, for regulating and governing the militia of this state," (March 10, 1797) in 2 Laws of the State of Vermont, Digested and Compiled, Ch. LXXXI, 122-46 (1808).

[32] In 1806, North Carolina joined this group. Gov. Replacement Br. at 18 (citing to Exhibit F at 4 (ECF No. 30-6)); see also "An act to revise and amend the Militia Laws" § 3168 (1806) in 2 The Code of North Carolina, 346-47 (William T. Dortch, John Manning, John S. Henderson, 1883).

But, from the Congressional legislative history provided by the Government about the federal Militia Act, it appears that the provisions were adopted out of concern that 18-to-20-year-olds would be unduly financially burdened if required to outfit themselves. See Exhibit H at 5 (ECF No. 30-8) (citing 2 Annals of Congress 1851, 1856 (debates of December 16, 1790)).[33] Nothing in those federal or state statutes suggests that 18-to-20-year-olds could not provide (or purchase) their own guns, just that their parents were also responsible for providing the necessary armaments. In sum, within a few short years of adopting the Second Amendment, the states revised their laws and demonstrated the nationwide understanding that militia service should begin at age 18.

The Government then turns to making the argument that, after the Founding, the age of militia service began to hover around 21 or service under 21 required parental consent. The Government points to a total of eleven laws in ten states to prove its point.

---

[33] The concern about the financial burden of providing militia arms persisted. In the 1810s, Congress debated providing federally funded arms to volunteer militiamen. Both those who opposed and supported the plan spoke in terms of taxation and where the financial burden of providing appropriate weaponry should fall. David Thomas Konig, "Arms and the Man: What Did the Right to Keep Arms Mean in the Early Republic," 25 Law & Hist. Rev., 177, 183-84 (2007) (quoting The National Intelligencer and Washington Advertiser, 8 February 1812).

Exhibits C & D. However, of the cited laws, only two were passed within 19 years of the ratification of the Second Amendment (Delaware's 1807 law and Pennsylvania's 1793 law).[34] And both of those statutes actually do require 18-year-olds to join the militia. They merely state that, unless in times of rebellion or invasion, those under the age of 21 are exempt from militia drill. Thus, under those statutes, 18-to-20-year-olds were still considered members of the militia and expected to arm themselves.

The later laws cited by the Government are similarly unhelpful to its argument. An 1818 New York law only restricts 18-to-20-year-olds from enrolling in certain militia companies (cavalry, artillery or flying artillery) without parental permission but not others (for example, infantry).[35] That law still retained 18 as the

___

[34] Gov. Exhibit C (ECF No. 30-3) (see "An Act to establish an Uniform Militia throughout this State," §§ 1-2, 4, in 4 Laws Of The State Of Delaware ch. XLIX, 123, 123-24, 125-26 (M. Bradford & R. Porter, 1816); "An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania," §§ I-II, in 14 James T. Mitchell & Henry Flanders, eds., The Statutes At Large Of Pennsylvania From 1682 to 1801 ch. MDCXCVI, 454, 455-56 (1909)); see Thomas Jefferson to James Madison (Sept. 6, 1789), https://jeffersonpapers.princeton.edu/selected-documents/thomas-jefferson-james-madison (defining a generation as lasting for 19 years).

[35] Gov. Exhibit D (ECF No. 30-4) (citing to "An Act to organize the Militia," § XXXIII (1818) in Laws of the State of New-York, Passed at the Forty-First Session of the Legislature, ch. CCXXII, 210, 225 (J. Buel, 1818).

51

age of general militia service. Id. at § 1, 211. The next state statute cited by the Government, New Jersey (1829), comes 38 years after the ratification of the Second Amendment.[36] Like Delaware and Pennsylvania, New Jersey also required 18-year-olds to join the militia but excused them from muster during times of peace. The earliest law that the Government points to actually establishing 21 as the age of militia service is Ohio's 1843 law, coming 52 years after the ratification of the Second Amendment.[37] Like the statutes of New York, New Jersey, and Pennsylvania, the Ohio law does not show that, at the time of the Founding, there was any doubt about the age that militia duty began.

