# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
————————————

## NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., *et al.*,

*Plaintiffs-Appellants,*

## v.

## COMMISSIONER, FLORIDA DEPARTMENT OF LAW ENFORCEMENT

*Defendant-Appellee.*

————————————

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:18-cv-00137-MW-MAF
————————————

## PLAINTIFFS-APPELLANTS' OPENING EN BANC BRIEF
————————————

John Parker Sweeney
James W. Porter, III
W. Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Counsel for Plaintiffs-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Baum, Christopher J. (Counsel for Defendant-Appellee)

2. Bell, Daniel (Counsel for Defendant-Appellee)

3. Blair, Connor M. (Counsel for Plaintiffs-Appellants)

4. Bondi, Pam, in her official capacity as Attorney General of Florida (Defendant-Appellee, substituted for Defendant-Appellee Moody who was dismissed by the District Court)

5. Bradley Arant Boult Cummings LLP (Law firm representing Plaintiffs-Appellants)

6. Fant, Radford (Plaintiff-Appellant, dismissed on appeal by this Court's panel on motion to substitute Plaintiff-Appellant Kelsey)

7. Fitzpatrick, Hon. Martin A. (United States Magistrate Judge)

8. Glass, Mark, in his official capacity as Florida Department of Law Enforcement Commissioner (Defendant-Appellee, substituted for Defendant-Appellee Swearingen on appeal)

9. Kelsey, Dominic (Plaintiff-Appellant, dismissed on appeal by this Court's panel on motion to substitute Plaintiff-Appellant Stefano)

10. Lamar, William Chadwick (Counsel for Plaintiffs-Appellants)

11.   Moody, Ashley, in her official capacity as Attorney General of Florida (Defendant-Appellee, dismissed by the District Court)

12.   National Rifle Association of America, Inc. (Plaintiff-Appellant)

13.   Newhall, Timothy (Counsel for Defendant-Appellee)

14.   Percival, James H. (Counsel for Defendant-Appellee)

15.   Porter, James W. (Counsel for Plaintiffs-Appellants)

16.   Stefano, Brooke (Plaintiff-Appellee, substituted for Plaintiff-Appellant Kelsey)

17.   Swearingen, Rick, in his official capacity as Commissioner of the Florida Department of Law Enforcement (Defendant-Appellee, substituted for Defendant-Appellee Glass on appeal)

17.   Sweeney, John Parker (Counsel for Plaintiffs-Appellants)

18.   Teegen, Elizabeth (Counsel for Defendant-Appellee)

19.   Walker, Mark E., Hon. (United States District Judge below)

20.   Whitaker, Henry (Counsel for Defendant-Appellee)

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: July 31, 2024                         */s/ John Parker Sweeney*
                                             John Parker Sweeney

                                             *Counsel for Plaintiffs-Appellants*

iii

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request oral argument, which the Court has already scheduled for the week of October 21, 2024. ECF No. 93. This appeal presents several important constitutional questions of first impression in the Eleventh Circuit, including whether a state law categorically prohibiting young adults from purchasing any firearm violates the Second and Fourteenth Amendments where the State's evidence failed to prove an enduring, representative, and comparable historical tradition of regulation. Plaintiffs-Appellants believe that oral argument will assist the Court in resolving these issues.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vi

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF THE ISSUE...........................................................4

STATEMENT OF THE CASE.............................................................4

    I.    Statutory Background and Context ......................................4

    II.   Course of Proceedings.........................................................6

        A.   Pre-*Bruen* proceedings in the district court ...............6

        B.   Appellate History: *Bruen*, the panel decision, and *Rahimi*.........9

        C.   Standard of Review.................................................15

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT ................................................................................17

    I.    The Young Adult Ban burdens conduct that is presumptively protected by the Second Amendment's plain text. ............................17

        A.   Young adults are part of "the people." ....................18

        B.   The plain text protects purchasing a firearm ............23

    II.   The State has failed to prove that the Young Adult Ban is consistent with this Nation's historical tradition of firearm regulation ...............28

        A.   The State must prove an enduring, representative, and comparable tradition of regulation from the Founding Era. ......28

        B.   The State has not met its burden to prove a historical tradition justifying the Young Adult Ban. ................36

CONCLUSION................................................................................55

CERTIFICATE OF COMPLIANCE....................................................57

CERTIFICATE OF SERVICE ...........................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015)...................................................................................19

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)...................................................................................19

*Atkinson v. Garland*,
70 F.4th 1018 (7th Cir. 2023) ...................................................................27

*Aymette v. Tennessee*,
21 Tenn. 154 (1840)...................................................................................49

*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
141 S. Ct. 1220 (2021)...............................................................................26

*Carter v. City of Melbourne*,
731 F.3d 1161 (11th Cir. 2013) .................................................................15

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)...................................................................................45

*Crawford v. Washington*,
541 U.S. 36 (2004).....................................................................................33

\* *District of Columbia v. Heller*,
554 U.S. 570 (2008)...... 10–11, 18, 20–21, 23–24, 26, 30–31, 34, 40, 42, 45, 49, 51–52

*Drummond v. Robinson*,
9 F.4th 217 (3d Cir. 2021) ...................................................................24, 31

*Espinoza v. Mont. Dep't of Rev.*,
591 U.S. 464 (2020)...................................................................................33

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................23–24

vi

*Firearms Policy Coalition, Inc. v. McCraw*,
    623 F. Supp. 3d 740 (N.D. Tex. 2022) ...............................................................52

*Fraser v. ATF*,
    672 F. Supp. 3d 118 (E.D. Va. 2023) ....................................................39, 42, 48

*Frein v. Penn. State Police*,
    47 F.4th 247 (3d Cir. 2022) ........................................................................25, 27

*Gamble v. United States*,
    587 U.S. 678 (2019).......................................................................33, 35–36, 48

\* *Hirschfeld v. ATF*,
    5 F.4th 407 (4th Cir. 2021) ........ 18, 20–21, 23–24, 38–39, 41–42, 44, 49, 51–53

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ..............................................................................24

\* *Jones v. Bonta*,
    34 F.4th 704 (9th Cir. 2022) ........................................ 18, 21–24, 38–39, 49, 53

*Konigsberg v. State Bar of Cal.*,
    336 U.S. 36 (1961)...............................................................................................27

\* *Lara v. Commissioner Penn. State Police*,
    91 F.4th 122 (3d Cir. 2024) ....................................................3, 18, 35, 37–39, 41

*Luis v. United States*,
    578 U.S. 5 (2016)..................................................................................................24

*Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*,
    594 U.S. 180 (2021)..............................................................................................20

*McDonald v. City of Chicago*,
    561 U.S. 731 (2010).........................................................................................31–33

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................................................22

*Nevada Comm'n on Gaming Ethics v. Carrigan*,
    564 U.S. 117 (2011)..............................................................................................33

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985)...................................................................20

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
140 S. Ct. 1525 (2020)...........................................................24

\* *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)...... 1, 3, 7, 9–13, 15, 17–19, 26–32, 34–35, 37, 41–43, 45–52, 54–55

*NRA v. ATF*,
714 F.3d 334 (5th Cir. 2013) ...............................................22–23, 38

*Nunn v. Georgia*,
1 Ga. 243 (1846) ............................................................18, 26

*Page v. Tennessee*,
50 Tenn. 198 (1871)...............................................................49

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ...................................................23

*Perpich v. Dep't of Def.*,
496 U.S. 334 (1990)...............................................................21

*Ramos v. Louisiana*,
590 U.S. 83 (2020)................................................................33

*Range v. Att'y Gen.*,
69 F.4th 96 (3d Cir. 2023) (*en banc*) ........................................53–54

*Snell v. United Specialty Ins. Co.*,
102 F.4th 1208 (11th Cir. 2024) .................................................15

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ....................................................24

*Tennessee v. Callicutt*,
69 Tenn. 714 (1878).............................................................48

*Terry v. Ohio*,
392 U.S. 1 (1968)................................................................27

*Tex. Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ...............................................................27

*Timbs v. Indiana*,
  586 U.S. 146 (2019).........................................................................3, 31–32

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969).............................................................................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017).............................................................................26

*United States v. Duarte*,
  101 F.4th 657 (9th Cir. 2024) ...............................................................50

*United States v. Dubois*,
  94 F.4th 1284 (11th Cir. 2024) .............................................................51

*United States v. Focia*,
  869 F.3d 1269 (11th Cir. 2017) ............................................................51

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) .................................................................53

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022) ...............................................18, 20, 25

*United States v. Miller*,
  307 U.S. 174 (1939).............................................................................38

* *United States v. Rahimi*,
  144 S. Ct. 1889 (2024)......... 1, 3, 9, 13–15, 17, 27, 29–30, 36, 43–44, 46, 50–54

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) .............................................................51

*United States v. Stevens*,
  559 U.S. 460 (2010).............................................................................26

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) .........................................................................18

*Virginia v. Moore*,
    553 U.S. 164 (2008) .........................................................................33

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .........................................................................20

*Worth v. Jacobson*,
    --- F.4th ----, 2024 WL 3419668 (8th Cir. July 16, 2024)... 18, 39, 43, 47, 49, 54

**Statutes and Constitutional Provisions**

18 U.S.C. § 922 ...............................................................5, 13, 44, 52

1885 Nev. Stat. 51 .................................................................................47

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1343 ....................................................................................4

Act of May 8, 1792, 1 Stat. 271. ......................................................21, 38

