# In the United States Court of Appeals for the Eleventh Circuit

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL.,

*Appellants,*

v.

COMMISSIONER, FLORIDA DEPARTMENT OF LAW ENFORCEMENT,

*Appellee.*

## APPELLEE'S EN BANC BRIEF

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:18-CV-137

ASHLEY MOODY
ATTORNEY GENERAL

HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
CHRISTOPHER J. BAUM, B.C.S.
KEVIN A. GOLEMBIEWSKI
*Senior Deputy Solicitors General*
Office of the Attorney General
1 SE 3rd Avenue
Miami, FL 33131
(978) 460-1314; (850) 410-2672 (fax)
*christopher.baum@myfloridalegal.com*
*Counsel for Defendant/Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for the Commissioner of the Florida Department of Law Enforcement, certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3.:

1. Baum, Christopher J., *Counsel for Defendant/Appellee*

2. Bell, Daniel, *Counsel for Defendant/Appellee*

3. Blair, Connor M., *Counsel for Plaintiffs/Appellants*

4. Bradley Arant Boult Cummings LLP, *Counsel for Plaintiffs/Appellants*

5. Fant, Radford, *Plaintiff/Appellant*

6. Fitzpatrick, Hon. Martin A., *United States Magistrate Judge*

7. Florida Attorney General's Office

8. Florida Department of Law Enforcement

9. Glass, Mark, in his official capacity as Commissioner of the Florida Department of Law Enforcement, *Defendant/Appellee*

10. Golembiewski, Kevin, *Counsel for Defendant/Appellee*

11. Kelsey, Dominic, *Plaintiff/Appellant*

12. Lamar, William Chadwick, *Counsel for Plaintiffs/Appellants*

13. Nardone, Marc A., *Counsel for Plaintiffs/Appellants*

14. National Rifle Association of America, Inc., *Plaintiff/Appellant*

15. Newhall, Timothy, *Counsel for Defendant/Appellee*

16.   Percival, James H., *Counsel for Defendant/Appellee*

17.   Porter, James W., *Counsel for Plaintiffs/Appellants*

18.   Stefano, Brooke, *Plaintiff/Appellant*

19.   Swearingen, Richard, former Commissioner of the
      Florida Department of Law Enforcement

20.   Sweeney, John Parker, *Counsel for Plaintiffs/Appellants*

21.   Teegen, Elizabeth, *Counsel for Defendant/Appellee*

22.   Walker, Hon. Mark E., *United States District Judge*

23.   Whitaker, Henry, *Counsel for Defendant/Appellee*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Christopher J. Baum*
Christopher J. Baum, B.C.S.
*Counsel for Defendant/Appellee*

**STATEMENT REGARDING ORAL ARGUMENT**

The Court has set oral argument for the week of October 21, 2024. Dkt. 93.

# TABLE OF CONTENTS

Page(s)

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF CITATIONS ....................................................................... iii

STATEMENT OF JURISDICTION .......................................................1

STATEMENT OF THE ISSUE ...............................................................1

INTRODUCTION.....................................................................................1

STATEMENT OF THE CASE ................................................................3

    I.       Background.................................................................................3

    II.     Standard of review ..................................................................7

SUMMARY OF THE ARGUMENT .......................................................8

ARGUMENT ..........................................................................................11

    The Second Amendment does not preclude regulating the purchase of
    firearms by those under the age of 21..................................................11

    A.    Neither the Founding generation nor the generations that followed
         believed that 18-to-20-year-olds had a Second Amendment right to
         purchase a firearm.............................................................................13

    B.    Florida's law is constitutional because it fits within the Nation's
         regulatory tradition. .........................................................................27

CERTIFICATE OF COMPLIANCE ....................................................42

CERTIFICATE OF SERVICE...............................................................43

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Beeler v. Young*,
  4 Ky. (1 Bibb) 519 (Ky. 1809) ..............................................................17

*Bellotti v. Baird*,
  443 U.S. 622 (1979) ...........................................................................14

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ...................................................1, 13, 15, 25, 28

*Christie v. Woods*,
  2 Yeates 213 (Pa. 1797) ....................................................................17

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..........................................10, 11, 23, 27, 33, 37

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2024) .............................................................10, 12, 37

*Ginsberg v. State of N. Y.*,
  390 U.S. 629 (1968) ...........................................................................14

*Hirschfeld v. BAFTE*,
  5 F.4th 407 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) .......31

*House v. Alexander*,
  4 N.E. 891 (Ind. 1886) .......................................................................17

*Ingraham v. Wright*,
  430 U.S. 651 (1977) ...........................................................................14

*Johnson v. Transp. Agency, Santa Clara Cty.*,
  480 U.S. 616 (1987) ...........................................................................35

*Khoury v. Miami-Dade Cty. Sch. Bd.*,
  4 F.4th 1118 (11th Cir. 2021)..............................................................7

*Kline v. L'Amoureux*,
  2 Paige Ch. 419 (N.Y. Ch. 1831) .................................................16, 29

*Lara v. Comm'r Pa. State Police*,
  91 F.4th 122 (3d Cir. 2024)................................................................33

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ...........................................................................11

*Moody v. NetChoice,*
144 S. Ct. 2383 (2024) ......................................................................39

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ...................................2, 5, 10, 11, 12, 22, 27, 28, 29, 30, 36, 38

*NRA v. BATFE,*
700 F.3d 185 (5th Cir. 2012)........................................................13, 33

*NRA v. Bondi,*
61 F.4th 1317 (11th Cir.), *reh'g en banc granted, opinion vacated,*
72 F.4th 1346 (11th Cir. 2023).................................................21, 26, 29

*Prince v. Massachusetts,*
321 U.S. 158 (1944) ..........................................................................14

*Robinson v. Sauls,*
46 F.4th 1332 (11th Cir. 2022).............................................................5

*Saunders Glover & Co. v. Ott's Adm'r,*
12 S.C.L. 572 (1 Mill 1822).........................................................16, 17

*State v. Callicutt,*
69 Tenn. 714 (1878).........................................................................27

*United States v. Dubois,*
94 F.4th 1284 (11th Cir. 2024)...........................................................40

*United States v. Rahimi,*
602 U.S. ---,
144 S. Ct. 1889 (2024) ...6, 7, 11, 12, 27, 28, 29, 30, 32, 34, 35, 37, 38, 39, 40, 41

*United States v. Rene E.,*
583 F.3d 8 (1st Cir. 2009) .................................................................27

*United States v. Rozier,*
598 F.3d 768 (11th Cir. 2010)...........................................................40

*United States v. Salerno,*
481 U.S. 739 (1987) ............................................................................6

*Wills v. Brown,*
3 N.J.L. 548 (N.J. Sup. Ct. 1809) .....................................................17

**Statutes**

18 U.S.C. § 922 .....................................................................................6

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

Fla. Stat. § 790.065...................................................................................3

Fla. Stat. § 790.22....................................................................................3

14 JAMES T. MITCHELL & HENRY FLANDERS, THE STATUTES AT LARGE OF
PENNSYLVANIA FROM 1682 TO 1801, 456 ...........................................19

1855 Ala. Laws 17....................................................................................26

2 LAWS OF THE STATE OF DELAWARE 1135, 1136 (New-Castle, Samuel and John
Adams 1797) ........................................................................................19

Act of Feb. 4, 1812, ch. CXCV, § 2, 4 Del. Laws 522 (1812)................................32

Act of March 16, 1802, ch. 9, sec. 11, 2 Stat. 132, 135 .........................................15

An Act to Amend the Criminal Laws of this State, ch. 81, 1856 Acts of Tenn. 92,
§ 2.......................................................................................................26

Ch. 33, 1859 Laws of Ky. 241, 245, § 23 ............................................................26

Columbia, S.C., Ordinances no. 41 (1817) ...........................................................32

Connecticut (1792), ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA
307–09 (Hartford, Hudson & Godwin 1796).......................................................20

Illinois (1826), LAWS PASSED BY THE FOURTH GENERAL ASSEMBLY OF THE STATE
OF ILLINOIS, AT THEIR SECOND SESSION 23 (Vandalia, Robert Blackwell 1826).20

Indiana (1824), AN ACT REGULATING THE MILITIA, OF THE STATE OF INDIANA 14,
19–20 (Corydon, Carpenter & Douglasse 1824)..................................................20