Though dating from the nineteenth-century and thus afforded less weight, judicial opinions in the Early Republic support that conclusion. The Supreme Court of Pennsylvania, one of the states exempting 18-to-20-year-olds from muster in times of peace, underscored the notion that those individuals were still considered part of the militia. In an 1813 opinion, the Supreme Court of Pennsylvania observed that: "[i]n every section of the

---

[36] Gov. Exhibit C (citing to "An Act to exempt minors from Militia Duty in time of peace" § 1 (1829), in Josiah Harrison, ed., A Compilation Of The Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820, 266, 266 (J. Harrison, 1833)).

[37] Gov. Exhibit C (citing to "An Act to regulate the Militia," § 2 in 42 Acts of a General Nature Passed by the Forty Second General Assembly of the State of Ohio 53, 53 (Samuel Medary, 1844)).

union, military duty is required from eighteen to forty-five. Every where [sic] then the law disregards minority upon the question of military service." Commonwealth v. Barker, 5 Binn. 423, 425-26 (Pa. 1813). The Supreme Court of Massachusetts was even more explicit. It declared: "[w]e think that under our militia laws for all purposes connected with the performance of military service, the age of maturity is eighteen." In re Dewey, 11 Pick. 265, 271-72 (Mass. 1831).[38] This opinion was echoed elsewhere. Justice Baldwin, sitting on the Supreme Court of Appeals of Virginia, noted in 1847:

> We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms; and that it is the military age recognized by the whole legislation of Congress, and of the State of *Virginia*, and of all the States of the Union, perhaps without exception.

Blakeney, 3 Gratt. at 418 (opinion of Baldwin, J.). In his opinion, Justice Baldwin explicitly rejected the argument that the common law infancy age of 21 should control the age of military majority. Id. at 409.[39] These judicial opinions, combined with the

---

[38] But see Commonwealth v. Cushing, 11 Mass. 67, 71 (1814) (requiring parental or guardian consent for individuals under 21 to enlist in Army).

[39] Though Justice Baldwin's view prevailed, it was not universally shared. In the same case, his colleague Justice Allen wrote that the general rule of contracts, which deemed 21 the age of majority,

legislation of every state, show a broad (though perhaps not universal) consensus that 18 was the age of majority for membership in the militia, membership which required its members to supply their own arms.

The rest of the Government's evidence is even further removed from the Founding. When later evidence "contradicts earlier evidence," it "cannot provide much insight into the meaning of the Second Amendment." <u>N.Y. State Rifle & Pistol Assoc. v. Bruen</u>, 142 S.Ct. 2111, 2154 (2022). Because the Founding-era sources establish that 18 was the age of militia service, the Court cannot accord significant credit to this later evidence.

From the historical evidence before the Court, it appears that the Founders understood that militia service began at the age of 18. At that age, men were considered to have reached the age of majority for military service and society not only allowed but required them to begin to keep and bear firearms. Historic legislative records support that conclusion.

### 2. <u>Historical Restrictions on the Ability of 18-to-20-year-olds to Purchase Firearms</u>

We now turn to the core question, whether our Nation's history and tradition contains "analogous" restrictions on the ability of

---

should apply in the military context. <u>Blakeney</u>, 3 Gratt. at 429 (opinion of Allen, J.).

18-to-20-year-olds to purchase firearms. The Government once again comes up short. <u>N.Y. State Rifle & Pistol Assoc. v. Bruen</u>, 142 S.Ct. 2111, 2133 (2022).

The Government has not presented any evidence of age-based restrictions on the purchase or sale of firearms from the colonial era, Founding, or Early Republic. <u>See</u> Exhibit B (ECF No. 30-2); Gov. Replace Br. at 17-18 ("there were no laws during [the] period [from 1776 to 1789] explicitly prohibiting the sale of firearms or handguns to individuals under the age of 21"). Nor has the Government offered evidence of such regulation between then and 1791 or in relevant proximity thereafter. For that reason alone, it has failed to meet the burden imposed on it by <u>Bruen</u>.