An Act for the Regulation of the Militia of the Commonwealth of
    Pennsylvania, ch. MDCXCVI, §§ I–II (1793) ....................................40

Ch. 2018-3, § 2, Laws of Fla. ...............................................................5

Fla. Stat. § 743.07 .............................................................................1, 54

Fla. Stat. § 775.082 ...............................................................................5

Fla. Stat. § 790.22 ..................................................................................5

Fla. Stat. § 790.23 ..................................................................................5

Fla. Stat. § 790.065 .......................................................................2, 4, 5

Fla. Stat. § 790.233 ...............................................................................5

x

Tenn. Code § 4864 (1858) ....................................................................44, 48

U.S. Const. amend II ...............................................................................17

U.S. Const. amend. XXVI, § 1 ...............................................................19

U.S. Const. art. I, § 2, cl. 2 ....................................................................19

U.S. Const. art. I, § 3, cl. 3 ....................................................................19

U.S. Const. art. II, § 1, cl. 5 ..................................................................19

**Other Authorities**

1 Noah Webster, American Dictionary of the English Language
    (1828)...................................................................................................25

1 Samuel Johnson, Dictionary of the English Language (4th ed. 1773) ................25

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment
    Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ............................22, 38–39

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of
    Incorporation*, 97 Ind. L.J. 1439 (2022)............................................32

T. Cooley, The General Principles of Constitutional Law in the United
    States of America (1880) ...................................................................24

T. Cooley, Treatise on Constitutional Limitations (5th ed. 1883)...........................48

**INTRODUCTION**

The Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), reiterated the straightforward "standard for applying the Second Amendment": "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and a law burdening protected conduct is unconstitutional unless the government "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 24. The Court reaffirmed this standard in *United States v. Rahimi*, 144 S. Ct. 1889, 1898–99 (2024), upholding a "narrow" federal criminal statute supported by comparable Founding Era laws, *id.* at 1902–03. The only way for the government to meet its burden here is to "affirmatively prove"—based on "historical evidence"—that an "enduring," "representative," and "comparable tradition of regulation" justifies the challenged law. *Bruen*, 597 U.S. at 19, 24, 27, 30, 69.

In Florida, persons aged 18 and older are legal adults for purposes of the civil rights and obligations of adulthood. Fla. Stat. § 743.07. Florida's young adult citizens aged 18 to 20 can vote, contract, and marry. They may be required to appear for jury duty. And they may choose to risk life and limb by serving in our military or Florida's law enforcement agencies. But they face prison for exercising their right

to buy a firearm because Florida bans young adults from purchasing any firearm for any reason. Fla. Stat. § 790.065(13) ("Young Adult Ban").

This law is unconstitutional. The Second Amendment's text protects young adults' right to purchase a firearm, and the State has not proven that the ban is consistent with our Nation's historical tradition of firearm regulation. The Young Adult Ban cannot stand.

The district court upheld the ban without the benefit and guidance of *Bruen*. App.188–235. After the Supreme Court decided *Bruen*, a panel of this Court affirmed based on a motley assortment of incomparable and far-too-late laws from the Reconstruction Era that contradict the Founding Era tradition permitting and requiring young adults to acquire firearms. 61 F.4th 1317, 1333. To justify doing so, the panel held that, in reviewing a state law, "historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era"; in other words, the panel declared, "the Reconstruction Era understanding of the right to bear arms . . . is what matters." *Id.* at 1322.

The panel's holding casts aside Founding Era understandings and is profoundly wrong. The meaning and protective scope of the Second Amendment are determined by the public understanding of the right at the Founding, **not** Reconstruction or later, regardless of whether a state or federal law is being

challenged. *See Bruen*, 597 U.S. at 66 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) ("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."); *Lara v. Comm'r Penn. State Police*, 91 F.4th 122, 134 (3d Cir. 2024) ("[T]he Second Amendment should be understood according to its public meaning in 1791."), *cert. pet. filed*, No. 24-93 (U.S. July 25, 2024). The panel's Reconstruction Era bias turns *Bruen* on its head and would work a radical, unsupported shift in constitutional jurisprudence.

The State's evidence "has several serious flaws even beyond [its] temporal distance from the founding." *Bruen*, 597 U.S. at 66. Evidence from Reconstruction and later "cannot overcome the overwhelming evidence" demonstrating a Founding Era tradition permitting (and even requiring) young adults to acquire and use firearms. *Id.* at 67. Nor does it otherwise show a "comparable tradition of regulation" that could justify the ahistorical Young Adult Ban. *Id.* at 27. The State has not shown that our Nation "impos[ed] similar restrictions for similar reasons" or tolerated efforts by States to do so. *Rahimi*, 144 S. Ct. at 1898.

The State failed to meet its burden to justify the Young Adult Ban under a straightforward application of the standard established in *Heller* and then reiterated

in *Bruen* and again in *Rahimi*. This Court should hold that Florida's Young Adult Ban is unconstitutional under the Second and Fourteenth Amendments.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. After granting the State's motion for summary judgment and denying Plaintiffs-Appellants' motion for summary judgment, App.234, the district court entered final judgment dismissing Plaintiffs-Appellants' claims with prejudice on June 24, 2021, App.236. Plaintiffs-Appellants timely filed their notice of appeal on July 7, 2021. App.237. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Is § 790.065(13) of the Florida Statutes unconstitutional under the Second and Fourteenth Amendments to the Constitution?

## STATEMENT OF THE CASE

### I.    Statutory Background and Context

Since 2018, Florida has completely banned law-abiding 18-to-20-year-olds from purchasing any firearm, of any kind, for any purpose. *See* 2018 Fla. Laws 10, 18–19 (codified at Fla. Stat. § 790.065(13)). The text of the Young Adult Ban is:

> **A person younger than 21 years of age may not purchase a firearm.**
> The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s.

4

775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law enforcement officer or correctional officer, as those terms are defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9), or a servicemember as defined in s. 250.01.

Fla. Stat. § 790.065(13) (emphasis added). Florida's Legislature enacted the ban to "address the crisis of gun violence, including but not limited to, gun violence on school campuses." Ch. 2018-3, § 2, Laws of Fla. A young adult who purchases any firearm in violation of the ban is subject to five years' imprisonment, a fine up to $5,000, or both. Fla. Stat. §§ 775.082, 775.083.

The Young Adult Ban overlaps with other Florida and federal laws not challenged here. Florida generally prohibits the purchase or possession of a firearm by: minors under 18, *id.* § 790.22(3); convicted felons, *id.* § 790.23(1)(a); anyone enjoined against committing acts of domestic violence, *id.* § 790.233(1); and anyone adjudicated mentally defective or committed to a mental institution, *id.* § 790.065(2)(a)(4). Federal law prohibits federally licensed dealers from selling handguns to individuals under 21, 18 U.S.C. § 922(b)(1), and imposes other prohibitions on possession by certain categories of individuals similar to Florida's, *id.* § 922(g).

Under Florida's Young Adult Ban, 18-to-20-year-old law-abiding citizens are forbidden from purchasing any firearm, including all handguns and long guns, from any sources. Fla. Stat. § 790.065(13). It does not prohibit obtaining a firearm by gift

or loan. But, as the district court put it, the Young Adult Ban "functions as a total ban" on firearm purchase by law-abiding, responsible young adults most likely to "actually need firearms to defend themselves." App.232–33. That includes, for example, prohibiting "the 20-year-old single mother living on her own [from] obtain[ing] a firearm for self-defense [while allowing] a 20-year-old living with their parents [to] easily obtain one." App.232–33.

## II. Course of Proceedings

### A. Pre-*Bruen* proceedings in the district court

Plaintiff-Appellant National Rifle Association of America, Inc. ("NRA"), brought this suit on behalf of its young adult Florida members challenging the Young Adult Ban in 2018 as soon as it was passed. App.19. The NRA asserted facial and as-applied challenges under the Second Amendment and Equal Protection Clause. App.26–30. After denial of its motion for individuals to proceed pseudonymously and a short-lived appeal, App.9–10 (DE44, DE55-1), the NRA returned to the district court and filed the operative amended complaint, which added a named individual plaintiff and dropped as-applied challenges, App.10 (DE54).[1]

---

[1] During the pendency of this appeal, the Court has twice granted Plaintiffs-Appellants' motions to substitute additional individual plaintiffs and to supplement the record to avoid mootness. ECF Nos. 63, 85. Brooke Stefano is the individual plaintiff at this time. *See* Decl. of Brooke Stefano, ECF No. 85-3.

Defendants Commissioner of the Florida Department of Law Enforcement and Attorney General of Florida moved to dismiss and argued that Plaintiffs-Appellants failed to state a claim and that the Attorney General was an improper defendant. App.12 (DE73). The district court dismissed the Attorney General but otherwise denied their motion to dismiss. App.14 (DE94). After expert discovery, both sides moved for summary judgment. App.15–16 (DE107, DE109).

Without the benefit of *Bruen*, the district court denied Plaintiffs-Appellants' motion and granted the Commissioner's. App.188–235. The district court proceeded under the two-step test abrogated by *Bruen*, 597 U.S. at 19, but it upheld the ban under the first step without reaching means-end scrutiny, App.229.

The district court began by asking whether the State showed, based on historical evidence, that "18-to-20-year-olds lacked the right to purchase firearms." App.199. Although it "found no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms," App.200–01, and acknowledged militia laws proving that young adults were required to acquire firearms, App.202–203, the court concluded that it "cannot say definitively from Founding-Era sources whether the Second Amendment protects the purchase of firearms by 18-to-20-year-olds." App.208.