Kentucky (1807), 2 LAWS OF KENTUCKY 401 (Lexington, John Bradford 1807)...20

Louisiana (1805), ACTS PASSED AT THE FIRST SESSION OF THE LEGISLATIVE
COUNCIL OF THE TERRITORY OF ORLEANS 284–88 (New-Orleans, James M.
Bradford 1805)......................................................................................19

Maine (1821), AN ACT TO ORGANIZE, GOVERN, AND DISCIPLINE THE MILITIA, OF
THE STATE OF MAINE 21, 37 (Portland, Todd & Smith 1824)..............................19

Maryland (1798), WILLIAM KILTY, 2 THE LAWS OF MARYLAND 452 (Annapolis,
Frederick Green 1800) .............................................................................20

Massachusetts (1793), 2 THE PERPETUAL LAWS OF THE COMMONWEALTH OF
MASSACHUSETTS 181–82 (Boston, I. Thomas & E.T. Andrews 1801) ...............19

Mississippi (1807), HARRY TOULMIN, THE STATUTES OF THE MISSISSIPPI
TERRITORY 80 (Natchez, Samuel Terrell 1807) ..................................................20

Missouri (1825), 2 LAWS OF THE STATE OF MISSOURI 554, 571, 574 (St. Louis, E. Charless 1825)................................................................................................19

N.Y.C., N.Y., Ordinances ch. 23, § 1 (1803) ...........................................................32

New Hampshire (1792), THE LAWS OF THE STATE OF NEW HAMPSHIRE 421–22 (Portsmouth, John Melcher 1797).......................................................19

New Jersey (1799), WILLIAM PATERSON, LAWS OF THE STATE OF NEW JERSEY 438–40 (New Brunswick, Abraham Blauvelt 1800)....................................20

A By-Law in relation to the Firing of Guns and Pistols, ch. 26 (1835) in The By-Laws of the City of New London .................................26

New York (1793), 3 THE LAWS OF THE STATE OF NEW YORK 63–64 (New York, Thomas Greenleaf 1797)............................................................20

Ohio (1803), 2 ACTS OF THE STATE OF OHIO: SECOND SESSION OF THE GENERAL ASSEMBLY 31–32, 35 (Norwalk, N. Willis 1901) ................................20

Rhode Island (1798), THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 436–39 (Providence, Carter & Wilkinson 1798).....20

Vermont (1797), 2 THE LAWS OF THE STATE OF VERMONT 131–32 (Randolph, Sereno Wright 1808) ............................................................19

**Other Authorities**

1 *The Many Legalities of Early America* (Bruce H. Mann et al. eds., 2001)..........18

1 Theophilus Parsons, *The Law of Contracts* (1853) ..............................................................18

2 James Kent, *Commentaries on American Law* (1827) .................................................13, 16, 17

2 William Blackstone & St. George Tucker, *Blackstone's Commentaries* (1803) ..............................................15, 18

3 John Fauchereaud Grimke, *The South Carolina Justice of the Peace* (1788)..................................15

4 William Blackstone, *Commentaries on the Laws of England* (1765)....................................32

David E. Shi, *America: A Narrative History* (12th ed. 2016) ..................................23, 24, 25, 36

Herbert Asbury, *The Gangs of New York: An Informal History of the Underworld* (1928)...........26

Holly Brewer,
  *By Birth or Consent: Children, Law, and the Anglo-American Revolution in
  Authority* (2005) ........................................................................16, 17, 18

J. Burgh,
  *Thoughts on Education* (1749) ..........................................................14

Laura L. Finley,
  *Encyclopedia of Juvenile Violence* (Laura L. Finley ed., 2007) ...................25, 26

Letter to James Sullivan (May 26, 1776),
  in 4 Papers of John Adams 210 (R. Taylor ed. 1979) .........................................14

Patrick J. Charles,
  *Armed in America: A History of Gun Rights from Colonial Militias to Concealed
  Carry* (2019) ..........................................................................24, 25, 26, 27

Pauline Maier et al.,
  *Inventing America* (2003) .............................................................23, 35

Randolph Roth,
  *Why Guns Are and Are Not the Problem: The Relationship Between Guns and
  Homicide in American History*, in *A Right to Bear Arms?: The Contested Role of
  History in Contemporary Debates on the Second Amendment* (Jennifer Tucker et
  al. eds., 2019) ..........................................................................36

*Statistics of Population*, U.S. Census (1900),
  https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-
  1-p2.pdf ..........................................................................24

Thomas M. Cooley,
  *A Treatise on Constitutional Limitations* (5th ed. 1883)....................................27

Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes
  (October 4–5, 1824)*, Encyclopedia Va. 6–7,
  https://encyclopediavirginia.org/primary-documents/university-of-virginia-
  board-of-visitors-minutes-october-4-5-1824/......................................................21

Vol. 1 1787: Drafting the Constitution (W. Benton ed. 1986)................................14

William Blackstone,
  1 *Commentaries on the Laws of England* (1769)................................................13

William Macpherson,
  *Treatise on the Law Relating to Infants* (1843) ............................................15, 18

William Waller Hening, *New Virginia Justice* (1795)............................................16

*Black's Law Dictionary* (12th ed. 2024) ................................................................13

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99 (2023) ..........................................................23, 36

Lindsey Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 Bus. Hist. Rev. 57 (2018)....23, 24

*Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms*, 1791–1868, 108 Minn. L. Rev. 3049 (2024) .................................20, 21, 32

*Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers U.L. Rev.: Commentaries (2024) .................................................................18, 20, 22

Sarah Winsberg, *Contract's Covert Meddlers*, 97 Notre Dame L. Rev. 1265 (2022) ..........................................................................................................................18

William S. Bailey, *Flawed Justice: Limitation of Parental Remedies for the Loss of Consortium of Adult Children*, 27 Seattle U. L. Rev. 941 (2004).................24, 36

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiffs' federal constitutional claims under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment of June 24, 2021, denying Plaintiffs' motion for summary judgment and granting the Commissioner's motion for summary judgment on all claims. DE137, DE138. Plaintiffs' notice of appeal was timely filed on July 7, 2021. DE139.

## STATEMENT OF THE ISSUE

Is Section 790.065(13), Florida Statutes, unconstitutional under the Second and Fourteenth Amendments to the Constitution?

## INTRODUCTION

This case involves a Second Amendment challenge to a Florida law that does not prohibit 18-to-20-year-olds from receiving, possessing, or using firearms, or from acquiring firearms by gift from a more mature adult, such as a parent. The law prohibits only purchase of firearms by and sale to 18-to-20-year-olds.

The Second Amendment does not forbid that modest and temporary restriction. At the time of the Founding, under-21-year-olds lacked the capacity to enter into contracts for firearms. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting) (explaining that at the time, "the law imposed age limits on all manner of activities that required judgment and reason"). At the

time, as well, contracting was the only practical way to purchase a firearm. And when the States enacted laws organizing their militias in response to the Militia Act of 1792, they overwhelmingly recognized that feature of common law. Most States held the parents of militiamen under 21 liable if the minor mustered without a firearm; many States expressly charged parents with the duty to provide the minor with a firearm; and some even exempted minors from providing a firearm for militia service altogether. When the common-law restrictions on minors purchasing firearms began to lose effectiveness because of sweeping societal changes wrought by the Industrial Revolution and the Civil War, States across the country reinforced those restrictions by prohibiting minors from purchasing firearms. Even then, some States allowed minors to obtain firearms with their parents' consent, as at the Founding.

Florida's law is therefore not an "outlie[r] that our ancestors would never have accepted." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022) (quotation omitted). It is fully consistent with this historical tradition of regulating minors' purchase of firearms, ensuring—as at the Founding—that parents continue to play a key role in supervising and facilitating 18-to-20-year-olds' access to firearms. And because this is a facial challenge, it is enough that the statute is constitutional in most of its applications.

# STATEMENT OF THE CASE

## I.   BACKGROUND

Florida law has long regulated the manner in which a person under the age of 18 may possess and use firearms. A minor under the age of 16 may use gas-operated weapons only under the supervision of an adult who is acting with the consent of a minor's parent or guardian. Fla. Stat. § 790.22(1). A minor under the age of 18 may possess firearms outside the home only when engaged in lawful hunting or recreational-shooting activities, and, if the minor is under 16, only when engaging in those activities under adult supervision. *Id.* § 790.22(3).