The earliest such laws to which the Government points were passed in 1856 by Alabama and Tennessee. Exhibit B at 1, 17; Gov. Replacement Br. at 18. Alabama's law provided for a fine for "any one who shall sell or give or lend, to any male minor, . . . [an] air guns or pistol."[40] "An Act to Amend the Criminal Law," § 1

---

[40] It is unclear why this law only applies to "male" minors and the how it defines minors. The Court was unable to identify any case law interpretating the meaning of minor within the statute. <u>See</u> <u>Coleman v. State</u>, 32 Ala. 581, 582 (1858) (<u>referring</u> to the individual the defendant loaned a handgun to as a "minor" but not supplying an age). Perhaps to clarify confusion or simply to change the law, by 1867, the Alabama legislature had revised the law to only apply to "any boy under eighteen years of age." A.J. Walker. <u>Revised Code of Alabama</u>, part four, title 1, ch. 10, § 3751, p. 712 (1867).

(1856) in Acts of the Fifth Biennial Session of the General Assembly of Alabama, No. 26, 17, 17 (Bates & Lucas, 1856). A violation of Tennessee's prohibition against the sale, gift, or loan of a "pistol, bowie-knife, dirk or Arkansas tooth-pick, or hunter's knife" to a minor came with a fine and the threat of prison time. "An Act to amend the Criminal Laws of this State," § 2 in Acts of the State of Tennessee Passed at the First Session of the Thirty-First General Assembly, ch. 81, 92, 92 (G.C. Torbett & Co. 1856). The Tennessee law did, however, provide a carve out for guns provided to a minor for hunting. Id.

The Court has identified one additional age-based restriction on the sale of firearms before the Civil War.[41] In 1859, Kentucky passed a law prohibiting anyone other than a parent or guardian from selling, gifting, or loaning "any pistol. . . slung-shot,

---

[41] The only other related law comes from Louisville, Kentucky. In 1853, the city prohibited the sale of gunpowder—but apparently not firearms-to minors under fifteen. Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws, in Force, and Applicable to the City of Louisville, Ky. Prepared and Digested, under an Order from the General Council of Said City 175, Image 176 (1857) in Duke Center for Firearms Law, https://firearmslaw.duke.edu/repository/search-the-repository.

colt, cane gun, or other deadly weapon, which is carried concealed"
to a minor.[42]

    None of these antebellum laws provide a definition of "minor"
and it is unclear to whom exactly they applied. However, it seems
most probable that they applied to all individuals under the age
of 21, because, at this time, the common law age of majority
remained 21. Nat'l Rifle Ass'n. v. ATF, 700 F.3d 185, 201 (5th
Cir. 2012) ("it was not until the 1970s that States enacted
legislation to lower the age of majority to 18"); see also Nat'l
Rifle Assoc. v. Bondi, 61 F.4th 1317, 1325-26 (11th Cir. 2023).

    When determining original intent, the Eleventh Circuit, in
Bondi, proposed evaluating an additional source-type: public
universities' regulations. In its canvas of that source, the
Eleventh Circuit noted that the University of Georgia (1810), the
University of Virginia (1824), and the University of North Carolina
(1838) all prohibited students from possessing firearms on campus
(or on Grounds in the case of the University of Virginia) in the
first half of the nineteenth century. Bondi, 61 F.4th at 1327.
But, universities' regulations limiting the ability of students to
carry firearms on campus are not "analogous" to the wholesale

---

[42] "An Act to Amend An Act Entitled 'An Act to Reduce to One the
Several Acts in Relation to the Town of Harrodsburg,'" § 23 in
1859 Ky. Acts 245, 245.

prohibition on 18-to-20-year-olds from purchasing firearms manifest in the statutes and regulations here at issue.