After concluding that the State cannot prove a Founding Era tradition, the court moved on to another pre-*Bruen* analytical framework: it "examine[d] the entire historical record [*i.e.* Reconstruction Era and modern] background," App.208, and asked "whether restrictions on the purchase of firearms by 18-to-20-year-olds are longstanding in time when compared to other restrictions listed in *Heller and* are sufficiently analogous to those restrictions," App.215 (emphasis in original).

The district court concluded that restrictions on firearm purchases by young adults are "longstanding" because (1) some states restricted firearm acquisition by 18-to-20-year-olds in various ways during the late-19th and early-20th centuries and the federal government began prohibiting federal firearm licensees from selling handguns to young adults in 1968, App.208–11; and (2) those restrictions were "longstanding" "at least relative to the other prohibitions listed in *Heller*" that arose during the "twentieth century," App.219–20. It then concluded that restrictions on firearm purchases by young adults are "analogous" because it could "identify no meaningful difference between prohibitions listed in *Heller*, other restrictions courts have found analogous, and restrictions on the purchase of firearms by 18-to-20-year-olds." App.223. The court then held the ban presumptively lawful, which was a barrier it construed as "insurmountable." App.228. So it upheld the Young Adult

Ban,[2] granted summary judgment to the State, and denied Plaintiffs-Appellants' summary-judgment motion. App.234. It then entered final judgment. App.236.

## B. Appellate History: *Bruen*, the panel decision, and *Rahimi*

**1.** The parties briefed and argued this appeal before the Supreme Court decided *Bruen*. The Supreme Court issued *Bruen*, which made the history-and-tradition "standard endorsed in *Heller* more explicit" and rejected means-end scrutiny. 597 U.S. at 19, 31. It made clear that the Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. Thus, to justify a law that burdens Second Amendment rights, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

*Bruen* addressed a New York permitting regime that effectively banned all public handgun carry. *Id.* at 12–13. The Court held that the Second Amendment's plain text covered the plaintiffs' proposed conduct: carrying handguns publicly for self-defense. *Id.* at 32. Canvassing the historical record, the Court held that the state failed to prove a "tradition of broadly prohibiting the public carry of commonly used

---

[2] The district court also rejected the plaintiffs' Equal Protection challenge under rational basis review. App.230.

firearms for self-defense," and held that the state's "handful of late-19th-century" laws were not enough to carry its burden. *Id.* at 38.

*Bruen* acknowledged "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," or instead "the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. After recognizing a "general[] assum[ption]" that "1791" is the correct temporal reference point, the Court found it unnecessary to resolve that dispute because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38. But the Court nevertheless explained that "late-19th-century-evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence" and refused to address "20th-century historical evidence" that "contradicts earlier evidence." *Id.* at 66 & n.28.

**2.** In March 2023, a panel of this Court issued a published opinion that affirmed the district court. 61 F.4th 1317. The panel began by suggesting in the introduction that the Young Adult Ban is "presumptively lawful" as a "law[] imposing conditions and qualifications on the commercial sale of firearms." *Id.* at 1320 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 616–27 & n.26 (2008)).

The panel then moved to apply its own version of the *Bruen* methodology. At the textual stage, the panel assumed without deciding that young adults are among "the people," and that the plain text covers purchasing a firearm. *Id.* at 1324–25. But the panel strayed far off course at the historical stage to uphold Florida's law.

The panel held that, for purposes of reviewing a challenge to state law, "what matters" is "the Reconstruction Era understanding of the right to bear arms." *Id.* at 1322. According to the panel, "historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era." *Id.* The panel reasoned that "the understanding of the Second Amendment right that ought to control in this case—where a State law is at issue—is the one shared by the people who adopted 'the Fourteenth Amendment, not the Second.'" *Id.* (quoting *Bruen*, 597 U.S. at 37). After asserting that "[m]any prominent judges and scholars—across the political spectrum—agree," *id.* at 1322 n.9, it reasoned that its holding was "necessar[y] . . . if we are to be faithful" to the will of the people who adopted the Fourteenth Amendment and that saying otherwise "would be illogical," *id.* at 1323–24. The panel rejected *Bruen*'s instruction that the value of historical evidence depends upon its temporal proximity to the Founding even when reviewing a state law. *See id.* at 1323. And it sought to reconcile its holding with *Bruen* by

11

asserting that rights have "the same scope" when applied against the federal government and states, but different "contours." *Id.*

Turning to the State's "historical" evidence, the panel held that the State satisfied its burden through a "Reconstruction Era" tradition it believed supported the Young Adult Ban. 61 F.4th at 1325. It relied on: (1) three state laws between 1856 and 1859 that prohibit anyone from giving a handgun to a minor; (2) a "flurry" of statutes by 16 states and D.C. between 1875 and 1897 that prohibited anyone from giving a handgun to a minor or restricted young adults' concealed handgun carry; (3) three 19th-century university resolutions that restricted possession of weapons on school grounds (one applied off-campus); and (4) late-19th-century state court cases, legal commentary, and newspapers. *Id.* at 1325–30. The panel found that these laws were **more** burdensome on young adults than Florida's law because the Young Adult Ban allows them to acquire firearms "as long as they don't buy the weapon[]" and allows them to acquire non-firearm arms like "bows and arrow." *Id.* at 1328, 1331. And it found them comparably justified by the broad generalization that each sought "to improve public safety." *Id.* at 1331 (citing no authority).

The panel never addressed the complete absence of any comparable Founding Era bans—except to deem the Founding Era irrelevant. *But see Bruen*, 597 U.S. at 26 (describing the "straightforward" analysis). Nor did it explain why "nuanced"

reasoning was appropriate. *Id.* at 27. And the panel rejected Plaintiffs-Appellants' argument that the Founders required young adults to acquire arms to participate in the militia because, in its view, this Founding Era evidence was **too early** and "mistakes a legal obligation for a right." 61 F.4th at 1331–32.

Plaintiffs-Appellants filed a petition for rehearing en banc. ECF No. 68. This Court granted rehearing and vacated the panel opinion, 72 F.4th 1346, and delayed briefing until the Supreme Court decided *Rahimi*. ECF No. 88.

**4.** In June 2024, the Supreme Court in *Rahimi* upheld the constitutionality of 18 U.S.C. § 922(g)(8). 144 S. Ct. at 1903. Section 922(g)(8) is a "narrow" criminal law, *id.* at 1902, that prohibits possession of a firearm by an individual subject to a domestic violence restraining order if that order includes a judicial determination that he or she "represents a credible threat to the physical safety of [an] intimate partner," or a child of the partner or individual, 18 U.S.C. § 922(g)(8).

*Rahimi* reaffirmed the governing standard: "[w]hen the Government regulates arms-bearing conduct," it bears "the burden to 'justify its regulation'" by proving that the challenged law "is consistent with the principles that underpin" our Nation's "'historical tradition of firearm regulation.'" *Id.* at 1897–98. It emphasized that "[w]hy and how the regulation burdens the right are central" to answering "whether the challenged regulation is consistent with the principles that underpin our

13

regulatory tradition." *Id.* at 1898. For example, even when purpose is identical, a challenged law "may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* By contrast, "laws imposing similar restrictions for similar reasons" as the Founders well might be constitutional. *Id.*

The Court identified a sufficient historical tradition in Founding Era surety laws and going-armed laws, which demonstrated that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed." *Id.* at 1903. It found comparable justification because the modern and historical laws both sought to "restrict[] gun use to mitigate demonstrated threats of physical violence." *Id.* at 1901. And it found comparable burdens because each was "narrow" and required particularized "judicial determinations" of an individual threat, *id.* at 1901–02; the modern law, "like the surety laws," was "of limited duration," *id.* at 1902; and the going-armed laws imposed the greater burden of "imprisonment," *id.* In doing so, the Court drew a sharp historical contrast between the "narrow" statute it upheld and laws that "broadly restrict arms use by the public generally" like the one struck down in *Bruen. Id.* at 1901–02. Additionally, all nine Justices rejected the argument that a government can disarm anyone not "responsible." *Id.* at 1903; *id.* at 1945 (Thomas, J., dissenting).

The *Rahimi* Court, which addressed a challenge to federal law, found it again "unnecessary to decide" whether 1791 or 1868 was the correct temporal reference point. *Id.* at 1898 n.1 (majority op.). But it did not cite a single Reconstruction Era law. The Court concluded, as in *Heller*, *McDonald*, and *Bruen*, that its decision was not "an exhaustive historical analysis." *Id.* at 1903 (quoting *Bruen*, 597 U.S. at 31).

### C.    Standard of Review

This Court "review[s] *de novo* a district court's grant of summary judgment." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024) (citation omitted). It also "review[s] *de novo* a district court's denial of summary judgment." *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013).

## SUMMARY OF THE ARGUMENT

The Young Adult Ban violates the Second Amendment under a straightforward application of controlling Supreme Court precedent. The plain text covers young adults' purchasing of firearms, and the State has not met its burden to prove that the ban is consistent with this Nation's historical tradition.

The ban burdens conduct that is protected by the Second Amendment's plain text. Young adult citizens are among "the people" who enjoy Second Amendment rights because they are members of the national community. That conclusion is confirmed by ubiquitous Founding Era evidence that young adults were required to acquire and use arms to participate in the militia and by considering other

constitutional guarantees that protect young adults. The plain text also protects their proposed conduct: purchasing firearms. The right to keep and bear arms necessarily protects the ability to acquire them, and purchase is the most common, most important, and often only available method of acquisition. Any law that hinders the exercise of Second Amendment rights, as the Young Adult Ban does here, triggers the State's burden to affirmatively prove a historical tradition.