On February 14, 2018, a 19-year-old used a lawfully purchased firearm to kill 17 students and faculty members, and to injure many others, at Marjory Stoneman Douglas High School in Parkland, Florida. Responding to that and other incidents of gun violence, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act. One of its provisions generally prohibits the purchase of firearms, though not their mere possession, by persons under the age of 21:

> A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 790.065(13). The statute contains exceptions permitting the purchase of a rifle or shotgun by a law-enforcement officer, correctional officer, or a military servicemember under the age of 21. *Id.*

Shortly after Section 790.065(13)'s enactment in 2018, the National Rifle Association of America sued two Florida officials it claimed were responsible for administering the law: Appellee, the Commissioner of the Florida Department of Law Enforcement; and the Attorney General of Florida. The NRA's original complaint alleged that Florida's age qualification for purchasing firearms violated the Second Amendment and Equal Protection Clause of the United States Constitution both facially and as-applied. DE1. The operative complaint at the summary judgment stage (the Second Amended Complaint (DE54)) added a new plaintiff, Radford Fant, and dropped the as-applied claims. In the Second Amended Complaint, Plaintiffs claimed only that Section 790.065(13) was facially unconstitutional under both the Second Amendment and the Equal Protection Clause of the U.S. Constitution. DE54 ¶¶ 25–33. They did not challenge the manner in which Florida regulates the possession and use of firearms by those under the age of 18.

The Commissioner moved to dismiss, arguing that Plaintiffs failed to state a claim and that the Attorney General of Florida was an improper defendant. DE73. The district court dismissed the Attorney General for lack of subject-matter

jurisdiction, but otherwise denied the motion. DE94. The district court then denied Plaintiffs' motion for summary judgment and granted the Commissioner's motion as to each of Plaintiffs' claims. The court assessed Plaintiffs' Second Amendment claim under this Court's then-existing two-step test, concluding that "restrictions on the purchase of firearms by 18-to-20-year-olds" are—"at least relative to the other prohibitions listed in *Heller*—longstanding in time." DE137, at 32–33. The court held that Section 790.065(13) was therefore presumptively valid and that this Court's precedents foreclosed Plaintiffs from overcoming that presumption of validity. DE137, at 40–42. As for Plaintiffs' Equal Protection claims, the district court held that because age is not a suspect class and because Section 790.065(13) did not violate the Second Amendment, rational-basis review applied and was satisfied. DE137, at 42–43.

This appeal followed. After oral argument, but before the panel issued its decision, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). There, the Court clarified that Second Amendment claims turn on whether the challenged "regulation is consistent with this Nation's historical tradition." *Id.* at 17. Applying *Bruen*, the panel affirmed, holding that Section 790.065(13)'s restriction on the sale of firearms to 18-to-20-year-olds is consistent

with that tradition. The Court did not address Plaintiffs' argument that Section 790.065(13) violates the Equal Protection Clause.[1]

Plaintiffs petitioned for rehearing en banc, and in July 2023, the Court vacated the panel's opinion and granted rehearing en banc. A week later, the Court postponed briefing until the Supreme Court decided *United States v. Rahimi*, No. 22-915 (U.S.).[2]

That decision issued in June 2024. *Rahimi* presented the question whether 18 U.S.C. § 922(g)(8) violates the Second Amendment on its face. Section 922(g)(8) prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he "'represents a credible threat to the safety of [an] intimate partner,' or a child of the partner or individual." *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889, 1894 (2024) (quoting 18 U.S.C. § 922(g)(8)). The Supreme Court upheld the statute. The Court observed, at the threshold, that because Rahimi's challenge was facial, he had a demanding burden to "establish that no set of circumstances existed under which the Act would

---

[1] In their en banc brief, Plaintiffs have abandoned their contention that Section 790.065(13) violates the Equal Protection Clause, which the Court therefore need not consider. *See Robinson v. Sauls*, 46 F.4th 1332, 1341 n.6 (11th Cir. 2022).

[2] After the three-judge panel heard oral argument, Plaintiffs moved to substitute in a new Plaintiff between the ages of 18 and 21; Florida opposed but the Court granted the motion without comment. DE63. After the panel issued its opinion, Plaintiffs again moved to substitute in a new Plaintiff over Florida's opposition, and the Court again granted the motion without comment. DE85.

be valid." *Id.* at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The Supreme Court then ruled that Rahimi had failed to make that showing because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 1902.

The Court identified two types of historical regulations establishing that tradition: "surety laws," which "authorized magistrates to require individuals suspected of future misbehavior to post a bond," *id.* at 1899–1900; and "going armed laws," which "prohibited riding or going armed, with dangerous or unusual weapons, to terrify" the community. *Id.* at 1901 (quotation omitted). Section 922(g)(8), the Court concluded, "is by no means identical to these founding era regimes, but it does not need to be." *Id.* Those regimes evidenced a tradition that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," and Section 922(g)(8) "fi[t] neatly within th[at] tradition." *Id.* Rahimi's facial challenge therefore failed.

## II. STANDARD OF REVIEW

The Court "review[s] de novo" the district court's order granting summary judgment for the Commissioner and denying summary judgment to Plaintiffs, "applying the same legal standards applied by the district court in the first instance." *Khoury v. Miami-Dade Cty. Sch. Bd.*, 4 F.4th 1118, 1124 (11th Cir. 2021).

## SUMMARY OF THE ARGUMENT

Florida's law restricting the purchase, but not possession or use, of firearms by those under 21 is consistent with the principles that underpin our regulatory tradition. At the Founding, individuals under 21 were considered lacking in the requisite judgment and reason to enter into contracts, which at the time were necessary to purchase firearms because such goods were bought on credit in early America's agrarian economy. States recognized this common-law limitation when enacting their militia laws. They either exempted minors from the requirement to acquire firearms for militia service, charged minors' parents with the duty to acquire firearms for them, or held parents liable for fines when minors mustered without the proper firearm. Then, when the restrictions preventing those under 21 from purchasing firearms began to lose force in the nineteenth century—because of urbanization, access to cash rather than credit, and greater availability of firearms—States buttressed those restrictions. Across the country, States passed laws prohibiting those under 21 from purchasing firearms (with some exceptions for parental consent), consistent with the Founding generation's beliefs.

Plaintiffs' facial challenge fails because Florida's law fits neatly within this historical tradition. The purpose of Florida's law is the same as those historical restrictions—preventing those who the Founders considered to lack capacity from purchasing firearms, while allowing parents to facilitate their possession and use. As

is the how: The law applies to the same population; it is temporary; and it is comparable to the Founding-era limits on under-21-year-olds' contracting for and purchasing firearms, as opposed to possession and use. Although those under 21 had the legal capacity to engage in some activities, entering into contracts for firearms was not one of them.

In attacking Florida's law, Plaintiffs mainly rely on two flawed historical points. *First*, Plaintiffs highlight that those under 21 were required to serve in the militia at the Founding. But the States almost universally recognized the purchasing limitations on minors and therefore held their parents responsible for providing the required firearms. And that aside, an obligation to serve in a highly regulated militia does not imply a right to purchase firearms unconnected to that service.

*Second*, Plaintiffs argue that Florida has not pointed to a Founding-era regulation that is similar enough. Under Supreme Court precedent, however, the Second Amendment requires only a historical analogue demonstrating the principles underlying a modern regulation, not a historical twin. This case illustrates why no such requirement exists. The absence of a Founding-era doppelgänger for Florida's law is a product of the fact that minors could not as a practical matter purchase firearms at that time without parental assistance. Later, when guns became more available to minors as a result of techological and economic change, legislatures begain enacting statutory prohibitions on minors' purchase of firearms to address a

burgeoning problem of youth violence. The absence of a historical twin is thus not evidence that Florida's law is an "outlie[r] that our ancestors would never have accepted." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022). The evidence is to the contrary.

Plaintiffs also contend that the Court should ignore historical evidence post-dating the Founding. But the Supreme Court has frequently consulted such evidence in interpreting the Constitution, both in Second Amendment cases and others. *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 248–49 & nn.33–34 (2024). Plaintiffs' argument also overlooks that the Reconstruction-era evidence here is confirmatory of the Founding-era regulatory tradition.