More importantly, the Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines, 393 U.S. 503, 507 (1969). Though outside the scope of the question presented in the motions presently before the Court, the carrying of firearms on university campuses could well be considered an "action that intrudes upon the work of the schools or the rights of other students," id. at 508, and thus the prohibition of such conduct might be permissible under the Second Amendment. And, taken as a whole, these regulations support the assumption that, outside of the public university setting, college-aged students could, and did, regularly possess firearms.[43]

Thus, by the eve of the Civil War, only three states had passed any form of restrictions on the ability of minors to

---

[43] In 1800, Yale College prohibited students from possessing guns and gun powder. This regulation provides even less support as Yale is a private, rather than public, institution. See Worth, at *12 (citing to The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795, at 26 (1800)).

purchase firearms and each of these was passed 65 years or more after the ratification of the Second Amendment. See also Bondi, 61 F.4th at 1325-27. This legislation therefore tells us nothing about the Founders' understanding of the Second Amendment. Bruen, 142 S.Ct. at 2147 n.22 (determining a law passed 69 years after the ratification of the Second Amendment is of "insubstantial" value in "discerning the original meaning of the Second Amendment"). The other laws cited by the Government all date from Reconstruction and beyond. Gov. Replacement Br. at 18-22. And, thus, they are not helpful in determining the situation at and around the Founding. Bruen, 142 S.Ct. at 2154 n.28 (declining to consider late-19th or 20th century evidence because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence").[44]

---

[44] The Eleventh Circuit determined that a similar Florida-state law prohibiting 18-to-20-year-olds from purchasing guns did comport with our Nation's history and tradition. Bondi, 61 F.4th at 1325. But it did so by evaluating Reconstruction-era historical analogues. Id. The Eleventh Circuit reasoned that this was proper because the Second Amendment only applies to the states through the Fourteenth Amendment. Id. at 1322-23. Therefore, so it says, it looks to Reconstruction, not the Founding, to understand original intent. Whether that is a sound rationale will be tested on appeal. However, this case is readily distinguishable because this case concerns a federal, rather than state, law, and thus this Court's review is governed by Founding-era sources.

Finally, the lack of analogous evidence of Founding-era regulations demonstrates that the statutes and regulations at issue are inconsistent with the Second Amendment. Since time immemorial, teenagers have been, well, teenagers.[45] The "general societal problem" of teenage impetuousness and rashness far proceeded the Founding. Bruen, 142 S.Ct. at 2131. Yet, that fact notwithstanding, the Government has not demonstrated that the Founders dealt with this problem in a "distinctly similar" way to the statutes and regulations at issue. Id. The lack of analogous regulations permits a finding that the Founders considered age-based regulations on the purchase of firearms to circumscribe the right to keep and bear arms confirmed by the Second Amendment.

### 3. Conclusion

Under the analytical framework established in Bruen, the Government simply has not met its burden to support the finding that restrictions on the purchasing of firearms by 18-to-20-year-olds is part of our Nation's history and tradition. Founding-era militia laws provide circumstantial evidence that 18-to-20-year-olds could purchase, own, and use arms. These militia laws and the

---

[45] Amicus Brady and Gifford present compelling scientific evidence that teenagers biologically are more impulsive than adults because their prefrontal cortexes are still developing. This supports the notion that teenage impulsivity long pre-dates modern society. Brady & Gifford Amicus Br. at 6.

cases interpreting them further support the finding that 18 was the age of majority for acquiring and possessing firearms in the Founding period. There is no direct evidence of age-based firearms restrictions. The Government, the party which bears the burden, fails to point to any Founding-era laws to support the challenged law and implementing regulations. The only laws it can point to date from more than a half-century _after_ ratification. And, that does not discharge the burden that <u>Bruen</u> imposes.

### C) *Prohibiting 18-to-20-year-olds from Purchasing Guns is not a Presumptively Lawful Restriction*

In <u>Heller</u>, the Supreme Court stated that its holding did not "cast doubt on longstanding prohibitions" including "laws imposing conditions and qualifications on the commercial sale of arms." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626-27 (2008). The Government claims that this exception applies to the regulations in question which, in its words, are "a narrow, commercial restriction on the sale of handguns by FFLs to individuals under the age of 21." Gov. Replacement Br. at 9. Assuming that the restriction is narrow, it is not properly classified as a condition or qualification on the commercial sale of arms. That is because, in effect, the laws operate to limit the right of the purchaser in the exercise of rights conferred by the Second Amendment, not the conditions or qualifications of the seller to enter the marketplace.