The State has not met its historical burden. The Second Amendment's meaning is rooted in the public understanding of the right at the Founding—not Reconstruction. Although post-ratification history can help confirm or clarify Founding Era understanding, evidence from Reconstruction or later cannot itself establish a historical tradition of firearm regulation, and it certainly cannot contradict a Founding Era tradition. Focusing on the history that matters, the Court should conclude that the State's evidence falls short. First, Founding Era evidence shows that young adults were required to acquire and use arms, and that era contains no evidence of restrictions on their ability to acquire them. Second, the State's meager evidentiary showing is too late, does not prove any comparable tradition of regulation, and otherwise cannot satisfy the State's burden. And third, the State cannot justify the ban by reference to *Heller*'s dicta about categories of

presumptively lawful regulations because the Second Amendment yields only to "historical justifications" and, in any event, none of those categories applies here.

The Court should hold that the Young Adult Ban is unconstitutional and reverse the judgment of the district court.

## ARGUMENT

The Young Adult Ban completely prohibits young adults from purchasing any firearm. That violates the Second Amendment. The plain text covers young adults and their proposed conduct, and the State has not met its burden to "affirmatively prove," based on "historical evidence," that an "enduring," "representative," and "comparable tradition of regulation" justifies the challenged law. *Bruen*, 597 U.S. at 19, 24, 27, 30, 69; *see also Rahimi*, 144 S. Ct. at 1898–99.

## I. The Young Adult Ban burdens conduct that is presumptively protected by the Second Amendment's plain text.

The Second Amendment's text provides a clear command: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. Young adults are among "the people," and the plain text covers their purchasing of firearms for lawful purposes including self-defense.

**A.      Young adults are part of "the people."**

American citizens aged 18 to 20 are part of "the people" who undoubtedly enjoy Second Amendment rights. *See, e.g.*, *Worth v. Jacobson*, --- F.4th ----, 2024 WL 3419668, at *8 (8th Cir. July 16, 2024) ("Ordinary, law-abiding 18 to 20-year old Minnesotans are unambiguously members of the people."); *Lara*, 91 F.4th at 132 (holding "that 18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extend"); *Hirschfeld v. ATF*, 5 F.4th 407, 422 (4th Cir. 2021) (holding "that 'the people' protected by the Second Amendment includes at least those 18 and older"), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *Jones v. Bonta*, 34 F.4th 704, 717–21 (9th Cir. 2022) ("[Y]oung adults have Second Amendment protections as 'persons who are a part of a national community.'"), *op. vacated in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022). The State has not disputed this. 61 F.4th at 1324.

The "normal and ordinary" meaning of "the people" includes all members of the "national community or who have otherwise developed sufficient connection with this county to be considered part of that community." *Heller*, 554 U.S. at 576, 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)); *see United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044–45 (11th Cir. 2022) (same). The text thus presumptively covers "all Americans," *Bruen*, 597 U.S. at 70, and it makes no textual distinction on the basis of age, *see Nunn v. Georgia*, 1 Ga. 243,

18

250 (1846) ("The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree . . . .") (cited as "particularly instructive," *Bruen*, 597 U.S. at 54). Two other sources confirm that understanding: the rest of the Constitution and Founding Era militia laws.

**1.** Because "there is no better dictionary than the rest of the Constitution itself," other constitutional provisions confirm that "the people" unambiguously includes young adults. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 829 (2015) (Roberts, C.J., dissenting); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015) ("it is important to read the Supremacy Clause in the context of the Constitution as a whole").

When the Framers sought to draw age-based distinctions in the Constitution, they did so expressly. *See* U.S. Const. art. I, § 2, cl. 2 (25 or older to hold office in the House of Representatives); *id.* art. I, § 3, cl. 3 (30 or older to hold office in the Senate); *id.* art. II, § 1, cl. 5 (35 or older to hold office as President); *see also id.* amend. XXVI, § 1 (right to vote set at 18 in 1971). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions

on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421; *Jiminez-Shilon*, 34 F.4th at 1045 (similar).

Other Bill of Rights provisions that refer to "the people" have been held to protect young adults: the First Amendment and the Fourth Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (free exercise of religion); *New Jersey v. T.L.O.*, 469 U.S. 325, 344 (1985) (unreasonable searches and seizures). There is no "textual, contextual, or historical reason to think that the Framers understood the meaning of the phrase to vary from one provision of the Bill of Rights to another." *Jiminez-Shilon*, 34 F.4th at 1045. To be sure, First Amendment and Fourth Amendment rights sometimes are more limited for people under 18, but those limitations are justified by historical tradition such as the doctrine of *in loco parentis* and not any age limitation inherent in the text. *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 187 (2021); *New Jersey*, 469 U.S. at 336. And that is entirely consistent with the Second Amendment, which similarly yields only to "historical justifications." *Heller*, 540 U.S. at 635.

Other constitutional rights also have been held to protect young adults, including: due process, equal protection, the right against cruel and unusual

punishment, jury trials, voting, and marriage, among others. *Hirschfeld*, 5 F.4th at 422–23. As a matter of text, the Second Amendment covers young adults too.

**2.** That 18-to-20-year-olds are part of "the people" finds even more support in the Second Amendment's relationship to militia service. *Heller* explained that the Second Amendment's prefatory clause "announce[d] the purpose for which the right was codified: to prevent elimination of the militia," 554 U.S. at 599, and "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577. Although that "command" protects "an individual right unconnected with militia service," *id.* at 582, any logical connection between purpose and protection demonstrates that those expected (and, indeed, obligated) to participate in the militia are among "the people" whom the Second Amendment protects.

Just a few months after the Second Amendment's ratification, Congress passed the Militia Act of 1792.[3] The Militia Act "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). That Congress

---

[3] The Militia Act obligated "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five" to "be enrolled in the militia." Act of May 8, 1792, 1 Stat. 271. It also obligated each member to "provide himself with a good musket or firelock . . . or with a good rifle." *Id.*

required militia participation to begin at 18 is "owed, in large part, to George Washington's stated belief that the best soldiers were those aged eighteen to twenty-one." *NRA v. ATF*, 714 F.3d 334, 341 n.9 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). The Founders thus expected **and** obligated young adults to acquire arms for use in the militia.

The same practice, expectation, and obligation spread among the states: "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen," and "every state's militia law obliged young adults to acquire and possess firearms." *Jones*, 34 F.4th at 719 (quoting *NRA*, 714 F.3d at 340 (Jones, J., dissenting from denial of rehearing en banc)); *id.* at 719 & App'x 2 (collecting post-ratification laws). As explained in a comprehensive "colony-by-colony survey of militia laws," no colony or state "except for one 19-year period in Virginia" ever set the minimum age for militia duty higher than 18 years old. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533–35 (2019). "[T]he militia of the United States has always included eighteen-year-olds." *Id.* at 613.

The "contemporaneous legislative exposition" at the Founding is definitive evidence that the Framers understood young adults to enjoy Second Amendment rights. *Myers v. United States*, 272 U.S. 52, 175 (1926). The "members of the Second

Congress" in 1791, after all, "were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570. Their passage of the Militia Act demonstrates that they understood young adults to be within the "pool" from which the militia would be drawn, *Heller*, 554 U.S. at 596, and among those who enjoy Second Amendment rights. And "those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right." *Hirschfeld*, 5 F.4th at 429–30.

With all this evidence, it is "inconceivable" to suggest "that 18-to-20-year olds were not considered, at the time of the founding, to have full rights regarding firearms." *Jones*, 34 F.4th at 719 (quoting *NRA*, 714 F.3d at 342 (Jones, J., dissenting from denial of rehearing en banc)). Young adults are part of "the people."

### B. The plain text protects purchasing a firearm.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And to "keep" weapons means "to have weapons." *Id.* at 582. The only additional question is whether the text protects acquiring arms through purchase, and the answer is yes.

Courts have consistently held that the right to keep and bear arms "implies a corresponding right to acquire" those arms. *See, e.g.*, *Ezell v. City of Chicago*, 651

F.3d 684, 704 (7th Cir. 2011); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (following *Ezell*); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *see also Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (explaining that "the right to possess firearms for protection implies a corresponding right" to "obtain the bullets necessary to use them"). *Heller* itself endorsed the view that the right textually "implies something more." 554 U.S. at 617 (quoting T. Cooley, The General Principles of Constitutional Law in the United States of America 271 (1880)). It must cover purchasing, too.

The right to acquire arms necessarily includes purchasing them. "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting) (same). The act of purchasing (as opposed to receiving a gift or loan) is self-evidently the most common and most important method of acquisition; and for many, as the district court observed, it is the only available option. App.231–33; *see Hirschfeld*, 5 F.4th at 417. The Second Amendment would be meaningless if it did not protect purchasing firearms. "And thus laws that burden the ability to purchase arms burden Second Amendment rights." *Jones*, 34 F.4th at 716.