Finally, Plaintiffs err in suggesting that Florida's law is facially unconstitutional because it does not require an individualized determination before someone under 21 is prohibited from purchasing a firearm. In both *Heller* and *Rahimi*, the Court indicated that legislatures may impose categorical restrictions if supported by the relevant historical tradition. And as noted in *Rahimi*, the Court should focus not on the hypothetical scenarios posited by Plaintiffs where Florida's law might pose concerns, but instead on the circumstances in which it is most likely to be constitutional. Florida's law is constitutional in most, if not all, of its applications.

The Court should affirm.

## ARGUMENT

**THE SECOND AMENDMENT DOES NOT PRECLUDE REGULATING THE PURCHASE OF FIREARMS BY THOSE UNDER THE AGE OF 21.**

The Second Amendment protects the right of "citizens to use arms" for "self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). That right is "fundamental," guaranteeing Americans the means to protect themselves, their families, and their homes. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (plurality op.).

"'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626). The Supreme Court has "directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right.'" *Id.* (quoting *Bruen*, 597 U.S. at 17). "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment," keeping in mind that, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). But because Plaintiffs mount a facial challenge to the statute, Florida "need only demonstrate that" its law "is constitutional in some of its applications." *Id.* at 1898.

In *Rahimi*, the Supreme Court clarified what meeting that burden entails. The "appropriate analysis involves considering whether the challenged regulation is

consistent with the principles that underpin our regulatory tradition." *Id.* The government does not need to identify a historical "dead ringer" or "twin" for the challenged regulation. *Id.* (quoting *Bruen*, 597 U.S. at 30). The overarching judicial task, instead, is to adhere to the original public meaning of the right to keep and bear arms and "appl[y] faithfully the balance struck by the founding generation to modern circumstances." *Id.* (quoting *Bruen*, 597 U.S. at 29).

That requires examining the history of the right—for example, the "historical background of the Second Amendment," "American colonial views," and "other [historical] sources"—and our tradition of firearms regulation. *Bruen*, 597 U.S. at 20 (quotation omitted); *see Rahimi*, 144 S. Ct. at 1897 (stating that under *Heller* and *Bruen*, "constitutional text," "history," and "tradition" inform "the scope of the right"). The "historical tradition of firearm regulation [can] help delineate the contours of the right" by illuminating the ways in which the public believed firearms could be regulated in the years after ratification of the Second Amendment. *Rahimi*, 144 S. Ct. at 1897 (quotation omitted). In particular, if the regulatory regime in place at the time of the Constitution's original ratification, and at the time of the ratification of the Fourteenth Amendment, imposed burdens on bearing arms comparable to the burdens that Florida law now imposes, that is strong evidence that the law is consistent with the Constitution's original meaning. *See id.* at 1898; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 248–50 & nn.33–35 (2024).

The common law, historical statutes and regulations, and post-ratification history and commentary demonstrate that the government may lawfully establish a regulatory regime that generally prohibits individuals aged 18-to-20 from purchasing firearms, while also permitting those individuals to obtain those arms from a more mature adult. Florida's law is fully consistent with that historical tradition.

**A.** **Neither the Founding generation nor the generations that followed believed that 18-to-20-year-olds had a Second Amendment right to purchase a firearm.**

**1.** At the Founding, individuals under the age of 21 were in most instances unable to purchase firearms, and parents were expected to supervise their acquisition of firearms. That reality flowed from the fact that, at the time of the Founding, and deep into the 20th century, individuals under the age of 21 were considered minors who lacked the same legal rights as adults.[3] At common law, those who had not yet "attained the age of twenty-one years" were deemed unable "to take care of themselves," 2 James Kent, *Commentaries on American Law* 191 (1827), and viewed as "lack[ing] reason and decisionmaking ability." *Brown v. Ent. Merchs.*

---

[3] *NRA v. BATFE*, 700 F.3d 185, 201, 204 (5th Cir. 2012); William Blackstone, 1 *Commentaries on the Laws of England* 55 (1769) ("So that full age in male or female, is twenty-one years . . . , who till that time is an infant, and so styled in law."); *Black's Law Dictionary* (12th ed. 2024) (describing "infant" as "a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority").

*Ass'n*, 564 U.S. 786, 826–27 (2011) (Thomas, J., dissenting) (citing Letter to James Sullivan (May 26, 1776), in 4 Papers of John Adams 210 (R. Taylor ed. 1979); Vol. 1 1787: Drafting the Constitution, p. 229 (W. Benton ed. 1986); J. Burgh, *Thoughts on Education* 7 (1749)). It was not until the 1970s that states enacted legislation to lower the age of majority to 18.

"The [Supreme] Court long has recognized that the status of minors under the law is unique in many respects." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.); *see Prince v. Massachusetts*, 321 U.S. 158, 168–69 (1944). "[A]lthough children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability." *Bellotti*, 443 U.S. at 635. "[E]ven where there is an invasion of protected freedoms[,] the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* at 636 (quotation omitted). It is well settled, for example, that States have broader authority to regulate minors under the First and Fourteenth Amendments. *See*, *e.g.*, *Ginsberg v. State of N. Y.*, 390 U.S. 629, 638 & n.6 (1968) (holding that States have greater leeway under the First Amendment to regulate "literature sold to" minors); *Ingraham v. Wright*, 430 U.S. 651, 675 (1977) (rejecting Fourteenth Amendment challenge to a Florida law permitting "corporal punishment" because that practice is "rooted in history").

That modern understanding is firmly rooted in history. The Founding generation "imposed age limits on all manner of activities that required judgment and reason"—including constitutionally protected activities. *Brown*, 564 U.S. at 834 (Thomas, J., dissenting). And Founding-era parents retained substantial authority to oversee individuals under the age of 21. *See id.* at 821–31. Minors "could not vote." *Id.* at 834. They could not enlist in the military without parental consent. Act of March 16, 1802, ch. 9, sec. 11, 2 Stat. 132, 135 ("[N]o person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent."). Minors lacked a First Amendment right to access information, including books, of their choosing. *Brown*, 564 U.S. at 831–32. States "set age limits restricting marriage without parental consent." *Id.* at 834. Minors had no right to their wages; their parents "receive[d] the profits" of their labor. 2 William Blackstone & St. George Tucker, *Blackstone's Commentaries* 452 (1803); William Macpherson, *Treatise on the Law Relating to Infants* 327 (1843) ("A father frequently sends out his son to work as journeyman, and his earnings are taken to be the father's."). Minors could not even perform certain jobs, such as "constable." 3 John Fauchereaud Grimke, *The South Carolina Justice of the Peace* 117 (1788).

That legal status, as a practical matter, prohibited those who had not yet turned 21 from engaging in firearms transactions. At common law in early America,

"infants"[4]—those under "the age of twenty-one years"—could not "make a binding contract [for goods], unless it [was] for necessaries." Kent, *supra*, at 191.[5] Proprietors who entered contracts with minors for goods other than necessaries thus did so "at the[ir] [own] peril." William Waller Hening, *New Virginia Justice* 262 (1795); Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 271 (2005) (explaining that it was "risk[y]" for proprietors to sell goods to minors). Minors who entered such a contract had no obligation to honor it—it was voidable. Kent, *supra*, at 191–92; *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572, 572 (1 Mill 1822). If a proprietor contracted with a minor, it had to "bear the loss" if the minor refused to pay after receiving the goods. *Kline v. L'Amoureux*, 2 Paige Ch. 419, 421 (N.Y. Ch. 1831) (dismissing proprietors' claims even though some were not even aware that the defendant—a 19-year-old—was a

---

[4] "Infants" and "minors" were interchangeable terms at the Founding. 1 Zephaniah Swift, *System of Laws of the State of Connecticut* 213 (1795) ("Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech, minors.").

[5] William Waller Hening, *New Virginia Justice* 262 (1795) ("At 21, and not before, persons may bind themselves by any deed, and alien lands, goods, and chattels."); Macpherson, *supra*, at 317 ("The law does not allow infants to trade, either in the way of mere buying and selling, or by the exercise of handicraft."); *Brawner v. Franklin*, 4 Gill 463, 468–69 (Md. 1846) ("It is a general and well settled principle, as well at law as in equity, that no person under the age of twenty-one years, is competent to make a contract, binding upon him, unless it be for 'necessaries.'"); *Pool v. Pratt*, 1 D. Chip. 252, 253, 256 (Vt. 1814) (invalidating a marriage contract that the minor entered at age 20 because it did not involve necessaries).

minor). That deterred proprietors from entering the contracts and made minors "effectively unable to . . . contrac[t]" for goods other than necessaries. Brewer, *supra*, at 271.