As the Plaintiffs suggest, the continued vitality of the Heller exceptions is not clear. The Supreme Court re-affirmed Heller's list of exceptions in McDonald v. Chicago. 561 U.S. 742, 786 (2010). However, it did not repeat this list in Bruen. But, throughout Bruen, the Supreme Court routinely cites McDonald and Heller without questioning the validity of the list of Heller exceptions, so the Court assumes that these exceptions still apply. See e.g., N.Y. State Rifle & Pistol Assoc. v. Bruen, 142 S.Ct. 2111, 2129 (2022). Other courts have reached the same conclusion and continue to apply these exceptions.[46] But, assuming that these exceptions survive Bruen, they do not save the statutes and regulations at issue in this case.

When considering whether a regulation "impos[es] conditions and qualifications on the commercial sale of arms," courts have separated regulations that impose limitations on consumers from those that impose limits on sellers. For example, the Ninth Circuit cited this Heller exception when it determined that firearms retailers did not have a freestanding right to sell firearms. Teixeira v. Cnty of Alameda, 873 F.3d 670, 682 (9th Cir. 2017). In

---

[46] United States v. Rahimi, 61 F.4th 443, 452 (5th Cir. 2023); United States v. Price, __ F.Supp.3d __, No. 2:22-cr-97, 2022 WL 6968457, at *7 (S.D. W.Va. Oct. 12, 2022); United States v. Nutter, __ F.Supp.3d __, No. 2:21-CR-00142, 2022 WL 3718518, at *4 (S.D. W. Va. Aug. 29, 2022); Reese v. ATF, __ F.Supp.3d __, No. 6:20-CV-01438, 2022 WL 17859138, at *6 (W.D. La. Dec. 21, 2022).

its reasoning, the Ninth Circuit pointed out that "restrictions on a commercial actor's ability to enter the firearms market may. . . have little or no impact on the ability of individuals to exercise their Second Amendment right to keep and bear arms." Id. at 687. On the inverse, regulations on consumers would impact individuals' Second Amendment rights. The Fourth Circuit similarly determined that a prohibition on unlicensed firearms dealing falls within the commercial sale exception. United States v. Hosford, 843 F.3d 161, 166 (4th Cir. 2016). In making this determination, the Fourth Circuit stressed that that the challenged regulation "affects only those who regularly sell firearms" and is only a requirement on "those who engage in the commercial sale of firearms." Id. Like the Ninth Circuit, the Fourth Circuit upheld the regulation because it affected *sellers*, not *purchasers*.

Those constitutionally acceptable regulations contrast with regulations affecting the purchasing or acquisition of firearms that courts have found unconstitutional. After considering a Chicago regulation that banned "virtually all sales and transfers of firearms inside the City's limits," the Northern District of Illinois held it unconstitutional. Ill. Ass'n of Firearms Retailers v. Chicago, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014). In so doing, the court determined that the regulation did not fall under the Heller exception because it had the effect of "outright

63

banning legal buyers and legal dealers from engaging in lawful acquisitions and lawful sales of firearms." Id. Likewise, the Southern District of West Virginia invalidated a federal law requiring serial numbers on firearms. In so doing, the court concluded that the regulation was "far more than [a] mere commercial regulation. . . it is a blatant prohibition on possession." Price, 2022 WL 6968457 at *3. By prohibiting the ability of individuals to *acquire* or *possess* arms, those regulations crossed the bounds of a presumptively constitutional commercial regulation to an impermissible infringement on the Second Amendment.