24

This commonsense holding finds support in the meaning of "infringe." That term demonstrates that the Second Amendment textually prohibits any regulation that hinders, places an obstacle on, or otherwise obstructs the ability to acquire, keep, or bear a firearm—a purchase ban plainly fits that mold. Founding Era dictionaries defined "infringe" to include burdens that fall short of total or permanent deprivations. 1 Samuel Johnson, Dictionary of the English Language 1101 (4th ed. 1773) (defining "infringe" as "[t]o destroy; to **hinder**" (emphasis added)), *id.* at 1007 (defining "to hinder" as "to impede"); 1 Noah Webster, American Dictionary of the English Language 110 (1828) (defining "infringe" as "[t]o destroy or **hinder**" (emphasis added)); *id.* at 106–07 (defining "hinder" as "to obstruct" and "[t]o interpose obstacles or impediments"); *see also Jiminez-Shilon*, 34 F.4th at 1045–46 (relying on the same or similar Founding Era dictionaries); *Frein v. Penn. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (explaining that the Second Amendment "forbids lesser violations that hinder a person's ability to hold on to his guns" (internal quotation and alteration omitted)). A purchase ban undoubtedly hinders acquisition of firearms, and also the keeping and bearing of them.

The Supreme Court's Second Amendment precedents confirm that less-than-total deprivations trigger the amendment's protections. *Heller* approvingly quoted language from *Nunn* that Second Amendment rights "shall not be *infringed*,

curtailed, or broken in upon, in the smallest degree." 554 U.S. at 629 (quoting *Nunn*, 1 Ga. at 251). It also rejected the argument that a total ban on handguns is constitutional merely because "the possession of other firearms (*i.e.*, long guns) is allowed." *Id.* at 619. *Bruen* then rejected the interest-balancing notion that the Second Amendment's protections depend on "the severity of the law's burden on that right," and held that a licensing regime "infringed" the Second Amendment even though it allowed the plaintiffs to "carry to and from work." 597 U.S. at 16, 18. The right to keep and bear arms must protect against more than just regulations that completely foreclose armed self-defense.

Interpreting the Second Amendment's text to protect against any deprivation—and reserving any exceptions for historical justification—is exactly how constitutional jurisprudence works. Regulations that "affect speech are valid if they would have been permissible at the time of the founding," but those regulations still implicate the First Amendment's text. *See Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1223–24 (2021) (Thomas, concurring in the denial of certiorari) (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Similarly, "the Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). A pat-down is a "search" under

the Fourth Amendment's text but is permissible if it is "reasonable." *See Terry v. Ohio*, 392 U.S. 1, 30–31 (1968). And a law would "abridge" the right to vote if it "makes it more difficult for the challenger to exercise her right to vote." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 190–92 (5th Cir. 2020).

The Second Amendment ("infringe[]") carries an "unqualified command" equal to that of the First Amendment ("abridg[e]"). *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). And holding that it does not protect purchasing a firearm would make the Second Amendment a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 70 (citation omitted). The Second Amendment covers a state law, like the Young Adult Ban, that burdens the exercise of the right by banning the purchase of any firearm of any kind.

Because "the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023); *Frein*, 47 F.4th at 254 ("[T]he Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification."); *Rahimi*, 144 S. Ct. at 1896 ("In *Bruen*, we explained that when a firearm regulation is challenged under the Second

Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'").

## II. The State has failed to prove that the Young Adult Ban is consistent with this Nation's historical tradition of firearm regulation.

The State's evidence does not satisfy its burden to prove that the Young Adult Ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The panel lost its analytical bearings by holding that Reconstruction Era understandings are controlling and erroneously upholding the ban based on incomparable mid-to-late 19th-century laws. 61 F.4th at 1322–25. That is not how the Second Amendment works. At the Founding, our Nation recognized, protected, and even obligated young adults to acquire firearms, including through purchase. That "tradition[] of the American people . . . demands our unqualified deference." *Bruen*, 597 U.S. at 26; *id.* at 67 (holding that an "enduring American tradition permitting public carry" could not be "overcome"). The State's evidence— even if it were relevant—does not prove a comparable tradition of firearm regulation. And the ban is not entitled to any presumption of lawfulness. The Court should hold that the Young Adult Ban is unconstitutional.

### A. The State must prove an enduring, representative, and comparable tradition of regulation from the Founding Era.

The Young Adult Ban is unconstitutional unless the State meets its burden to "affirmatively prove," based on "historical evidence," that an "enduring,"

"representative," and "comparable tradition of regulation" justifies the challenged law. *Bruen*, 597 U.S. at 19, 24, 27, 30, 69. As *Rahimi* put it, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898.

In some cases—like *Bruen* and *Heller*—this analysis is "straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a **distinctly similar** historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen*, 597 U.S. at 26–27 (emphasis added). *Bruen* and *Heller* both "exemplifie[d] this kind of straightforward historical inquiry." *Id.* at 27. The challenged laws in both cases sought to remedy the centuries-old problem of firearm violence in populated areas, and both were laws "that the Founders themselves could have adopted to confront that problem." *Id.* No distinctly similar regulation existed in either case, and both laws were held unconstitutional. *Id.*

By unsurprising contrast, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 144 S. Ct. at 1898. Courts conduct "more nuanced"

29

analogical reasoning in "cases implicating unprecedented societal concerns," "dramatic technological changes," or otherwise "*new*" issues. *Bruen*, 597 U.S. at 27–28. The required historical analysis does not "suggest a law trapped in amber": "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1897–98 (quoting *Bruen*, 597 U.S. at 30).

To be a proper analogue, the State must show that the modern law and historical law are "relevantly similar" based on both "how and why" the laws burden protected conduct. *Bruen*, 597 U.S. at 29. This is a "*central* consideration," and it turns on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (quotation marks omitted). This test is conjunctive; thus, "[e]ven when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 144 S. Ct. at 1898.

"[H]istorical tradition" is what "delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19; *Heller*, 554 U.S. at 635 (explaining "historical justifications" provide for "exceptions" to the Second Amendment's protections). The entire point of this analysis is to determine whether the challenged law is an

"outlier[] that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (quoting *Drummond*, 9 F.4th at 226). It is vitally important, then, to apply the correct public understanding of the right. The meaning and scope of the Second Amendment, whether applied against the federal government or a state, is the public understanding of the right during the Founding Era surrounding 1791. The panel was profoundly wrong—and defied Supreme Court precedent—to conclude otherwise.

First, the Fourteenth Amendment "incorporate[d] the Second Amendment right recognized in *Heller*." *McDonald v. City of Chicago*, 561 U.S. 731, 791 (2010). *Heller* held that the Second Amendment "codified a *pre-existing* right," 554 U.S. at 592, and the scope of the individual right it recognized was grounded in Founding Era evidence, *see Bruen*, 597 U.S. at 37 (discussing *Heller*). The Fourteenth Amendment's ratifiers "adopted" the right to keep and bear arms as it was "understood" at the Founding. *Id.* at 37, 45. The panel erred by holding that the Fourteenth Amendment's ratifiers adopted something else. 61 F.4th at 1322.

Second, the Supreme Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37. "Thus, if a Bill of Rights protection is incorporated, there is **no daylight** between the federal and state conduct it prohibits or requires." *Timbs*, 586 U.S. at

31

150 (emphasis added). *McDonald* already rejected the dangerous notion that "only a watered-down" version of the Second Amendment applies against the states. 561 U.S. at 786; *see also id.* at 850 (Thomas, J., concurring in part and concurring in judgment) (concluding that the Privileges or Immunities Clause "establishes a minimum baseline of federal rights, and the constitutional right to keep and bear arms plainly was among them"). The panel's holding that the right as applied against states has "the same scope" but different "contours" than as applied against the federal government, 61 F.4th at 1323, cannot be squared with *McDonald*, *Bruen*, or *Timbs*. The distinction is meaningless; different "contours" necessarily imply a different "scope," and the same "scope" necessarily implies the same "contours." The panel's reasoning does not justify ignoring *Bruen* and other controlling Supreme Court precedent. The Second Amendment's meaning as applied to the federal government undoubtedly is "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. And under the no-daylight rule mandated by *Timbs* and *McDonald*, the Second Amendment's meaning as applied against the states must be the exact same, as *Bruen* assumed.[4]

---

[4] Even the panel stopped short of suggesting, under a theory of "reverse incorporation," that the relevant temporal scope as applied against the federal government is 1868. *See* Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1440 (2022). Nor is that theory compatible with ratification history, which demonstrates that the ratifiers sought to

Third, the panel's holding would work a radical shift in constitutional jurisprudence. The Supreme Court has always treated the Founding Era as the key period for determining the meaning of Bill of Rights guarantees. *See, e.g.*, *Gamble v. United States*, 587 U.S. 678, 683, 709 (2019) (relying primarily on Founding Era history to ascertain Double Jeopardy Clause "as originally understood" in a case against the federal government and noting that its interpretation would apply the same way against a state). That is equally true in cases challenging state laws. The Court rejected reliance on a 30-state practice that "arose in the second half of the 19th century," which could not "evince a tradition that should inform our understanding of the Free Exercise Clause." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 482 (2020). It reviewed 19th-century sources only to "confirm th[e] understanding" of the Sixth Amendment's unanimity requirement, which it held "applies to state and federal criminal trials equally." *Ramos v. Louisiana*, 590 U.S. 83, 91–93 (2020). And it has likewise focused on the Founding for the Sixth Amendment right to confrontation, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004), the Fourth Amendment, *Virginia v. Moore*, 553 U.S. 164, 168 (2008), and the Free Speech Clause, *Nev. Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117,

_____

"enforce" the same right against the states, not to change it. *See McDonald* 561 U.S. at 829–50 (Thomas, J., concurring in part and concurring in the judgment).

122–25 (2011). Regardless of what the panel here thought would be most "[]logical," 61 F.4th at 1324, it was error to disregard this entire body of constitutional jurisprudence.