"Lodging, clothing, food, medicine and education, [we]re necessaries to every infant," but "liquor, pistols, powder, saddles, bridles, [and] whips" were not. *Ott's Adm'r*, 12 S.C.L. at 572; *House v. Alexander*, 4 N.E. 891, 893 (Ind. 1886) ("[N]ecessaries do not include horses, saddles, liquors, bridles, pistols, powder, whips, and fiddles."); *Beeler v. Young*, 4 Ky. (1 Bibb) 519, 520 (Ky. 1809) ("The law is settled, that an infant can only bind himself for necessary tuition, medicine, victuals and clothes, and such like necessaries."); Kent, *supra*, at 196 (same). Minors could therefore readily contract for food and clothing but, unlike adults, could not lawfully enter into a binding contract for firearms.

That made it all but impossible for minors to purchase firearms. During the Founding era, "contracts were more important for the basic transactions of society." Brewer, *supra*, at 271. The Founding generation often bought goods, including firearms, from local stores and craftsmen "on an open account"—that is, on credit. *See*, *e.g.*, *Wills v. Brown*, 3 N.J.L. 548, 548 (N.J. Sup. Ct. 1809) (dispute over "a running blacksmith account"); *Christie v. Woods*, 2 Yeates 213, 215 (Pa. 1797) (dispute over "goods [that] were sold on six months' credit"); *Ott's Adm'r*, 12 S.C.L. at 572 (dispute over "pistols" and "powder" purchased on credit); Macpherson,

*supra*, at 321 (discussing disputes over clothing bought on credit).[6] But because of their legal disability, and proprietors' unwillingness to contract with them, minors were able to "contract for [only necessaries] on credit." 1 Theophilus Parsons, *The Law of Contracts* 245 (1853); *see also* Macpherson, *supra*, at 303 ("An infant cannot bind himself by . . . an account.").

As a result, those not yet 21 had to rely on their parents to purchase firearms. *See* Brewer, *supra*, at 270–71; 1 *The Many Legalities of Early America* 316–17 (Bruce H. Mann et al. eds., 2001). Although a minor could, in theory, purchase a firearm if he gathered enough money to pay in full, rather than using credit, that was impractical for most minors at the Founding. They typically worked for their parents on the family farm and had no wages at all. Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers U.L. Rev.: Commentaries, 101, 108 (2024) (explaining that at the Founding, minors lacked "disposable income" because they "mostly lived at home, under the care of their parents, and participated in farm work" (collecting authorities)). And those who did work off the farm generally had no right to their wages—their wages were considered their parents' property. Blackstone's Commentaries, *supra*, at 452.

---

[6] Sarah Winsberg, *Contract's Covert Meddlers*, 97 Notre Dame L. Rev. 1265, 1288 n.105 (2022) ("[M]ost business was conducted on credit in early America").

That Founding-era evidence regarding minors' general inability to acquire firearms is consistent with the early militia laws. Appellants' Br. 38–39. In the Militia Act of 1792, Congress provided for men aged 18-to-45 to be enrolled in the militia and to provide their own firearms. *Id.* at 38. But because of the legal disability imposed by the common law, militiamen aged 18-to-20 were heavily, if not fully, reliant on their parents to acquire firearms for militia service.

After the Militia Act of 1792 was passed, each of the States passed a militia law in conformity with it. Between 1792 and 1826, two states exempted minors altogether from acquiring firearms for militia service.[7] Six states expressly charged the parents of minors with the duty to acquire firearms for them and held parents liable for minors who mustered without a proper firearm.[8] Ten more states held

---

[7] 14 JAMES T. MITCHELL & HENRY FLANDERS, THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 456 (Harrisburg, Harrisburg Publishing Co. 1909) ("young men under the age of twenty-one . . . shall be exempted from furnishing the necessary arms, ammunition and accoutrements"); 2 LAWS OF THE STATE OF DELAWARE 1135, 1136 (New-Castle, Samuel and John Adams 1797) (same).

[8] New Hampshire (1792), THE LAWS OF THE STATE OF NEW HAMPSHIRE 421–22 (Portsmouth, John Melcher 1797); Massachusetts (1793), 2 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 181–82 (Boston, I. Thomas & E.T. Andrews 1801); Vermont (1797), 2 THE LAWS OF THE STATE OF VERMONT 131–32 (Randolph, Sereno Wright 1808); Louisiana (1805), ACTS PASSED AT THE FIRST SESSION OF THE LEGISLATIVE COUNCIL OF THE TERRITORY OF ORLEANS 284–88 (New-Orleans, James M. Bradford 1805); Maine (1821), AN ACT TO ORGANIZE, GOVERN, AND DISCIPLINE THE MILITIA, OF THE STATE OF MAINE 21, 37 (Portland, Todd & Smith 1824); Missouri (1825), 2 LAWS OF THE STATE OF MISSOURI 554, 571, 574 (St. Louis, E. Charless 1825).

parents liable for fines related to militia service incurred by minors, such as failure

to procure an appropriate firearm.[9] *See also* Spitzer, 76 Rutgers U.L. Rev. at 111. In

other words, the burden of arming minor recruits fell on their parents, employers, or

guardians. *Id.* When those responsible for the minor could not afford a firearm, the

government would in some instances purchase (and retain ownership) of the weapon.

*Id.* at 111 & n.61; *see* Megan Walsh & Saul Cornell, *Age Restrictions and the Right

to Keep and Bear Arms*, 1791–1868, 108 Minn. L. Rev. 3049, 3077 & n.118 (2024)

(explaining that minors depended on parents, guardians, or the government to

---

[9] Connecticut (1792), ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 307–09 (Hartford, Hudson & Godwin 1796); New York (1793), 3 THE LAWS OF THE STATE OF NEW YORK 63–64 (New York, Thomas Greenleaf 1797); Rhode Island (1798), THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 436–39 (Providence, Carter & Wilkinson 1798); Maryland (1798), WILLIAM KILTY, 2 THE LAWS OF MARYLAND 452 (Annapolis, Frederick Green 1800); New Jersey (1799), WILLIAM PATERSON, LAWS OF THE STATE OF NEW JERSEY 438–40 (New Brunswick, Abraham Blauvelt 1800); Ohio (1803), 2 ACTS OF THE STATE OF OHIO: SECOND SESSION OF THE GENERAL ASSEMBLY 31–32, 35 (Norwalk, N. Willis 1901); Mississippi (1807), HARRY TOULMIN, THE STATUTES OF THE MISSISSIPPI TERRITORY 80 (Natchez, Samuel Terrell 1807); Kentucky (1807), 2 LAWS OF KENTUCKY 401 (Lexington, John Bradford 1807); Indiana (1824), AN ACT REGULATING THE MILITIA, OF THE STATE OF INDIANA 14, 19–20 (Corydon, Carpenter & Douglasse 1824); Illinois (1826), LAWS PASSED BY THE FOURTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, AT THEIR SECOND SESSION 23 (Vandalia, Robert Blackwell 1826).

"[E]ven when such obligations were not expressly included by statute, the common law definition of infants meant that any legal proceeding that would attempt to prosecute minors for such a failure would have to proceed against the legally responsible adult in charge of the minor's household." Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms*, 1791–1868, 108 Minn. L. Rev. 3049, 3080 (2024).

provide weapons for militia service). And when minors failed to acquire the proper arms for militia service, their parents or guardians—not the minors—were subject to discipline. This history thus confirms that at the Founding, "minors did not have the legal capacity or financial resources to purchase or own weapons themselves." Walsh & Cornell, 108 Minn. L. Rev. at 3078.