Differentiating restrictions on buyers from restrictions on sellers is consistent with the broader understanding of the Second Amendment. As explained, the Second Amendment protects the rights of individuals. Because of this, the Second Amendment includes the corollary right to purchase firearms but not the corollary right to sell firearms. The regulations are a blanket prohibition, rather than a mere condition or qualification, on who can purchase arms and cannot be considered commercial limitations on the sale of firearms. The Heller exceptions do not apply.

64

## D) Conclusion

Because the statutes and regulations in question are not consistent with our Nation's history and tradition, they, therefore, cannot stand.

## IV. Equal Protection

Plaintiffs also challenge these regulations on equal protection grounds. As these motions are decided on Second Amendment grounds, there is no reason to conduct an equal protection analysis.

## CONCLUSION

For the foregoing reasons, the DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (ECF No. 21) will be denied and the PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 28) will be granted.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May _10_, 2023

65

## APPENDIX A

Both parties, many courts, and legal scholars generally accept as fact that 21 was the age of majority at the time of the Founding, simply citing William Blackstone's Commentaries. See William Blackstone, 1 Commentaries on the Laws of England, ch. 16, at 441 ("The legal power of a father (for a mother, as such, is entitled to no power, but only to reverence and respect) the power of a father, I say, over the persons of his children ceases at the age of twenty one: for they are then enfranchised by arriving at years of dis[c]eretion, or that point which the law has established (as some must nec[e]ssarily be established) when the empire of the father, or other guardian, gives place to the empire of reason"). But, it is not entirely clear that 21 was the age at which one attained membership in the Founding-era political community or at least in terms military service.

The use of the age of 21 to mark the divide between childhood and adulthood arose in the Middle Ages. During the chivalrous period, young men of noble birth could not become knights until they reached the age of 21, thus marking their transition from childhood to adulthood. T.E. James, "The Age of Majority," 4 Am. J. Legal Hist. 22, 26 (1960). However, throughout the medieval period, men who were tenants in socage (agricultural tenure), reached the age of majority at a considerably younger age: fourteen

or fifteen. Id. at 30. It was not until the reign of King Charles
II in the second half of the seventeenth-century that English
fathers could appoint guardians for their children, regardless of
social status or gender, until they attained the age of 21. Id. at
31. As various Founding-era commentators, including Blackstone,
observed, the age of majority is set by positive, rather than
divine or natural, law. See Blackstone, 1 Commentaries, ch. 17, at
452. As a result, the legislature was empowered to determine and
change the age of majority. In re Dewey, 11 Pick. 265, 271 (Mass.
1831).

Though they do say that an individual is an "infant" until
the age of 21 under the common law of England, the Commentaries
themselves underscore the difficulty of determining the definitive
age of "adulthood" at the time of the Founding and reflect an
eventual accumulation of the legal rights and responsibilities
that we today associate with adulthood. Blackstone, 1
Commentaries, ch. 17, at 451-52; see also Worth v. Harrington,
__ F.Supp.3d __, No. 21-cv-1348, 2023 WL 2745673, at *8 (D. Minn.
March 31, 2023) ("Although the full age of majority was often 21,
'that only mattered for specific activities'; for others, such as
taking an oath (12), selling land (21), receiving capital
punishment (14), serving as an executor or executrix (17), being
married (for a woman 12), choosing a guardian (for a woman 14),

the age of majority varied widely") (<u>citing to</u> <u>Hirschfeld v. Bureau</u>

<u>of Alcohol, Firearms, Tobacco, and Explosives</u>, 5 F.4th 407, 435

(4th Cir. 2021), <u>vacated as moot</u>, 14 F.4th 322, 328 (4th Cir.

2021)).