Fourth, the Supreme Court's Second Amendment cases further demonstrate that proximity to the Founding is critical. *Bruen* and *Heller* considered English practices only to discern what the Founders understood. *Bruen*, 597 U.S. at 35, 45–46; *Heller*, 554 U.S. at 593. Both considered Colonial and early Republic sources, *Bruen*, 597 U.S. at 46–50; *Heller*, 554 U.S. at 581–86, 600–03, but *Bruen* made clear that the relevance of such evidence depends on its proximity to 1791, 597 U.S. at 49 (discounting a colonial statute from "roughly a century before the founding"). As for post-ratification, antebellum evidence, *Bruen* reiterated *Heller*'s assertion that "evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" 597 U.S. at 35 (quoting *Heller*, 554 U.S. at 605). But *Bruen* warned "against giving postenactment history more weight than it can rightly bear," *id.*, forbade reliance on post-ratification understandings "that are *inconsistent* with the original meaning," *id.* at 36 (citation omitted), and dismissed an 1860 statute as "insubstantial" because it was enacted "nearly 70 years after the ratification of the Bill of Rights," *id.* at 55 n.22. *Heller* considered post-ratification evidence as "mere

confirmation." *Gamble*, 587 U.S. at 702 (discussing *Heller*). As for Reconstruction Era evidence, *Bruen* explained that this evidence is "secondary," reviewed for "mere confirmation," and "do[es] not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Bruen*, 597 U.S. at 36–37. And *Bruen* swiftly rejected late-19th-century and 20th-century sources, at least where they contradicted earlier evidence. *Id.* at 66 & n.28.[5]

"[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. Consistently with the Supreme Court's constitutional jurisprudence, this Court should hold that the public understanding of the right to keep and bear arms in 1791 is the correct temporal reference point for all Second Amendment claims. *See, e.g.*, *Lara*, 91 F.4th at 133–34 (holding "that the Second Amendment should be understood according to its public meaning in 1791" and "set[ting] aside the [State's] catalogue of statutes from the mid-to-late nineteenth century"). Evidence from Reconstruction or later is "simply too late" to establish a historical tradition. *See Bruen*, 597 U.S. at 82 (Barrett, J., concurring). And other

---

[5] Justice Barrett wrote that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." 597 U.S. at 83 (Barrett, J., concurring). Justice Barrett also explained that, "if 1791 is the benchmark, then . . . appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)." *Id.* at 82.

post-ratification (*i.e.*, post-1791) evidence can be considered only to the extent it is a permissible tool to confirm or clarify original public meaning in 1791. *See, e.g.*, *Gamble*, 587 U.S. at 702; *Rahimi*, 144 S. Ct. at 1915–16 (Kavanaugh, J., concurring); *id.* at 1924–25 (Barrett, J., concurring). In other words, the Founders' understanding in 1791 of the right to keep and bear arms is what matters.

### B. The State has not met its burden to prove a historical tradition justifying the Young Adult Ban.

To uphold the ban, the panel relied on: (1) three state laws between 1856 and 1859 that prohibited anyone from giving a handgun to a minor; (2) a "flurry" of statutes by 16 states and D.C. between 1875 and 1897 that either prohibited anyone from giving a handgun to a minor or restricted young adults' concealed carry; (3) three 19th-century university resolutions that restricted possession of weapons on school grounds (one applied off-campus); and (4) selected late-19th-century state court cases, legal commentary, and newspapers. 61 F.4th at 1325–30. That evidence cannot satisfy the State's burden for three reasons. First, it is too late to establish a Founding Era tradition. Second, it cannot negate the Founding Era tradition recognizing the ability (and obligation) of young adults to acquire, possess, and use firearms. And third, the historical evidence cited by the panel does not establish a relevantly similar historical tradition of prohibiting young adults from purchasing any firearm under penalty of prosecution. The State's hodgepodge of unrelated

regulations does not prove an "enduring," "representative," and "comparable tradition of regulation." *Bruen*, 597 U.S. at 27, 30, 69.

### 1. The State's evidence is too late.

The historical evidence cited by the panel all comes from 65 years after ratification or later. 61 F.4th at 1325–30. Such "evidence is simply too late" to shed light on the original public meaning of the Second Amendment in 1791. *See Bruen*, 597 U.S. at 82 (Barrett, J., concurring). In *Lara*, when Pennsylvania tried to justify an 18-to-20-year-old public-carry ban, the Court "set aside the [state's] catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 years after the ratification of the Second Amendment," and then concluded that the Pennsylvania's earlier evidence was insufficient. 91 F.4th at 134–37. This Court should follow *Bruen*, as *Lara* did, "set[ting] aside" the State's too-late evidence here and striking down the Young Adult Ban as unconstitutional. *Id.* at 134.

### 2. Founding Era tradition confirms that 18-to-20-year-olds have a conclusive right to acquire arms.

*Bruen* made clear that "the traditions of the American people . . . demand[] our unqualified deference." 597 U.S. at 26. The tradition that carries the day here is the Founding Era tradition of permitting (and requiring) young adults to acquire and use firearms, which the State's 19th-century evidence "cannot overcome." *Id.* at 67.

The Second Congress enacted the Militia Act of 1792 just a few months after the Second Amendment's ratification. Act of May 8, 1792, 1 Stat. 271. That Act required all able-bodied men between 18 and 45 to "be enrolled in the militia," and it required each of them to "provide himself with a good musket or firelock . . . or with a good rifle." *Id.* By then or shortly after, "the minimum age for militia service in every state became eighteen," and "every state's militia law obliged young adults to acquire and possess firearms." *Jones*, 34 F.4th at 719, 721 (quoting *NRA*, 714 F.3d at 340–44 (Jones, J., dissenting from denial of rehearing en banc)). "[T]he government did not provide or keep the guns unless the citizen was too poor to afford one," *Hirschfeld*, 5 F.4th at 429, and even then required the citizen "to pay back the government or work off their debt," in effect, selling young adults firearms, *see Jones*, 34 F.4th at 718; *see also United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves.").

The universal practice of requiring young adults to acquire firearms in order to serve in the militia demonstrates our Nation's tradition: young adults "could, and indeed should, keep and bear arms." *Lara*, 91 F.4th at 136. "[T]he militia of the United States has always included eighteen-year-olds," Kopel & Greenlee, *supra*, 43 S. Ill. U. L.J. at 613, and the Second Amendment conclusively protects the right

38

of militiamen to keep and bear arms "for all lawful purposes; these include not only militia service, but also self-defense, hunting, target practice, and so on," *id.* at 499. Often based on that tradition, courts across the nation have held that laws burdening the ability of young adults to acquire or carry firearms are unconstitutional. *See Worth*, 2024 WL 3419668, at *14 (holding that Minnesota's law prohibiting young adults from publicly carrying handguns was unconstitutional); *Lara*, 91 F.4th at 140. (invalidating law banning young adults from public carry during state-of-emergency); *Jones*, 34 F.4th at 723 (concluding, after surveying Founding Era militia laws, that "young adults have Second Amendment protections" and holding that California law restricting sales of most firearms to young adults was unconstitutional); *Hirschfeld*, 5 F.4th at 434 (concluding that "state and federal militia laws show that 18-year-olds had a right to keep and bear arms" and holding that the federal ban on selling handguns to people under 21 was unconstitutional); *Fraser v. ATF*, 672 F. Supp. 3d 118, 145 (E.D. Va. 2023) (holding that federal ban on selling handguns to young adults was unconstitutional). This Court should follow suit.

The panel saw things differently. Rather than recognizing our enduring tradition, the panel incorrectly observed that Plaintiffs-Appellants had "mistake[n] a legal obligation for a right." 61 F.4th at 1331. That distinction suffers a logical flaw:

an obligation to acquire a firearm presupposes the ability to acquire one, and young adults' historical ability to acquire a firearm (including through purchase) demonstrates a tradition recognizing their right to do so. It also suffers precedential flaws. For one, it violates *Heller*'s admonition to uphold the "link between the stated purpose [protecting the militia] and the command [to protect the right to keep and bear arms]." 554 U.S. at 577. For another, it ignores that *Heller* relied on "colonial statutes [that] required individual arms bearing for public-safety reasons"—*i.e.*, legal obligations—to evidence the tradition of "an individual right to bear arms for defensive purposes." *Id.* at 601–02. That young adults were legally obligated to acquire arms for militia purposes is not a basis to ignore this Founding Era evidence demonstrating a right to acquire firearms by purchase or otherwise.

In earlier briefing, the State tried to sow doubt about Founding Era tradition by pointing out that the Militia Act permitted states to exempt those under 21,[6] that some states in the 19th-century required parents to supply weapons, and that some mid-19th-century state laws required parental consent for young adults to participate in the militia. ECF No. 32 at 24–25. But these rare and too-late exceptions prove too much; they confirm the enduring tradition that young adults almost universally were

_____

[6] The State cited only one example of a state exercising this option near the Founding: An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, ch. MDCXCVI, §§ I–II (1793). ECF No. 32 at 24 n.6.

required to acquire firearms to participate in the militia. And "those laws do little to suggest that those under 21 were not required to keep and bear arms." *Hirschfeld*, 5 F.4th at 434. Similarly flawed is the State's contention that militia duty sometimes began around 16 or 21, ECF No. 32 at 24–25, because around the Founding "the minimum age for militia service in *every state* became eighteen," *Lara*, 91 F.4th at 137 (rejecting an identical argument). The burden to "affirmatively prove" a supporting historical tradition—and, necessarily, to disprove a Founding Era tradition that would defeat the ban—falls on the State. *Bruen*, 597 U.S. at 19. So the State's effort to muddle the history does nothing to help its case.