The Founding generation's attitudes about minors' ability to purchase firearms is similarly demonstrated by the extensive regulation of firearms in colleges at the time, both public and private. *NRA v. Bondi*, 61 F.4th 1317, 1327 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023). Many public universities, overseen by state legislatures, adopted strict prohibitions on keeping firearms. The University of Virginia, at a meeting attended by Thomas Jefferson and James Madison, enacted a regulation prohibiting students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds, despite Jefferson's support for the right to keep and bear arms more generally, and Madison's drafting of the Second Amendment.[10] Many other public universities

---

[10] Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes (October 4–5, 1824)*, Encyclopedia Va. 6–7, https://encyclopediavirginia.org/primary-documents/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/

adopted similar policies.[11] Dozens of private universities, starting with Harvard in 1655 and Yale in 1745, had similarly restrictive policies.[12]

Plaintiffs argue that "university prohibit[ions]" on students "bringing firearms to campus strongly sugges[t]" that 18-to-20-year-olds "regularly possess[ed] firearms." Appellants' Br. 48 (quotation omitted). But even assuming that were true, it would say nothing about the question presented here—whether the Second Amendment bars States from limiting 18-to-20-year-olds' ability to purchase firearms. That some college-aged students owned firearms does not establish that they purchased those firearms, much less that they were understood to have an unfettered constitutional right to purchase them.

Taken together, the historical record demonstrates that the common law curtailed minors' ability to purchase firearms, and the Founders expressed no concern about that limitation. *See Bruen*, 597 U.S. at 19, 35 (explaining that the common law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"). Instead, they recognized it by enacting militia laws requiring parents to provide minors with firearms, and the Founding generation

---

[11] *See* Spitzer, 76 Rutgers U.L. Rev. at 115–16 (collecting regulations for 14 state universities).

[12] *See id.* at 115–18 (collecting regulations for 46 private universities).

reinforced it in passing regulations restricting minors' access to firearms on college campuses—i.e., away from their parents.

**2.** Ninteenth-century history confirms that Founding-era evidence. *See Heller*, 554 U.S. at 605 (relying on 19th-century evidence to elucidate the meaning of the Second Amendment). With the march of time and technology, individuals under the age of 21 acquired more ready access to arms. States responded by, among other things, restricting the sale of firearms to them.

At the Founding, America was an agrarian society. "[U]rban areas simply did not exist." Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 154 (2023). In 1790, New York City was "the country's largest city," and it had just "33,000 people." *Id.* The population of "the entire country was under four million." *Id.* at 155. "[M]ost Americans were isolated farmers" who "produced just enough food, livestock, and clothing for their own family's needs." David E. Shi, *America: A Narrative History* 353 (12th ed. 2016). Families typically lived together on a farm, with children providing their parents much-needed labor throughout their youth. Pauline Maier et al., *Inventing America* 375 (2003). And many trades, including gunsmithing, were "small-scale" and "specialized." Lindsey Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 Bus. Hist. Rev. 57, 63 (2018).

Over the course of the 1800s, America transformed into an industrialized nation with a population of nearly 80 million by the end of the century.[13] After the War of 1812, which forced the country "to expand its manufacturing sector and become more self-sufficient," America began to shift from an "agricultural republic" to a "commercial" and "industrial" nation. Shi, *supra*, at 341–42. "Americans," including minors, "left farms and moved to towns and cities, drawn primarily by jobs in new mills, factories, stores, and banks." *Id.* at 352.[14] Halfway through the 1800s, a "market-based economy" had replaced the farm economy, and Americans had access to "cash" income, which they could use to buy "goods." *Id.* at 352–53.

That included firearms—which had become "readily available to" minors for the first time. Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 141 (2019). "[S]mall stores" and "pawn shops" started stocking firearms and sold them to minors. *Id.* at 404 n.211 (quotation omitted); *see also* Schakenbach Regele, 92 Bus. Hist. Rev. at 78 & n.105 (discussing

---

[13] *Statistics of Population*, U.S. Census (1900), https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-1-p2.pdf.

[14] *See also* William S. Bailey, *Flawed Justice: Limitation of Parental Remedies for the Loss of Consortium of Adult Children*, 27 Seattle U. L. Rev. 941, 946 (2004) ("The economic value of children shifted in the industrial revolution of the 18th Century, both in the United States and Europe, when many were removed from farms to an urban life as wage earners in mills and factories.").

the "market" for firearms in the mid-1800s). In America's new economy, minors had access to cash, which unburdened them from the legal disability imposed by the common law and allowed them to buy firearms on their own. *See* New York Tribune p. 4 (Feb. 22, 1884) ("There are plenty of places in this city where so-called toy pistols . . . are sold at prices which bring them within the reach of the boy of the period, and he certainly ought not to be trusted with deadly weapons."), in Charles, *supra*, at 405 n.214.

That greater access led to problems. "[L]ack[ing] reason and decisionmaking ability," *Brown*, 564 U.S. at 826–27 (Thomas, J., dissenting), persons under 21 were considered apt to—and in fact, did—misuse firearms, *see Accidental Shootings*, Inter Ocean p.4 (Chicago) (Jan. 21, 1876) (identifying instances where minors "killed others by playing with or carrying deadly weapons"), in Charles, *supra*, at 405 n.212; *Toy Pistols and Concealed Weapons*, Sun p.2 (Baltimore, MD) (July 19, 1881) ("Seventeen deaths from the toy pistol in the hands of children have been recorded in this city within the past two weeks."), in Charles, *supra*, at 405 n.212.

Youth crime was also surging. Industrialization and "the loss of fathers and older brothers" in the Civil War resulted in less family "control" over minors, while urbanization exposed many minors to crime and poverty. *Encyclopedia of Juvenile Violence* 148 (Laura L. Finley ed., 2007); Shi, *supra*, at 380. New York City, for instance, "saw an enormous increase in the number of juvenile gangsters" in its

neighborhoods. Herbert Asbury, *The Gangs of New York: An Informal History of the Underworld* 220 (1928). They included minors like "Johnny Spanish," who gained notoriety as a criminal at age "seventeen" and was known to always carry "two revolvers stuck in his belt." *Id.* at 242; *see also* A By-Law in relation to the Firing of Guns and Pistols, ch. 26 (1835) in The By-Laws of the City of New London ("[T]he firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age."); *Pistols in School*, Philadelphia Inquirer p.2 (March 1, 1884) (discussing an incident in which seven minors brought weapons to school), in Charles, *supra*, at 405 n.212. The rapid growth of "juvenile reformatories" evidenced the scope of this new societal problem: In 1825, the country had just one reformatory, but by 1885, it had 45. Finley, *supra*, at 148.

States responded by, among other things, banning sales of firearms to those under 21. In 1855, Alabama made it unlawful to sell, give, or lend "to any male minor . . . [an] air gun, or pistol." 1855 Ala. Laws 17. Within a couple years, Kentucky and Tennessee passed similar laws. Ch. 33, 1859 Laws of Ky. 241, 245, § 23; An Act to Amend the Criminal Laws of this State, ch. 81, 1856 Acts of Tenn. 92, § 2. Sixteen States and the District of Columbia quickly followed suit with similar prohibitions. *See Bondi*, 61 F.4th at 1333 (appendix collecting state laws). Often, these prohibitions expressly targeted handguns—"the quintessential self-

defense weapon," *Heller*, 554 U.S. at 629—and some criminalized their "mere possession," *United States v. Rene E.*, 583 F.3d 8, 14 (1st Cir. 2009).

Those prohibitions were upheld by courts, *see State v. Callicutt*, 69 Tenn. 714, 716–17 (1878), endorsed by commentators, *see* Thomas M. Cooley, *A Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883), and approved by the public at large, *see* Charles, *supra*, at 156 & nn.211–12. And for good reason. The States did directly what the common-law regime had effectuated during the Founding era: They limited minors' ability to purchase firearms, responding to "unprecedented societal concerns" that had outstripped those common-law restrictions. *Bruen*, 597 U.S. at 27.

## B. Florida's law is constitutional because it fits within the Nation's regulatory tradition.

Florida's law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898. It is consistent with the right to keep and bear arms because it is sufficiently analogous to the common-law regime in existence at the Founding and with the Reconstruction-era restrictions on minors.

In *Rahimi*, the Supreme Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Id.* at 1897. Those cases "were not meant to suggest a law trapped in amber," because the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. A modern firearms regulation is

constitutional, the Court held, if it "is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. As Justice Barrett emphasized, "a test that demands overly specific analogues" would involve "serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices" and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring). Instead, the Second Amendment requires only historical analogues that have a similar "why" and "how." *Bruen*, 597 U.S. at 29. Under this analysis, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 144 S. Ct. at 1898.