The <u>Commentaries</u> are not alone in reflecting the varied stages

of majority and infancy. For example, Sir Edward Coke remarked

that there was legal uncertainty over guardianship for orphaned

infants over the age of 14. Francis Hargaves & Charles Butler, 2

<u>The First Part of the Institutes of the Laws of England, Notes on</u>

<u>Lord Coke's First Institute, Or Commentary Upon Littleton</u>, Ch. 5

§ 123, note 70 (1794). This fluidity with determining the age of

majority in different contexts continued. In 1831, the Supreme

Court of Massachusetts observed that "[t]he age of maturity or

full age is . . . different in different countries; and it is

different for different purposes in the same country." <u>In re Dewey</u>,

11 Pick. at 271.

Furthermore, Blackstone writes that the common law

established different ages for certain steps in adulthood based on

gender. Blackstone, 1 <u>Commentaries</u>, ch. 17, at 451-52.

Differentiating based on sex did not end at the Founding. It was

not until 1975 that the Supreme Court struck down a Utah provision

that established 18 as the age of majority of women and 21 for

men. <u>Stanton v. Stanton</u>, 421 U.S. 7 (1975).

Some scholars have also made the argument that "the people" and "the militia" were synonymous terms in the Founding. Therefore, any member of the militia was a member of "the people." Since 18-to-20-year-old (able-bodied white men) were members of the militia, they would fall under the Founders' definition of "the people." See Sanford Levinson, "The Embarrassing Second Amendment," 99 Yale L.J. 637, 646-47 (1989) ("There is strong evidence that 'militia' refers to all of the people, or at least all of those treated as full citizens of the community"). This view is also supported by various Loyalty Oath laws passed shortly after the Declaration of Independence. Those laws required men under the age of 21 to swear allegiance to the new nation in order to exercise certain rights including, in some cases, the right to bear arms. Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America," 25 Law & Hist. Rev. 139, 159 (2007).[47]

---

[47] See also "An Act for the executing in the Colony of the Massachusetts Bay, in New England, one Resolve of the American Congress, dated March 14, 1776, recommending the disarming of such persons as are notoriously disaffected to the cause of America," (Mar. 14, 1776) in 1775-1776 Mass. Act ch. VII, 31-32, 35 (applying to men aged 16 and above); "An Act, obliging the male white inhabitants of this state to give assurances of allegiance to the same, and for other purposes therein mentioned" §§ 1, 2, 4 (1777) in 9 The Statues at Large of Pennsylvania From 1682 to 1801, ch. DCCLVI, 110, 111 (Wm. Stanley Ray, 1903) (applying to men aged 18 and above); "An act to oblige the free male inhabitants of this state above a certain age to give assurance of Allegiance to the

Finally, there is also an interesting and robust scholarly debate on the importance of "virtue" and who was deemed "virtuous" in determining full membership in the political community at the time of the Founding. Nat'l Rifle Ass'n v. ATF, 700 F.3d 185, 201 (5th Cir. 2012). But, the importance of virtue at the time of the Founding belies any simple answer and is far better left to historians than lawyers.

Of course, all of this assumes that the Founding generation had a uniform view of "the people." Just as we today have robust and spirited debates, so too did the Founders. See e.g. Op. of Judge Appleton, 44 Me. 521, 575 (1857) (determining that the Supreme Court's opinion in Dred Scott was erroneous and that "the people of Maine, in the exercise of their sovereign power, have conferred citizenship upon those of African descent"). We cannot expect or act as if the Founding generation uniformly agreed on the meaning of "the people."

---

same, and for other purposes" (1777), in 9 The Statutes at Large Being a Collection of all the Laws of Virginia, ch. 3, 281, 281-82 (William Hening, 1821) (applying to men 16 and above); "An Act for the Better Security of the Government," (1777) in 23 A Digest of the Laws of Maryland, 187 (Thomas Herty, 1799) (applying to men aged 18 and above); "An Act to amend an Act for declaring what Crimes and Practices against the State shall be Treason, and what shall be Misprison of Treason, and providing Punishments adequate to Crimes of both Classes, and for preventing the Dangers which may arise from Persons disaffected to the State" § VIII (1777) in 24 Acts of the North Carolina General Assembly, ch. VI, 84, 88-89 (applying to men aged 16 and above).

Having determined that a modern understanding of "the people" is appropriate for this case, the Court need not further investigate this point, but it does observe that there is uncertainty about the definition of "the people" at the time of the Founding.