The Court's analysis can end here: no 19th-century evidence can overcome the enduring and representative (indeed, nationwide) Founding Era tradition permitting young adults to acquire firearms including by purchase. *Bruen*, 597 U.S. at 26, 67.

### 3. The State's evidence does not establish a relevantly similar historical tradition of firearm regulation.

Separate and apart from the dispositive Founding Era tradition discussed above, the evidence cited by the State and the panel fails to justify the Young Adult Ban. The State has no support from the Founding Era.[7] So it retreats to a motley

---

[7] *Lara*, 91 F.4th at 136 (noting the "conspicuously sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification");

assortment of 19th-century evidence that is both too late and proves too little. As we have shown, the State's evidence "come[s] too late" to establish a Founding Era tradition. *Bruen*, 597 U.S. at 37. But that evidence also "has several serious flaws even beyond the[] temporal distance from the founding," which render the State's evidence insufficient to establish a justifying tradition. *Id.* at 66.

This is a "straightforward" case under *Bruen*. *Id.* at 26. The undisputed absence of a "distinctly similar historical regulation" from the Founding Era that criminalized a young adult's purchase of any firearm is strong evidence that the Young Adult Ban is unconstitutional. *Id.* The panel itself recognized that "firearm violence among some 18-to-20-year-olds is nothing new." 61 F.4th at 1332; *see also Fraser*, 672 F. Supp. 3d at 145 ("Since time immemorial, teenagers have been, well, teenagers."). But the Founders often "required individual arms bearing for public-safety reasons," *Heller*, 554 U.S. at 601, showing that they addressed the same problem "through materially different means," *Bruen*, 597 U.S. at 26. The brook is simply too broad for the State to leap: The Young Adult Ban is not "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

---

*Hirschfeld*, 5 F.4th at 437 ("[T]here were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856.").

Individually and collectively, the State's too-late evidence fails to establish a justifying historical tradition.

 **a.** The panel relied primarily on three state laws passed at least 64 years after the Second Amendment's ratification—Alabama (1855), Tennessee (1858), and Kentucky (1859)—that prohibited others from selling or giving a pistol (but not a long gun) to a minor. 61 F.4th at 1325–26 & App'x.

 These statutes did not "impose a comparable burden." *Bruen*, 597 U.S. at 29. Because they applied narrowly to pistols—and not all firearms—they did not restrict young adults' ability to acquire firearms as broadly as the Young Adult Ban. *See Rahimi*, 144 S. Ct. at 1898 (recognizing that a modern law is not analogous if it regulates Second Amendment rights "beyond what was done at the founding"). In *Bruen*, the Court held that historical laws restricting the intent of public carry, manner of public carry, or exceptional circumstances under which one could not carry, could not support a modern law banning all public carry. 597 U.S. at 39. A law restricting acquisition of some firearms thus cannot justify a modern law that applies to all firearms. *See Worth*, 2024 WL 3419668, at *13 (historical concealed carry laws could not justify ban on all public carry).[8] The Tennessee law allowed

---

[8] The panel also wrongly stated that these historical laws banned young adults "from even possessing" pistols. 61 F.4th at 1320. That is wrong. Nothing within the text of the cited statutes criminalized the young adults' conduct, and they certainly did not

minors to acquire firearms to hunt and for defense while traveling, which renders that one even less comparable. Tenn. Code § 4864 (1858).

Nor did these historical laws impose a comparable punishment on young adults. The historical laws regulated the supplier, not the young adult, but the Young Adult Ban subjects 18-to-20-year-olds to criminal prosecution and imprisonment. In *Rahimi*, the Supreme Court emphasized that the historical laws supporting 18 U.S.C. § 922(g)(8) were relevantly similar because "[t]he going armed laws provided for imprisonment." 144 S. Ct. at 1902. The historical laws cited here imposed **no** penalty on minors; the Young Adult Ban would have them imprisoned.

The panel believed, incorrectly, that these laws "more severely" burdened Second Amendment rights because the Young Adult Ban "leaves open avenues for 18-to-20-year-olds to acquire" firearms, such as a gift or loan. 61 F.4th at 1328. That is wishful thinking—many young adults lack those options. App.232–33; *Hirschfeld*, 5 F.4th at 417. For those young adults who do not have anyone willing to gift or loan a firearm to them, this law is a total ban on their right to acquire a firearm—as severe a burden on the right as there can be. App.232 & n.31. And, as the district court observed, "Worse still, it is likely that these particular 18-to-20-

criminalize a young adults' possession of a pistol. Those statutes criminalized only the conduct of those who supplied the pistol to the minor.

year-olds are the ones who actually need firearms to defend themselves: they are likely independent, likely to live in dangerous neighborhoods, and likely to have families and children of their own." App.232.

The ban's exceptions are legally irrelevant, too. For one, *Heller* rejected the argument that a ban on handguns was constitutional merely because other avenues of self-defense—*i.e.*, "the possession of other firearms (*i.e.*, long guns)"—were allowed. 554 U.S. at 629. For another, the Young Adult Ban simply does not apply to a young adult obtaining a firearm by gift or loan. As the district court put it, the question is whether the ban is constitutional when a young adult "attempts to purchase a gun but cannot." App.232 n.31. "[T]he proper focus of the constitutional inquiry" is the application of the Young Adult Ban on attempted purchases, rather than applications "for which it is irrelevant." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). The panel was wrong to suggest that the Young Adult Ban is constitutional because it leaves an exceedingly narrow avenue open.

The State's proffered laws also are not "comparably justified." *Bruen*, 597 U.S. at 29. The panel believed that each was passed "for the same reason: enhancing public safety." 61 F.4th at 1326. But that overgeneralization cannot justify a modern law; if that were so, then every firearm law would be comparably justified and this inquiry would be meaningless. *Rahimi* could have used the same broad justification,

but it more specifically referenced the purpose of "mitigat[ing] demonstrated threats of physical violence." 144 S. Ct. at 1901. The panel's own discussion demonstrates that these laws were passed to protect the young adult. 61 F.4th at 1326–27 (observing that the Tennessee and Kentucky statutes were enacted "in tandem with laws that prohibited giving spirits to minors"). But the Young Adult Ban was enacted to mitigate the risk that young adults would use guns against others. *Id.* (citing 2018 Fla. Laws 10). That is a markedly different "why." *Bruen*, 597 U.S. at 29. The State's and the panel's reliance on pre-civil war restrictions barring people from selling or giving a pistol to young adults does not support (much less prove) a "well-established and representative" tradition that could uphold the Young Adult Ban. *See Bruen*, 597 U.S. at 30; *id.* at 46 ("doubt[ing] that *three* colonial regulations could suffice to show a tradition").

**b.** The panel next relied on a "flurry" of even later regulations from 16 states and the District of Columbia between 1875 and 1897. 61 F.4th at 1327 & App'x. These late-19th-century regulations tell us nothing about Founding Era understandings. They also do not suggest a comparable tradition of regulation. All but two—Missouri (1879) and Delaware (1881)—covered only handguns and only applied to males, not young adult females. Only the 1885 Nevada statute criminalized any conduct of the minor. But that law merely restricted concealed

carry, 1885 Nev. Stat. 51 (codified at Nev. Rev. Stat. § 4864 (1885)) (making it a crime for a young adult to "wear or carry any . . . pistol . . . concealed upon his person"), which cannot justify an outright ban on acquisition of all firearms, *Bruen*, 597 U.S. at 38 (holding concealed carry restrictions could not support banning all public carry). The rest of these laws applied only to the supplier, not to the young adult. None of them subjected a young adult to imprisonment for acquiring a firearm.

**c.** The panel also cited three university resolutions—University of Georgia (1810), University of Virginia (1824), and University of North Carolina (1838)— that in varying degrees regulated possession of firearms by students of any age. 61 F.4th at 1327.[9] Reliance on these fails for several reasons. The burdens are not comparable because the resolutions only affected students, only one of them applied while students were off-campus, and none of them could result in a young adult's imprisonment. *See Worth*, 2024 WL 3419668, at *11 (rejecting university rules as "very different in their 'how'"). Nor do they show a "well-established and representative" tradition. *See Bruen*, 597 U.S. at 30; *id.* at 46 ("doubt[ing] that *three* colonial regulations could suffice to show a tradition"). And, rather than helping the

---

[9] This discussion was improper from its start because the State did not cite these resolutions in its briefing. *Bruen*, 597 U.S. at 38 (discussing "the historical record compiled by [the government]"); *id.* at 25 n.6 (instructing courts "to decide a case based on the historical record compiled **by the parties**" (emphasis added)).

State, the fact that a few universities prohibited students from bringing firearms to campus strongly suggests "that, *outside* of the public university setting, college-aged students could, and did, regularly possess firearms." *Fraser*, 672 F. Supp. 3d at 144.

**d.** The panel's reliance on selected late-19th-century legal commentary, state court decisions, and newspapers also was misplaced. 61 F.4th at 1329–31.