Florida's law satisfies that test. From the Founding through the end of the 19th century, the Nation limited minors' ability to purchase firearms. At the Founding, the common law prevented minors from purchasing firearms. Then, during the antebellum and Reconstruction eras, many States directly prohibited sales of firearms to minors. Those regimes are consistent with the Nation's broader tradition of "impos[ing] age limits on . . . activities that requir[e] judgment and reason," *Brown*, 564 U.S. at 834 (Thomas, J., dissenting), and "[t]aken together," they establish a "regulatory tradition" reflecting that States can prevent 18-to-20-year-

olds—a group that the Founders viewed as lacking reason and decisionmaking ability—from purchasing firearms. *Rahimi*, 144 S. Ct. at 1901.

Section 790.065(13) is similar to those "regimes in both why and how it burdens the Second Amendment right." *Id.* The "why" is the same: Just like those regimes, Florida's law generally allows those under 21 to obtain (e.g., as a gift from a parent), possess, and use firearms, but prevents them from buying firearms. That protects both minors and the public from their poor decisionmaking and impulsivity by limiting their access to the "means to" engage in "vicious courses." *Kline*, 2 Paige Ch. at 421–22. Plaintiffs err in claiming that the Reconstruction-era laws were solely enacted to "protect the young adult." Appellants' Br. 46. Because of minors' lack of capacity, the laws prohibited them from purchasing dangerous weapons that could be used against others, while in some instances allowing them to do so with the consent of a parent or guardian. *Bondi*, 61 F.4th at 1333 (Kentucky, Missouri, Illinois, Texas). That same lack of capacity is why the Founding generation prevented minors from purchasing firearms or keeping them in universities.

As for the "how": Florida's law burdens the "right to armed self-defense" even less than the common law and the Reconstruction-era laws. *Bruen*, 597 U.S. at 29. Under *Rahimi*, three metrics are relevant when comparing the burdens imposed by a modern law and historical laws: (1) to whom the laws apply, (2) how long the restrictions last, and (3) the manner in which the laws limit arms-bearing. 144 S. Ct.

at 1901–02; *see also Bruen*, 597 U.S. at 28–29 (emphasizing the importance of homing in on the right "metrics" when performing the analogical inquiry). Florida's law tracks the common law and the Reconstruction-era laws as to all three metrics.

First, it "applies only" to those under 21, which matches the common law and Reconstruction-era laws. *See Rahimi*, 144 S. Ct. at 1901–02. Second, like those regimes, the law places a "temporary" restriction on 18-to-20-year-olds, lasting only three years. *See id.* at 1902 (finding complete disarmament of the defendant for "one to two years" to be consistent with the Second Amendment). Third, Florida's law is comparable to the general disability on contracting for firearms that existed at the Founding, which left minors to rely on their parents to purchase firearms for them. And it is even less restrictive than the Reconstruction-era laws that precluded minors from possessing firearms. Florida's law allows 18-to-20-year-olds to obtain, possess, and use firearms; they just cannot purchase them.

True, the common law indirectly did what Florida's law does directly, and some of the Reconstruction-era laws allowed minors to buy long guns, while Florida's law does not. But the Second Amendment requires only that modern laws be "consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. And the common law and Reconstruction-era laws evince a principle—that the ability of those under 21 to purchase firearms can be limited—to which Florida's law adheres. The law does not "exten[d] beyond" that principle by, for instance,

regulating people other than those considered minors at the Founding, or by stopping those under 21 from obtaining firearms from parents, grandparents, brothers and sisters, or family friends. *Id.*

Plaintiffs are wrong to argue that because 18-to-20-year-olds are now "adults in the State of Florida," the "historically diminished rights" of minors are irrelevant. Appellants' Br. 54. The 1970s-era legislative decisions to give 18-to-20-year-olds greater rights in lowering the age of majority to 18 did not strip the States of their constitutional discretion to set the age of the majority at 21, the level it had been for two centuries. Florida's law is just as constitutional now as it would have been the day before Florida lowered the age of majority to 18. If anything, at the Founding, individuals aged 18-to-20 were at a relatively more advanced stage of life and maturity than they are today given increases in average lifespans. Nor does it matter that at the Founding, those under 21 had the legal capacity to engage in some other "activit[ies]," such as "tak[ing] an oath" and "choos[ing] a guardian." *See Hirschfeld v. BAFTE*, 5 F.4th 407, 435 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). Here, the relevant activity is purchasing firearms, and during the Founding, 18-to-20-year-olds had a legal disability that largely prevented them from engaging in that activity.

Citing *Rahimi*, Plaintiffs maintain that Florida's law is not analogous to the Reconstruction-era laws because the bans "imposed *no* penalty on minors," while

Florida's law "would have them imprisoned." Appellants' Br. 44 (citing 144 S. Ct. at 1902, considering the "penalty" imposed by 18 U.S.C. § 922(g)(8)). That proves the larger point: Minors were generally not subject to criminal punishment for the same reason that they could not contract to purchase firearms at the Founding—they lacked the same legal capacity as adults. *See* 4 William Blackstone, *Commentaries on the Laws of England* 22 (1765) (explaining that those under age 21 were "privilege[d]" from criminal punishment in most cases because they lacked "the capacity to do those things which the law require[d]"); Walsh & Cornell, 108 Minn. L. Rev. at 3080 ("[T]he common law definition of infants meant that any legal proceeding that would attempt to prosecute minors . . . would have to proceed against the legally responsible adult in charge of the minor's household."). That is why the supplier (like the parent supplying firearms for militia service) was the regulated party. *See* N.Y.C., N.Y., Ordinances ch. 23, § 1 (1803) (holding parents liable for unlawful discharge of firearm by minor); Act of Feb. 4, 1812, ch. CXCV, § 2, 4 Del. Laws 522 (1812) (similar); Columbia, S.C., Ordinances no. 41 (1817) (providing for seizure and sale of firearm to satisfy penalty because minors "have no ostensible property whereof the said penalty c[ould] be levied").

Plaintiffs' other arguments for why Florida's law is facially unconstitutional are similarly misplaced.

**1.** Plaintiffs contend that, "[a]t the Founding, our historical tradition was . . . [that] young adults had an unqualified right and obligation to acquire, possess, and carry firearms," pointing to the fact that 18-to-20-year-olds were for the most part required to serve in the militia. Appellants' Br. 38–41, 50. For one thing, "the right to 'keep Arms' [i]s an individual right unconnected with militia service." *Heller*, 554 U.S. at 582, 593–94, 605 (explaining that historical evidence suggests that in England "[it] was clearly an individual right, having nothing whatever to do with service in a militia"; Blackstone's description of the right "cannot possibly be thought to tie it to militia or military service"; and Founding-era and post-Civil War legal scholars and nineteenth-century cases interpreting the Second Amendment "understood it to protect an individual right unconnected with militia service"); *see BATFE*, 700 F.3d at 204 n.17 ("the right to arms is not co-extensive with the duty to serve in the militia"). The argument is a non sequitur: "[A] duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service." *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 137 (3d Cir. 2024). That minors could be made to serve in times of national urgency— and even then, only in the highly regulated context of the militia—sheds no light whatsoever on minors' capacity outside of that narrow circumstance.

As discussed above, moreover, Plaintiffs are incorrect that militia laws required 18-to-20-year-olds to purchase firearms: States required minors' parents (or

the local government) to purchase firearms for them and to take responsibility when minors failed to show up with adequate weaponry.[15] Plaintiffs are therefore wrong to suggest that in the militia context, "an obligation to acquire a firearm presupposes the ability to acquire one." Appellants' Br. 40. The States expressly accounted for minors' inability to purchase firearms by placing the obligation and its attendant penalties on their parents. In short, 18-to-20-year-olds had no "historical ability to acquire a firearm (including through purchase)" that "demonstrates a tradition recognizing their right to do so." *Id.*

**2.** Plaintiffs are just as wrong to insist that Florida's law is unconstitutional because the State has failed to identify a "distinctly similar historical regulation" or statute from the Founding. *Id.* at 42. First of all, as discussed above, Florida's law is indeed rooted in "distinctly similar historical regulation[s]"—at the Founding, those under 21 generally could not purchase firearms. Even "when a challenged regulation does not precisely match its historical precursors, it may still . . . pass constitutional muster" if it "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898 (quotation marks omitted). Plaintiffs demand not a "distinctly similar" regulation but instead a precise criminal-law analogue. Appellants' Br. 42 (calling for a "Founding Era [law] that criminalized" purchase by

---

[15] *See supra* at 19–21.