Those post-ratification sources carry no weight when compared to earlier evidence supporting young adults' right to acquire firearms. *Gamble*, 587 U.S. at 702–03. They also do not support a relevant tradition. Thomas Cooley made a passing reference in a footnote "[t]hat the State may prohibit the sale of arms to minors." Thomas M. Cooley, Treatise on Constitutional Limitations 740 n.4 (5th ed. 1883) (citing only *Tennessee v. Callicutt*, 69 Tenn. 714 (1878)). *Callicutt* does not help the State. Nearly a century after ratification, *Callicutt* declined to dismiss a criminal charge for violation of the state law prohibiting giving a pistol or dangerous weapon to a minor (which, under Tennessee law, was anyone younger than 21). 69 Tenn. at 714–16. That Tennessee law allowed minors to acquire firearms for purposes like hunting and for defense while traveling. Tenn. Code § 4864 (1858). *Callicut* also made no mention of the age of the minor, *id.*, and unbridled "speculat[ion]" that the minor was 18 or older does not satisfy the State's burden, *Bruen*, 597 U.S. at 58 n.25. The statute it analyzed "applie[d] only to concealed

carry" and therefore is not comparable to Florida's ban. *See Worth*, 2024 WL 3419668, at \*13. And *Callicutt*'s reference to the constitutionality of Tennessee's law was in reliance on *Aymette v. Tennessee*, 21 Tenn. 154, 158 (1840), which *Heller* expressly rejected as an "odd reading of the right," 554 U.S. at 613, and on *Page v. Tennessee*, 50 Tenn. 198 (1871), which adopted a militia-only reading of the Second Amendment that was necessarily rejected by *Heller*, 554 U.S. at 582–83. This Court should not stake its interpretation on Cooley's passing reference to a Tennessee decision that is inconsistent with the original public meaning of the Second Amendment. *See Bruen*, 597 U.S. at 65; *see Hirschfeld*, 5 F.4th at 436–47 (rejecting the same argument); *Jones*, 34 F.4th at 720 (same).

Finally, the panel relied on some selected "newspapers from the Reconstruction Era," which it said suggest that "much of the public at the time supported restrictions" on the firearms rights of young adults. 61 F.4th at 1329. But this argument—like all others—focuses on the wrong temporal reference point. It should not be considered here because it is temporally irrelevant and contradicts earlier evidence supporting young adults' traditional right to the acquisition, possession, and carry of firearms. *See Bruen*, 597 U.S. at 67.

\* \* \*

The State's evidence, "[t]aken together," does not establish that the Young Adult Ban "fits within our regulatory tradition." *Rahimi*, 144 S. Ct. at 1901. At the Founding, our historical tradition was the opposite: young adults had an unqualified right and obligation to acquire, possess, and carry firearms. *Bruen*, 597 U.S. at 26 ("[T]he traditions of the American people . . . demand[] our unqualified deference."). The State's evidence is far too late to establish a Founding Era historical tradition. Even if it were permissible as post-ratification evidence of original meaning—which it is not—that meager showing cannot overcome earlier evidence and does not demonstrate an "enduring," "representative," and "comparable tradition of regulation." *Id.* at 27, 30, 69. The Young Adult Ban violates the Second Amendment.

> ### 4. The Young Adult Ban is not "presumptively lawful" or a permissible ban on a "category" of citizens.

The Young Adult Ban is not constitutional as a presumptively lawful commercial regulation, as analogous to other categorical bans mentioned in *Heller*, or as supported by traditions of banning other demographic groups near the Founding. None of these arguments can save the ban.

**a.** There is no basis under *Heller*, *Bruen*, or *Rahimi* to uphold a ban as presumptively lawful without regard to historical tradition. *See United States v. Duarte*, 101 F.4th 657, 668 (9th Cir. 2024) ("Simply repeating *Heller*'s language about the presumptive lawfulness of felon firearm bans will no longer do after

50

*Bruen*." (quotations and alterations omitted)), *op. vacated, reh'g en banc granted* (9th Cir. July 17, 2024). *Heller* expressly reserved "expound[ing] upon the historical justifications" of any exceptions to the right for future cases. 554 U.S. at 635. *Bruen* made clear that the text-and-history standard governs all Second Amendment challenges, 597 U.S. at 24, and relied on what "the historical record yield[ed]" when it "assumed" that certain sensitive-place restrictions would be constitutional, *id.* at 30. And *Rahimi* reiterated the text-and-history standard. 144 S. Ct. at 1898–99. A law must be justified by **history**, and the en banc Court should make that clear. *But see United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (holding that *Bruen* did not abrogate *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)).

**b.** The Young Adult Ban is not a law "imposing conditions and qualifications on the commercial sale of firearms." 61 F.4th at 1320 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Commercial regulations "only minimally affect the ability to acquire a firearm." *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017); *see Hirschfeld*, 5 F.4th at 416 ("A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records."). Laws that "completely prohibit [the individual] or anyone else, for that matter, from selling or buying firearms," *Focia*, 869 F.3d at 1286, or laws that impose "a total ban on *buying*

51

a gun," *Hirschfeld*, 5 F.4th at 416, do not qualify as commercial regulations. The Young Adult Ban is a total ban, and the panel was wrong to hold that it is presumptively valid as a commercial regulation.

**c.** The Young Adult Ban cannot be upheld as analogous to other categories of restrictions that *Heller* presumed were lawful. *See Heller*, 554 U.S. at 626 (referencing "prohibitions on the possession of firearms by felons and the mentally ill"). Central to "an analogical inquiry" are "how and why the regulations burden" protected conduct. *Bruen*, 597 U.S. at 29. The Young Adult Ban is unlike bans on felons-in-possession or the mentally ill because those bans are "based on an *individualized* determination that allowing the person in question unfettered access to firearms would pose a threat to public safety." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 755 (N.D. Tex. 2022). In *Rahimi*, the Supreme Court emphasized that Section 922(g)(8), like surety and going-armed laws, "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." 144 S. Ct. at 1902. It also explained that such an analogy did not support laws that "broadly restrict arms use by the public generally" like the "regulation struck down in *Bruen*." *Id.* at 1901. The Young Adult Ban requires no similar individualized determination and resembles the laws struck down in *Heller* and *Bruen*, not the one upheld in *Rahimi*.

*Rahimi* held that the Second Amendment is not limited only to those who are "responsible," 144 S. Ct. at 1903, which is the premise underlying the argument for categorical disarmament of certain other demographic groups, *see, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (*en banc*) (holding that 18 U.S.C. § 922(g)(1) was unconstitutional as applied), *cert. granted, op. vacated, remanded*, 2024 WL 3259661 (U.S. July 2, 2024). And, in any event, there is zero historical evidence from the Founding Era demonstrating that young adults "presented an unacceptable risk of danger if armed." *See United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) (upholding Section 922(g)(1)), *cert. granted, op. vacated, remanded*, 2024 WL 3259675 (U.S. July 2, 2024). Just the opposite: the Founders expected young adults to acquire firearms, to keep them, and to use them in defense of the Nation. *See, e.g.*, *Hirschfeld*, 5 F.4th at 437 ("The idea that 18- to 20-year-olds are not virtuous in the same manner as felons is a strange contention. Why would the federal government and every state require unvirtuous people to have guns and be in a militia?"); *Jones*, 34 F.4th at 723 ("Young adults are neither felons nor mentally ill. The semiautomatic rifle law [banning acquisition by young adults] does not fall within the Supreme Court's enumerated categories.").

**d.** Lastly, the Young Adult Ban cannot be justified as analogous to historical bans on certain demographic groups. There is no evidence of any Founding Era

firearms ban that targeted young adults as a class. *See Bruen*, 597 U.S. at 26. Although historical legislatures disarmed certain groups based on race (Blacks, Native Americans), religion (Quakers, Catholics), and wartime political affiliation (Tories), those invidious restrictions "would be unconstitutional" today. *Range*, 69 F.4th at 104–05. There is no reason to conclude that young adults—who were expected to possess and use firearms at the Founding—are relevantly similar to those politically disfavored groups. *Worth*, 2024 WL 3419668, at *11 (rejecting argument that a legislature can "deem a category of people dangerous based only on belief"). Because of that Founding Era tradition and the fact that young adults are legally adults in the State of Florida, Fla. Stat. § 743.07, the Young Adult Ban cannot be justified by reference to historically diminished rights of "infants." *See Hirschfeld*, 5 F.4th at 435–37; *see also Worth*, 2024 WL 3419668, at *11 (rejecting argument that young adult carry ban was justified because minors had "restricted" common law rights). And the Supreme Court's rejection of the government's "responsible" citizen argument undermines a major premise of the constitutionality of such class-based bans. *Rahimi*, 144 S. Ct. at 1903; *see also id.* at 1944–45 (Thomas, J., dissenting) (elaborating on why the government's argument that Congress can "disarm anyone who is not 'responsible' and 'law-abiding'" is unsupported and "antithetical to our constitutional structure").

The Young Adult Ban is an "outlier[] that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (citation and quotation marks omitted). The State has not proven that its law completely barring young adults from purchasing any firearm is consistent with our Nation's historical tradition. It therefore violates the Second Amendment as incorporated by the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this Court reverse the judgment of the district court and remand the case with instruction to enter judgment for Plaintiffs-Appellants.

Dated: July 31, 2024                    Respectfully Submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
W. Chadwick Lamar, Jr.
Bradley Arant Boult Cummings LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 because it contains 12,950 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and type-style requirements of Rule 32(a) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 31, 2024.

/s/ *John Parker Sweeney*
John Parker Sweeney

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 31, 2024, a copy of the foregoing was served via electronic delivery to all parties' counsel via the Court's appellate CM/ECF system, which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney

*Counsel for Plaintiffs-Appellants*