"young adult[s]"). That argument was rejected in *Rahimi*, which held that the Second Amendment does not require a "historical twin" or "dead ringer" as the price of upholding a firearms regulation. 144 S. Ct. at 1898.

Dead-ringer arguments like Plaintiffs' "assum[e] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* at 1925 (Barrett, J., concurring). "[O]riginalism does not require" that assumption. *Id.* As Justice Scalia explained, it is "impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice." *Johnson v. Transp. Agency, Santa Clara Cty.*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting). And here, the Founders never criminalized the purchase of firearms by minors for good reason: Minors could not contract for a firearm, so there was little need to prohibit their acquisition by them.

Plaintiffs insist that if criminal prohibitions of this kind were permissible, we would have seen them at the Founding even so because youth violence has always been a societal problem. Appellants' Br. 42. But Plaintiffs offer no historical support for that claim. Indeed, few firearms homicides occurred in urban areas in 1791; in the agrarian society that existed at the Founding, minors lived with their families and worked the family farm. Maier, *supra*, at 375; Bailey, 27 Seattle U. L. Rev. at 946

n.24; *see also* Shi, *supra*, at 353. Youth crime was not a pressing problem, let alone

youth crime committed with guns.[16] Families typically owned only a "muzzle-

loading flintloc[k]," which was inaccurate and "liable to misfire"; as a result,

unsurprisingly, most violence was committed with other weapons. Blocher, 133

Yale L.J. at 153–54.[17] In other words, youth-firearm violence may have occurred

from time to time, but nothing suggests it was a "general societal problem" that

"preoccupied the Founders." *Bruen*, 597 U.S. at 26–27.

By the mid- to late-19th century, though, "[t]he regulatory challenges posed

by firearms" were not "the same as those that preoccupied the Founders," *Bruen*,

597 U.S. at 27, precisely because of the dramatic changes affecting minors that had

occurred during the Industrial Revolution and the Civil War. A new societal problem

had arisen that required States to enact positive laws restricting those under 21 from

purchasing firearms.

**3.** Plaintiffs contend that the Court should reject evidence that post-dates the

Founding. Appellants' Br. 36. But the Reconstruction-era prohibitions are "mere

confirmation," *Bruen*, 597 U.S at 36–37, of the Founding-era understanding of that

---

[16] *See* Blocher, 133 Yale L.J. at 153–54; Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 116–17 (Jennifer Tucker et al. eds., 2019).

[17] *See also* Roth, *supra*, at 116–17.

age group's rights. When the Founding-era common-law restrictions on minors' ability to purchase firearms (inability to contract, no access to cash, dearth of affordable firearms, etc.) began to erode, and when the problem of youth gun violence began to increase (because of urbanization, decreased parental supervision, increased supply of cheap firearms, etc.), States across the country took action to reinforce Founding-era restrictions on minors' firearms access. This evidence is thus not "too late," as Plaintiffs contend; it is critical historical context consistent with and demonstrative of the original understanding of the right.[18] *See Dobbs*, 597 U.S. at 248–49 & nn.33–34 (relying on historical evidence from the time of the Fourteenth Amendment's ratification showing that States prohibited abortion at all stages of pregnancy).

What is more, "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represents "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring) ("[P]ost-ratification history" is "a proper tool to discern constitutional meaning."); *id.* at 1924 (Barrett, J., concurring) ("postenactment history can be an important tool"). "[T]he Framers themselves

---

[18] As in *Bruen* and *Rahimi*, "resolving the dispute" over whether the public's understanding of the Second Amendment in 1791 or 1868 is determinative is "unnecessary to decide th[is] case." *Rahimi*, 144 S. Ct. at 1898 n.1.

intended that post-ratification history would shed light on the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring). That is why "[r]eliance on post-ratification history has shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe." *Id*. at 1918 (quotation omitted); *see id*. at 1918–19 (citing dozens of Supreme Court decisions that look to post-ratification history). And contrary to Plaintiffs' assertions, none of the post-ratification history here is "*inconsistent* with the original meaning." Appellants' Br. 34 (quoting *Bruen*, 597 U.S. at 36). Ignoring evidence from after the Founding era, particularly when it is consistent with the original understanding, would be antithetical to how the Supreme Court has conducted constitutional analysis.

**4.**  Finally, Plaintiffs are incorrect to demand that Florida's statute "requir[e]" an "individualized determination" by a court that a person "pose[s] a threat to public safety" before the purchase restriction can apply. Appellants' Br. 52. That is necessary, Plaintiffs assert, because otherwise the statute sweeps too broadly, applying to 18-to-20-year-olds such as a "20-year-old single mother living on her own," unable to obtain a firearm for self-defense. *See id.* at 6, 52–53. But because Plaintiffs pursue only a facial challenge, *see* DE54 (amended complaint dropping as-applied challenges); Appellants' Br. 6 (Plaintiffs "dropped [their] as-applied challenges"), the Court must "focu[s] on" the "circumstances in which" the statute

is "most likely to be constitutional," not "hypothetical scenarios where [it] might raise constitutional concerns," *Rahimi*, 144 S. Ct. at 1903.

Plaintiffs' decision to litigate this case as a facial challenge "comes at a cost." *Moody v. NetChoice*, 144 S. Ct. 2383, 2397 (2024). The Supreme Court has "made facial challenges hard to win" because they "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quotation omitted). In *Rahimi*, the Supreme Court explained that a facial challenge "is the most difficult challenge to mount successfully, because it requires a defendant to establish that no set of circumstances exists under which the [regulation] would be valid." 144 S. Ct. at 1898 (quotation omitted). Florida's burden is therefore only to demonstrate that its law "is constitutional in some of its applications." *Id.*

*Rahimi* is again instructive. The Court there chided the Fifth Circuit for identifying "faults" in the statute that "sound in due process rather than the Second Amendment" because "unless these hypothetical faults occur in every case, they do not justify invalidating" the statute. *Id.* at 1903 n.2. Florida's law, too, is facially constitutional without the need for additional process to verify whether an individual under the age of 21 is sufficiently mature to purchase firearms.

To the extent Plaintiffs suggest that the Second Amendment simply prohibits States from using categorical, or class-based, restrictions as a regulatory tool, they

are mistaken. *Heller*, on the contrary, indicated that "felons are unqualified as 'a class'" to possess arms "because they are not 'law-abiding' citizens.'" *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) (quoting *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (in turn citing *Heller*)). Nothing in *Rahimi* suggests that a legislature is disabled from making such categorical determinations where, as here, history supports it. In upholding a law that disarmed an individual subject to a domestic-violence restraining order, the Court was careful not to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons *thought by a legislature* to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901 (emphasis added). Whatever might be said about other legislative categories, or of a general ban on possession, the history shows that it is at least permissible to restrict firearm purchases by those under the age of 21, who are still free to exercise their Second Amendment rights by obtaining arms from more mature adults.

Similarly, Plaintiffs err in invoking the scenario of a "20-year-old single mother living on her own" who cannot purchase a firearm. Appellants' Br. 6. That argument also runs aground on *Rahimi*, in which the Court faulted the Fifth Circuit for "focus[ing] on hypothetical scenarios where" the statute "might raise constitutional concerns," instead of the "likely" constitutional applications of the statute. 144 S. Ct. at 1903. The law, at the least, is constitutional in most of its

applications. The Court thus need not reach the constitutionality of the statute in peculiar applications involving individuals aged 18-to-20 who, for example, may be unusually mature, or have a particularized need for access to firearms. *See id.* at 1909–10 (Gorsuch, J., concurring).

## CONCLUSION

The Court should affirm.

Respectfully submitted.

ASHLEY MOODY
Attorney General

*/s/ Christopher J. Baum*
HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
CHRISTOPHER J. BAUM, B.C.S.
KEVIN A. GOLEMBIEWSKI
*Senior Deputy Solicitors General*

Office of the Attorney General
1 SE 3rd Ave Suite 900
Miami, FL 33131
(978) 460-1314
(850) 410-2672 (fax)
*christopher.baum@myfloridalegal.com*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limits of Fed. R. App. P. 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,883 words.

2.      This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Christopher J. Baum*
Christopher J. Baum

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2024, I electronically filed the foregoing Brief with the Clerk of Court by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christopher J. Baum*
Christopher J. Baum