No. 21-12314

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————

NATIONAL RIFLE ASSOCIATION, et al.

Plaintiffs-Appellants,

v.

COMMISSIONER, Florida Department of Law Enforcement,

Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the Northern District of Florida

———————————

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
## SUPPORTING APPELLEE

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

MARK B. STERN
MICHAEL S. RAAB
COURTNEY L. DIXON
STEVEN H. HAZEL
  *Attorneys, Appellate Staff
  Civil Division, Room 7246
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530
  (202) 353-8189*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that, to counsel's knowledge, the certificate of interested persons contained in the parties' briefs are complete, with the following additions:

Boynton, Brian M., Principal Deputy Assistant Attorney General

Dixon, Courtney L., counsel for the United States

Hazel, Steven H., counsel for the United States

Raab, Michael S., counsel for the United States

Stern, Mark B., counsel for the United States

/s/ Courtney L. Dixon
Courtney L. Dixon

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST AND SUMMARY ........................................................1

STATEMENT OF THE CASE.................................................................................3

    A.    Statutory Background.....................................................................3

    B.    Prior Proceedings...........................................................................5

ARGUMENT .........................................................................................................6

I.    Age-Based Firearms Regulations Are Consistent with the
Second Amendment........................................................................................6

II.    The Federal Age-Based Commercial Sales Restrictions Are
Constitutional ...............................................................................................22

CONCLUSION ....................................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Brown v. Entertainment Merchs. Ass'n,*
564 U.S. 786 (2011) ........................................................................ 7, 9

*Crawford v. Washington,*
541 U.S. 36 (2004) ........................................................................ 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................... 2, 3, 6, 11, 12, 15, 19, 20, 23

*Lara v. Commissioner Pa. State Police:*
91 F.4th 122 (3d Cir. 2024) ...................................................... 21, 21-22, 22
97 F.4th 156 (3d Cir. 2024) ...................................................... 16, 22

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................................ 20, 23

*National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
700 F.3d 185 (5th Cir. 2012), *abrogated on other grounds by*
*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ........................................... 4, 7, 10, 12, 13, 15, 23

*National Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir.), *reh'g en banc granted,*
*vacated by* 72 F.4th 1346 (11th Cir. 2023) .................................. 1, 2, 5, 6, 9, 9-10, 10,
11, 12, 15, 17, 18, 19, 21

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ........................................... 2, 5, 12, 17, 18, 19, 20, 21, 23

*Opinion of the Justices, In re,*
39 Mass. (22 Pick.) 571 (1838) .................................................... 13

*Ramos v. Louisiana,*
590 U.S. 83 (2020) ........................................................................ 20

*Roth v. United States,*
354 U.S. 476 (1957) ........................................................................ 20

*State v. Callicutt,*
69 Tenn. 714 (1878) ........................................................................ 12

*United States v. Alvarez,*
567 U.S. 709 (2012) ........................................................................ 19-20

*United States v. Rahimi,*
  144 S. Ct. 1889 (2024) ................................................... 2, 6, 16, 17, 19, 21, 23

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009) ............................................ 15

*Worth v. Jacobson,*
  108 F.4th 677 (8th Cir. 2024) ..................................... 21, 22

**Constitution:**

N.C. Const. of 1868, art. XII, § 1 ................................. 14

**Statutes:**

Act of Mar. 26, 1790, ch. IV, 1 Stat. 104 .............................7

Act of Jan. 29, 1795, ch. XX, 1 Stat. 414, 415 ......................7

National Militia Act of 1792, 1 Stat. 271:
  § 1, 1 Stat. at 271 ..............................................13
  § 2, 1 Stat. at 272 .............................................13

Omnibus Crime Control and Safe Streets Act of 1968,
  Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225 .......3
  18 U.S.C. § 921(a)(21) ........................................... 3
  18 U.S.C. § 921(a)(21)(C) ........................................ 3
  18 U.S.C. § 922(a)(1) ............................................ 3
  18 U.S.C. § 922(b)(1) ...................................... 3, 22, 23
  18 U.S.C. § 922(c)(1) ...................................... 3, 22, 23

**Legislative Material:**

S. Rep. No. 88-1340 (1964).........................................3

S. Rep. No. 90-1097 (1968).......................................3, 4

Act of Feb. 2, 1856, no. 26, §1, 1856 Ala. Acts 17........................ 10

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 ...................11

Act of Mar. 21, 1821, ch. CLXIV, § 34, 1821 Me. Laws 548, 570-71 ...........15

Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554 ................................. 15

Marjory Stoneman Douglas High School Public Safety Act,
    ch. 2018-3, 2018 Fla. Laws 6 ............................................. 4
        § 11 (codified at Fla. Stat. § 790.065(13) ....................... 4

**Rule:**

11th Cir. R. 35-8 ............................................................... 1

**Other Authorities:**

Act of Mar. 20, 1797, ch. LXXXI, No. 1, § 15, *in*
    2 *The Laws of the State of Vermont, Digested and Compiled* (1808) ..................... 15

An Act for forming and regulating the militia within this State,
    and for repealing all the laws heretofore made for that purpose,
    *in The Laws of the State of New Hampshire* (1793) ............................. 15

An Act for raising levies and recruits to serve in the present
    expedition against the French, on the Ohio, ch. II, §§ I-III,
    in 6 Hening (1819) ........................................................ 14

An Act for Regulating and Governing the Militia of the
    Commonwealth of Massachusetts, 1793 May Session,
    ch. 14, *in Acts and Laws of the Commonwealth of Massachusetts* (1895) ............ 15

An Act for the better regulating and training the Militia,
    ch. II, §§ II-III, in 6 Hening (1819) ...................................... 14

An Act for the settling and better Regulation of the Militia,
    ch. II, § II, in 4 *The Statutes at Large; Being a Collection of All
    the Laws of Virginia, from the First Session of the Legislature,
    in the Year 1619* (William Waller Hening ed., 1820) ....................... 14

An Act to exempt minors from Militia Duty in time of peace
    (1829), *reprinted in A Compilation of the Public Laws of the State
    of New-Jersey, Passed Since the Revision in the Year 1820*
    (Josiah Harrison ed., 1833) ............................................... 14

1 William Blackstone, *Commentaries on the Laws of England* (1765) ..................... 7

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ................ 11

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev. Inter Alia (Oct. 26, 2021), https://perma.cc/8994-XJH9 ...................................................7

John Faucheraud Grimké, *The South Carolina Justice of Peace* (R. Aitken & Son eds., 1788) ...................................................10

Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016) ........................................... 7-8

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003) .......................................... 8

2 James Kent, *Commentaries on American Law* (1827) ...................................................8

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (2000) ...................................................8

John Locke, *Two Treatises of Government* (Peter Laslett ed., Cambridge 1960) ...................................................8-9

*James Madison's Notes of the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 .......................................8

Nat'l Archives, *From John Adams to James Sullivan, 26 May 1776*, https://perma.cc/CE79-RA8K ...................................................8

Nat'l Archives, *Militia Act, [25 November 1755]*, https://perma.cc/2DFN-Z2GN ...................................................14

Randolph Roth, *Why Guns Are and Are Not the Problem*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker et al. eds., 2019) ...................................................10

2 *The Code of North Carolina* ch. 35, § 3168 (William T. Dortch, John Manning, & John S. Henderson eds., 1883) ...................................................15

*The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027 (Richard H. Clark et al. eds., 1861) ...................................................14

4 *The Statutes at Large of Pennsylvania from 1682 to 1801*
(James T. Mitchell & Henry Flanders eds., 1897) ...........................................7

Univ. of Ga. Libraries, *The Minutes of the Senatus Academicus*
*1799-1842* (Nov. 4, 1976), https://perma.cc/VVT2-KFDB .....................................9

Univ. of Va. Bd. of Visitors, *University of Virginia Board of*
*Visitors Minutes (October 4-5, 1824)*, Encyclopedia Va. 6-7 (Oct. 5, 1824),
https://perma.cc/HNY3-PXDZ ...................................................................9

## STATEMENT OF INTEREST AND SUMMARY

The panel correctly held that Florida's law restricting the purchase of firearms by those under 21 comports with the Second Amendment. The United States has a strong interest in the proper interpretation of the Second Amendment and this Nation's historical tradition of firearms regulation, and therefore submits this brief as amicus curiae under Eleventh Circuit Rule 35-8.

At the Founding, States set minimum-age requirements for an array of important rights, from marriage to voting. By far, the most common age qualification established by Founding-era legislatures was 21, the age of majority at common law. The historical record provides no support for the proposition that the Framers understood the Second Amendment to preclude legislatures from adopting the same age qualification in regulating firearms. Unsurprisingly, therefore, as firearms became deadlier during the nineteenth century, at least "nineteen states and the District of Columbia" enacted age-based firearms regulations and drew the line at age 21. *See National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1331 (11th Cir.), *reh'g en banc granted, vacated by* 72 F.4th 1346 (11th Cir. 2023). Florida's age-based restriction thus accords with a "longstanding tradition" of age- and safety-based firearms regulations that stretches from the Founding to the present, as the panel correctly held. *Id.* at 1320.

Plaintiffs' contrary arguments are at odds with Supreme Court precedent and the historical record. Plaintiffs rely on Founding-era militia laws, but Founding-era legislatures frequently imposed age limits on militia membership, and in all events, the

Supreme Court has held that the right to bear arms is "an individual right unconnected to militia service." *District of Columbia v. Heller*, 554 U.S. 570, 611 (2008). Plaintiffs likewise err in seeking to dismiss close historical analogues to Florida's prohibition. As the panel recognized, numerous nineteenth-century legislatures made it "unlawful even to give or lend handguns and other deadly weapons" to minors. *Bondi*, 61 F.4th at 1331. Those laws imposed at least a "comparable burden" on 18-to-20-year-olds' right to bear arms as Florida's restriction, and plaintiffs' contrary arguments erroneously demand a "historical *twin*," contrary to the Supreme Court's admonitions. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29, 30 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024). Plaintiffs' assertion that nineteenth-century laws are "simply too late" to demonstrate a historical tradition, Pls. En Banc Br. 37 (quotation marks omitted), is similarly incorrect. The Supreme Court has recognized that nineteenth-century evidence is "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *see also Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring).

For these reasons, the panel correctly upheld Florida's law. But in all events, federal age-based restrictions on the commercial sale of handguns comport with the Second Amendment. Those federal restrictions, which are not challenged here, prevent federal firearms licensees from selling handguns to individuals under the age of 21 but do not curtail the ability of 18-to-20-year-olds to possess handguns or acquire them from sources other than federal firearms licensees, and the federal

restrictions do not apply to shotguns or rifles. *See* 18 U.S.C. § 922(b)(1), (c)(1). The

federal restrictions are within the class of "commercial sale" regulations that the

Supreme Court has taken pains not to call into question, and they stand on

particularly firm historical footing. *See Heller*, 554 U.S. at 626-27.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**    The federal government has imposed reasonable age-based qualifications on

the commercial sale of arms since at least 1968. Following a multi-year inquiry that

included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964),

Congress found "that the ease with which" handguns could be acquired by "juveniles

without the knowledge or consent of their parents or guardians . . . is a significant

factor in the prevalence of lawlessness and violent crime in the United States,"

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV,

§ 901(a)(2), 82 Stat. 197, 225. To address "[t]he clandestine acquisition of firearms by

juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), Congress enacted legislation

which restricts federal firearms licensees from selling handguns and handgun

ammunition to individuals under the age of 21, *see* 18 U.S.C. § 922(b)(1), (c)(1).[1]

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms[ or ammunition]." 18 U.S.C. § 922(a)(1). A person is "engaged in the business" of dealing firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

These federal restrictions do not regulate private sales by individuals and do not prohibit the possession of handguns or other firearms by 18-to-20-year-olds. Congress recognized that, under the restrictions, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 79.

**2.** Many States "go[] beyond th[is] federal floor" and impose additional limits on 18-to-20-year-olds' access to and possession of firearms. *See National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* (NRA), 700 F.3d 185, 190 n.4 (5th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). In 2018, the State of Florida enacted the Marjory Stoneman Douglas High School Public Safety Act, ch. 2018-3, 2018 Fla. Laws 6, following a tragic mass shooting at a high school that was committed by a 19-year-old. As relevant here, the Act prohibits persons under the age of 21 from purchasing a firearm and prohibits licensed dealers from making or facilitating a firearms sale to such persons, with limited exceptions for law-enforcement officers and servicemembers. *See id.* § 11 (codified at Fla. Stat. § 790.065(13)). The Act does not prohibit firearm possession by 18-to-20-year-olds or the gifting or lending of firearms to individuals within that age group. Thus, as with the federal restrictions, an 18-to-20-year-old could receive a firearm from his or her parents.

4

## B.    Prior Proceedings

Plaintiffs challenge Florida's age-based purchase restriction as inconsistent with the Second Amendment.  The district court rejected that claim, and a panel of this Court affirmed.  *See National Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir.), *reh'g en banc granted, vacated by* 72 F.4th 1346 (11th Cir. 2023).  Applying the test articulated in *Bruen*, 597 U.S. 1, the panel first assumed, without deciding, that "the Second Amendment's plain text covers" the purchase of firearms by 18-to-20-year-olds.  *Bondi*, 61 F.4th at 1324-25 (quoting *Bruen*, 597 U.S. at 17).  The panel then found that Florida's age-based restriction is consistent with this Nation's historical tradition of firearms regulation.  *Id.* at 1325-27.  In particular, the panel emphasized that "at least nineteen states and the District of Columbia banned the sale and even the giving or loaning of handguns and other deadly weapons to 18-to-20-year-olds by the close of the nineteenth century."  *Id.* at 1331.  The panel found these historical age-based firearms laws to be "relevantly similar" to Florida's restriction both with respect to "how" they operated and "why" they were enacted.  *See id.* at 1325, 1331 (quoting *Bruen*, 597 U.S. at 28-29).  The panel therefore held that Florida's law fits "within [a] longstanding tradition" of age-based firearm regulations.  *Id.* at 1320.

In a concurring opinion, Judge Wilson explained that he would have "wait[ed] to issue an opinion until" after the Florida legislature completed its consideration of a bill that may have mooted the plaintiffs' challenge, though he did not express any

disagreement with the majority's Second Amendment analysis. *See* 61 F.4th at 1338 (Wilson, J., concurring in the judgment).

After the panel issued its decision, the Court granted plaintiffs' motion for rehearing en banc and held this case in abeyance pending *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

## ARGUMENT

### I. Age-Based Firearms Regulations Are Consistent with the Second Amendment

The Constitution protects an individual right to keep and bear arms, but, "[l]ike most rights . . . the right secured by the Second Amendment is not unlimited." *United States v. Rahimi*, 144 S. Ct. 1889, 1912 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). As *Rahimi* recently reaffirmed, in identifying categories of lawful firearms regulations, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. The panel correctly held that, even assuming the Second Amendment's plain text covers 18-to-20-year-olds' purchase of firearms, age-based firearms regulations such as Florida's are consistent with this Nation's regulatory tradition and do not offend the Second Amendment. *See National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1324-25, 1331 (11th Cir.), *reh'g en banc granted, vacated by* 72 F.4th 1346 (11th Cir. 2023).

**A. 1.** Today and at the time of the Second Amendment's ratification, legislatures exercised significant latitude in establishing age requirements for various rights. At the Founding, legislatures set age qualifications for an array of important activities, such as getting married, becoming a naturalized citizen, forming an enforceable contract, petitioning the government, and serving on juries.[2]

For the Second Amendment's ratifiers, the most natural point at which to draw the line between untrustworthy minors and responsible adults was age 21. "The age of majority at common law was 21," and individuals under that age were classified as "minor[s]" or "infant[s]." *NRA*, 700 F.3d 185, 201 (5th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *see* 1 William Blackstone, *Commentaries on the Laws of England* 451 (1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."). Consistent with the common law understanding, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian

---

[2] *See, e.g.*, 4 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 153 (James T. Mitchell & Henry Flanders eds., 1897) (age qualification for marriage); Act of Mar. 26, 1790, ch. IV, 1 Stat. 104; Act of Jan. 29, 1795, ch. XX, 1 Stat. 414, 415 (age qualification for becoming a naturalized citizen), Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev. Inter Alia (Oct. 26, 2021), https://perma.cc/8994-XJH9 (noting that the right to petition "was foreclosed [to] minors" and that even the "venerable" right to contract "could be overridden when the contracting party was a minor"); *see also Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 832-34 (2011) (Thomas, J., dissenting) (explaining that minors at the time of the founding could not "serve on juries," among other restrictions).

E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see* 2 James Kent, *Commentaries on American Law* 101 (1827) (confirming that "the inability of infants to take care of themselves . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years"). Indeed, at the time of the Founding, legislatures allowed individuals to vote only after they turned 21, a tradition that remained prevalent until the passage of the Twenty-Sixth Amendment in 1971. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 277 (2000) (explaining that, "[s]ince the nation's founding, a voting age of twenty-one . . . had been a remarkable constant in state laws governing the franchise" and emphasizing the "prevailing consensus that twenty-one was the age of political maturity"); *see also* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003).

These historical age restrictions reflect the Framers' view that reason and judgment are not fully developed before age 21. For example, John Adams observed that individuals under that age could not vote because they lack "[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic." Nat'l Archives, *From John Adams to James Sullivan, 26 May 1776*, https://perma.cc/CE79-RA8K (on file with the National Archives). Gouverneur Morris, a signer of the Constitution and drafter of the Preamble, similarly warned that under-21-year-olds "want prudence" and "have no will of their own." *See James Madison's Notes of the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4; *see also, e.g.*, John

Locke, *Two Treatises of Government* 324-28 (Peter Laslett ed., Cambridge 1960) (observing that the rights of minors could be restricted because they had not achieved a "state of reason"). Founding-era parents thus generally retained substantial authority to supervise individuals under the age of 21. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 821-31 (2011) (Thomas, J., dissenting).

Nothing in the historical record suggests that the Framers understood the Second Amendment to restrict legislatures from enacting age-based qualifications on the sale of arms. To the contrary, the Founding generation accepted prohibitions on firearm possession by university students, a group which included some of the most privileged 18-to-20-year-olds in the early Republic. *See Bondi*, 61 F.4th at 1327. For example, an 1824 University of Virginia resolution supported by Thomas Jefferson and James Madison forbade students from keeping "weapons or arms of any kind, or gunpowder" on school grounds. Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes (October 4-5, 1824)*, Encyclopedia Va. 6-7 (Oct. 5, 1824).[3] And as an 1810 University of Georgia resolution attests, public universities retained authority to bar students from possessing firearms not just while they stayed on school grounds but also when they left campus. *See* Univ. of Ga. Libraries, *The Minutes of the Senatus Academicus 1799-1842*, ¶ 86 (Nov. 4, 1976);[4] *see also Bondi*, 61 F.4th

---

[3] https://perma.cc/HNY3-PXDZ.
[4] https://perma.cc/VVT2-KFDB (prohibiting students from possessing "any gun" or "other offensive weapon in College" or "out of the college in any case whatsoever").

at 1327. Similarly, although at the Founding citizens generally had a duty to serve as peace officers, among the individuals ineligible for such service were "infants"—that is, individuals under the age of 21. *See* John Faucheraud Grimké, *The South Carolina Justice of Peace* 118 (R. Aitken & Son eds., 1788); *see also NRA*, 700 F.3d at 201 (explaining that the term "minor" or "infant," as "historically understood," "applied to persons under the age of 21").

**2.** Consistent with this view, as firearms became more lethal in the nineteenth century, state legislatures responded by enacting laws imposing age-based firearms qualifications. Firearms at the time of the Founding generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for extended periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, *in A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (Jennifer Tucker et al. eds., 2019). By the mid-nineteenth century, however, there was "a burst of innovations in the arms industry." *Id.* at 122. Legislatures accordingly moved to limit the sale of those weapons to underage individuals.

For as long as legislatures have codified age qualifications on the sale of arms, they have drawn the line at age 21. *See Bondi*, 61 F.4th at 1331. As early as 1856, Alabama forbade providing "to any male minor" any "air gun or pistol," Act of Feb. 2, 1856, no. 26, §1, 1856 Ala. Acts 17, and "[a]t that time, the age of majority in Alabama was twenty-one years," *Bondi*, 61 F.4th at 1325. A "flurry" of similar laws followed in the decades surrounding the passage of the Fourteenth Amendment. *See*

*id.* at 1327. An 1875 Indiana law, for example, made it a crime "for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol" or similar deadly weapon. Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59. Similar age-based restrictions were enacted in numerous other jurisdictions across the country, including Delaware (1881), the District of Columbia (1892), Illinois (1881), Iowa (1884), Kansas (1883), Kentucky (1859), Louisiana (1890), Maryland (1882), Mississippi (1878), Missouri (1879), North Carolina (1893), Tennessee (1858), Texas (1897), West Virginia (1882), Wisconsin (1883), and Wyoming (1890). Age-based restrictions thus spanned every region of the country and covered much of the population. The addendum to this brief provides source and citation information for each law.

The prohibitions were widely recognized and approved by courts, commentators, and the public. *See Bondi*, 61 F.4th at 1329-30. "[T]he judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, included among the permissible exercises of state police power "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883); *see Heller*, 554 U.S. at 616-17 (treating Cooley's interpretation of the Second Amendment as persuasive authority). Likewise, in what appears to be the sole nineteenth-century judicial decision addressing these prohibitions, the Tennessee Supreme Court upheld a state law outlawing the sale of pistols to individuals under

11

the age of 21. *See State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). The court explained that the challenged law "do[es] not in fact abridge[] the constitutional right of the 'citizens of the State to keep and bear arms for their common defense'" and that "acts to prevent the sale" of "a pistol or other like dangerous weapon to a minor" were "not only constitutional as tending to prevent crime but wise and salutary in all [their] provisions." *Id.* "[T]he fact that there was apparently only a single challenge to these [restrictions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330.

It is a testament to the strength of the historical tradition that laws restricting 18-to-20-year-olds' access to and use of firearms remain prevalent today. *See NRA*, 700 F.3d at 190 n.4. The Florida prohibition challenged here thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *See Bruen*, 597 U.S. at 70; *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Far from those exceptional laws, Florida's prohibition reflects a historical tradition that stretches from the Founding to the present, and it satisfies the Second Amendment.

**B.** Plaintiffs' contrary arguments reflect significant misunderstandings of the relevant historical evidence and of the Supreme Court's methodology for analyzing that evidence.

**1.** Plaintiffs primarily rest their historical argument on Founding-era militia laws, *see* Pls. En Banc Br. 37-41, but to the extent those laws are relevant, they are fully consistent with legislatures' authority to restrict 18-to-20-year-olds' access to firearms.

Founding-era legislatures retained discretion to exclude 18-to-20-year-olds from militia service. Plaintiffs rely on the Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as herein after excepted) shall severally and respectively be enrolled in the militia." National Militia Act of 1792, § 1, 1 Stat. 271, 271; *see* Pls. En Banc Br. 21, 38. The very next section of the Act, however, "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17; *see* National Militia Act of 1792, § 2, 1 Stat. at 272 (excluding from the militia "all persons who now are or may hereafter be exempted by the laws of the respective states"). Indeed, when the governor of Massachusetts requested legal advice on this issue, the Massachusetts Supreme Judicial Court concluded that "it is competent for the State legislature by law to exempt from enrol[l]ment in the militia, all persons under twenty-one and over thirty years of age." *In re Opinion of the Justices*, 39 Mass. (22 Pick.) 571, 576 (1838).

Thus, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17. Virginia set a minimum age of 21, which it lowered in times of

exceptional need, for example, in 1755 prior to the Seven Years War.[5]  Other states—

including Georgia, New Jersey, and North Carolina—enrolled only individuals over

21 in their respective militias at various points between the late eighteenth century and

the mid-nineteenth century.[6]

Indeed, Founding Era militia laws illustrate the tradition of adult supervision

over 18-to-20-year-olds' access to arms.  Pennsylvania's 1755 militia act, drafted by

Benjamin Franklin, permitted individuals under 21 to enroll in the militia but provided

"[t]hat no Youth, under the Age of Twenty-one Years, . . . shall be admitted to enroll

himself, or be capable of being enrolled, in the said Companies or Regiments without

the Consent of his or their Parents or Guardians."[7]  By the same token, many states

required parents to furnish the firearms for their minor children's militia duty,

---

[5] *See* An Act for the settling and better Regulation of the Militia, ch. II, § II, in 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 118, 118 (William Waller Hening ed., 1820) (originally promulgated in 1723); An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I-III, in 6 Hening, *supra*, at 438, 438-39 (1819) (originally promulgated in 1754); An Act for the better regulating and training the Militia, ch. II, §§ II-III, in 6 Hening, *supra*, at 530, 530-31 (1819) (originally promulgated in 1755).

[6] *See, e.g.*, *The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at 189, 189, 199 (Richard H. Clark et al. eds., 1861); An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266, 266 (Josiah Harrison ed., 1833); N.C. Const. of 1868, art. XII, § 1.

[7] Nat'l Archives, *Militia Act, [25 November 1755]*, https://perma.cc/2DFN-Z2GN.

including Massachusetts (1793), New Hampshire (1792), Vermont (1797), North Carolina (1806), Maine (1821), and Missouri (1825).[8]

In all events, plaintiffs are incorrect in assuming that authorization to carry a firearm while serving in the supervised context of the militia determines the scope of the right to bear arms outside that context. As the Supreme Court has emphasized, the Framers understood the Second Amendment as codifying "an individual right unconnected with militia service." *Heller*, 554 U.S. at 582. The panel therefore correctly recognized that "merely being part of the militia" does not establish an entitlement to Second Amendment rights. *See Bondi*, 61 F.4th at 1331. Some Founding-era militias included 16-year-olds, for example, *see NRA*, 700 F.3d at 204 n.17, but permitting a 16-year-old to drill with a musket under the oversight of militia offers does not imply that the same individual would have a right to obtain firearms for themselves outside that context. Plaintiffs do not appear to contend that the Second Amendment gives 16-year-olds the right to purchase and possess firearms of all types. *Cf. United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (upholding, based

---

[8] *See* An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, 1793 May Session, ch. 14, *in Acts and Laws of the Commonwealth of Massachusetts* 390 (1895); An Act for forming and regulating the militia within this State, and for repealing all the laws heretofore made for that purpose, *in The Laws of the State of New Hampshire* 441, 447 (1793); Act of Mar. 20, 1797, ch. LXXXI, No. 1, § 15, *in* 2 *The Laws of the State of Vermont, Digested and Compiled* 122, 131-32 (1808); 2 *The Code of North Carolina* ch. 35, § 3168, at 346-47 (William T. Dortch, John Manning, & John S. Henderson eds., 1883); Act of Mar. 21, 1821, ch. CLXIV, § 34, 1821 Me. Laws 548, 570-71; Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554.

on a review of Founding- and Reconstruction-era evidence, the federal prohibition on the possession of handguns by individuals under the age of 18).

**2.** Plaintiffs' efforts to disregard the extensive historical record supporting Florida's age-based restriction are similarly unpersuasive.

**a.** Plaintiffs suggest that the danger presented by young adults and firearms was the same at the time of the Founding as during later periods and today, and that the "absence" of a Founding-era law codifying an age qualification for firearms is conclusive that such a law is inconsistent with our Nation's regulatory tradition. *See* Pls. En Banc Br. 42. That is wrong in both premise and conclusion. As discussed above, firearms technology was meaningfully different at the time of the Founding. *See supra* p. 10. In light of the cumbersome nature and relative ineffectiveness of firearms at the time, Founding-era legislatures may have simply found little reason to adopt age qualifications on firearms sales. *See Lara v. Commissioner Pa. State Police*, 97 F.4th 156, 164 (3d Cir. 2024) (Krause, J., dissenting from the denial of rehearing en banc). Nonetheless, *Rahimi* makes clear that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. As Justice Barrett emphasized in concurrence, the Second Amendment is not confined to "late-18th-century policy choices," and "a test that demands overly specific analogues" would wrongly "assume[] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J.,

concurring). The Court in *Rahimi* correctly rejected that "'use it or lose it' view of legislative authority." *Id.*; *see id.* at 1898 (majority opinion).

As discussed above, age-based qualifications on firearms sales are consistent with Founding-era regulatory principles, and it is accordingly unsurprising that as firearms became deadlier in the nineteenth century, legislatures across the country responded by adopting age qualifications on the sale of such weapons and drew the line at age 21. *See Bondi*, 61 F.4th at 1321, 1325-26.

Plaintiffs seek to distinguish those nineteenth-century age qualifications from Florida's restriction, *see* Pls. En Banc Br. 43-47, but plaintiffs' argument relies on a highly selective account of the historical record and, at bottom, demands a "historical twin" contrary to the Supreme Court's repeated admonitions, *see Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 30). In *Rahimi*, the Supreme Court recognized that the modern prohibition at issue was "by no means identical" to historical laws, but the Court held that "it does not need to be." *Id.* at 1901. Instead, it was sufficient that the modern restriction was "relevantly similar" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* at 1901-02 (quotation marks omitted). And the Court derived the relevant regulatory tradition by considering the historical laws "[t]aken together," rather than parsing them individually as the dissent would have done and as plaintiffs seek to do here. *Compare id.* at 1901-02 (majority opinion), *with id.* at 1944 (Thomas, J., dissenting).

17

Plaintiffs' arguments cast no doubt on the panel's conclusion that Florida's law is relevantly similar to its historical counterparts. Plaintiffs emphasize, for example, that the nineteenth-century age qualifications primarily applied to handguns whereas Florida's law applies to all types of firearms. *See* Pls. En Banc Br. 43. In other respects, however, the historical laws were broader than Florida's restriction. As the panel explained, several nineteenth-century legislatures made it unlawful "even to give or lend handguns" and similar deadly weapons to minors under the age of 21. *See Bondi*, 61 F.4th at 1330-31. That includes, for example, the laws enacted by Alabama (1856), Tennessee (1856), Indiana (1875), Maryland (1882), Iowa (1884), Louisiana (1890), Wyoming (1890), the District of Columbia (1892), and North Carolina (1893). Moreover, at least two legislatures—Kansas (1883) and Wisconsin (1883)—enacted laws that prohibited minors from possessing handguns generally. Others, such as Missouri (1879), Illinois (1881), and Texas (1897), prohibited the sale or giving of a handgun to a minor but allowed for exceptions with parental consent.

Plaintiffs fail to explain why those historical laws did not impose at least a "comparable burden" on 18-to-20-year-olds' ability to keep and bear arms as Florida's age-based restriction, *see Bruen*, 597 U.S. at 29, which prohibits the purchase of firearms by 18-to-20-year-olds but does not prohibit that age group from possessing firearms or receiving them by gift from their parents, *see Bondi*, 61 F.4th at 1326, 1328. That numerous legislatures across the country enacted laws in the nineteenth century restricting 18-to-20-year-olds' access to firearms in the interest of "public safety"

confirms that the public at the time did not perceive any inconsistency between the right to bear arms and reasonable age-based restrictions. *See id.* at 1326.

**b.** Plaintiffs' assertion that the nineteenth-century laws must be ignored altogether as "simply too late" to inform the Second Amendment analysis, Pls. En Banc Br. 37 (quotation marks omitted), similarly lacks merit. The Supreme Court has explained that nineteenth-century materials constitute a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20, 36 (quoting *Heller*, 554 U.S. at 605); *see also Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring) (emphasizing that "post-ratification history" represents "a proper tool to discern constitutional meaning"); *id.* at 1924 (Barrett, J., concurring) (recognizing that "postenactment history can be an important tool"). The Court's extensive review of that evidence in both *Heller* and *Bruen* confirms that such evidence plays an important role in the Second Amendment analysis. *See Heller*, 554 U.S. at 605-19; *Bruen*, 597 U.S. at 30, 35-36, 50-56.

As Justice Kavanaugh explained in his concurrence in *Rahimi*, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." 144 S. Ct. at 1917 (Kavanaugh, J., concurring). "Reliance on post-ratification history" has thus "shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe." *Id.* at 1918 (quotation marks omitted). In analyzing the First Amendment, for example, the Court has reviewed nineteenth-century sources in discussing "historic and traditional" exceptions to the free speech right. *United States v. Alvarez*, 567 U.S.

709, 717 (2012) (plurality opinion) (quotation marks omitted); *see, e.g., Roth v. United States*, 354 U.S. 476, 483-85, 483 n.13, 485 n.17 (1957) (citing nineteenth-century laws in determining whether obscenity is protected by First Amendment).  In Sixth Amendment cases, the Court has likewise consulted nineteenth-century evidence.  *See Ramos v. Louisiana*, 590 U.S. 83, 92 (2020) (citing evidence from "throughout the 19th century" in addressing right to jury trial); *Crawford v. Washington*, 541 U.S. 36, 49-50 (2004) (citing mid-nineteenth-century materials in defining confrontation clause's scope).  There is no basis for adopting a more circumscribed view of the relevant historical evidence in Second Amendment cases.

The Supreme Court has explained, moreover, that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was ratified in 1791, *Heller*, 554 U.S. at 570, 603, 605, and "still recognized to be fundamental" in the mid-to-late nineteenth century, *McDonald v. City of Chicago*, 561 U.S. 742, 773 (2010).  Sources from both before and after 1791 thus provide insight into what the right to bear arms entails.  Nineteenth-century history assumes particular importance because the Supreme Court has determined that the right protected by the Second Amendment and Fourteenth Amendment "have the same scope."  *Bruen*, 597 U.S. at 37.  Tracing the meaning of a right codified in 1791 and renewed in 1868 requires a review of sources from both periods.  Indeed, *Bruen* recognizes that "a regular course of practice" arising after those periods "can liquidate

[and] settle the meaning of disputed or indeterminate terms" in the Constitution. *Id.* at 35-36 (quotation marks omitted).

The panel concluded that to the extent the historical record from the eighteenth and nineteenth centuries "conflict" when examining the constitutionality of a state firearm restriction, the understanding that prevailed at the time of "the later-enacted [Amendment] controls." *See Bondi*, 61 F.4th at 1323-24 (quotation marks omitted). That question is ultimately unnecessary to resolve in this case, however, because there is no conflict between the historical record of the two time periods: as discussed above, the nineteenth-century historical record is fully consistent with Founding-era views. *See Bruen*, 597 U.S at 37-38 (reserving question of whether "courts should primarily rely on the prevailing understanding" in 1791 or 1868 because the relevant public understanding "was, for all relevant purposes, the same"); *Rahimi*, 144 S. Ct. at 1898 n.1 (similar).

**c.** For these reasons, plaintiffs' reliance on *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), and *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) is misplaced. In *Lara*, a divided panel of the Third Circuit acknowledged the "catalogue" of age-based firearms laws enacted in the nineteenth century but erroneously "set aside" that nineteenth-century evidence and refused to consider it, instead placing conclusive weight on Founding-era militia laws. *See Lara*, 91 F.4th at 134-36. That approach is incorrect for the reasons discussed above and as explained by the panel dissent and the dissent from the denial of rehearing en banc. *See id.* at

145-47 (Restrepo, J., dissenting); *Lara*, 97 F.4th at 161-62 (Krause, J., dissenting from the denial of rehearing en banc).  Similarly, in *Worth*, the Eighth Circuit acknowledged Founding-era sources and the numerous age qualifications enacted in the nineteenth century, but erroneously discounted the nineteenth-century evidence and demanded an overly specific historical analogue, contrary to *Rahimi*.  *See Worth*, 108 F.4th at 696-97.  In all events, both *Lara* and *Worth* involved state laws that prohibited the public carrying of firearms by 18-to-20-year-olds, rather than restricting only firearms sales to that age group.  *See Lara*, 91 F.4th at 126; *Worth*, 108 F.4th at 683, 687.  The Eighth Circuit recognized the numerous nineteenth-century laws addressing "the *sale* or *furnishing* of weapons to minors," which the Court distinguished from the public-carry restriction at issue in that case.  *See Worth*, 108 F.4th at 697.

## II.     The Federal Age-Based Commercial Sales Restrictions Are Constitutional

For the reasons discussed above, age-based firearms regulations such as Florida's accord with the Second Amendment.  In all events, the federal restrictions on the commercial sale of handguns rest on especially firm doctrinal and historical foundations.  The federal commercial-sales restrictions bar federal firearms licensees from selling handguns to 18-to-20-year-olds.  *See* 18 U.S.C. § 922(b)(1), (c)(1).  They do not prevent 18-to-20-year-olds from "possess[ing] and us[ing] handguns," and they leave undisturbed 18-to-20-year-olds' ability to obtain handguns from "parents or

guardians" or "through unlicensed, private sales." *NRA*, 700 F.3d at 189-90. They also do not apply to shotguns or rifles. *See* 18 U.S.C. § 922(b)(1).

Because of their narrow focus, the federal commercial-sales restrictions hew especially close to the historical regulations, even under plaintiffs' own arguments. *See* Pls. En Banc Br. 43-44. The federal age-based commercial-sales restrictions also fit neatly within the category of commercial-sales restrictions the Supreme Court has approved. In *Heller*, the Court identified "laws imposing conditions and qualifications on the commercial sale of arms" as "presumptively lawful." 554 U.S. at 626-27, 627 n.26. And in *McDonald*, the Court "repeat[ed]" its "assurances" that *Heller* did not "cast doubt on such longstanding regulatory measures" as "laws imposing conditions and qualifications on the commercial sale of arms." *McDonald*, 561 U.S. at 786 (quotation marks omitted). Justice Kavanaugh, joined by Chief Justice Roberts, reiterated that point in *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring), and Justice Alito similarly underscored in *Bruen* that federal law continues to "bar[] the sale of a handgun to anyone under the age of 21," *id.* at 73 (Alito, J., concurring) (citing 18 U.S.C. § 922(b)(1), (c)(1)). The federal commercial-sales restrictions comport with "the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, and readily pass constitutional muster.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MARK B. STERN
MICHAEL S. RAAB
*s/ Courtney L. Dixon*
COURTNEY L. DIXON
STEVEN H. HAZEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*
*courtney.l.dixon@usdoj.gov*

August 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedures 29 and 32(a)(7)(B) because it contains 6,042 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2024, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

Eleventh Circuit by using the appellate CM/ECF system.

*s/ Courtney L. Dixon*
Courtney L. Dixon

**ADDENDUM**

**Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-Twenty Year Olds**

| Jurisdiction | Year | Source | Available at |
|---|---|---|---|
| Alabama | 1856 | 1856 Ala. Acts 17, No. 26, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssal0178&i=17 |
| Delaware | 1881 | 16 Del. Laws 716 (1881) | https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0173&id=430&collection=ssl |
| District of Columbia | 1892 | *The Miscellaneous Documents of the Senate of the United States for the First Session of the Fifty-Second Congress 1891-92*, at 288, § 5 (1892) | https://hdl.handle.net/2027/hvd.hj1gjl?urlappend=%3Bseq=294%3Bownerid=27021597767057788-314 |
| Illinois | 1881 | 1881 Ill. Laws 73, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssil0240&i=81 |
| Indiana | 1875 | 1875 Ind. Laws 59, ch. XL, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssin0221&i=59 |
| Iowa | 1884 | 1884 Iowa Acts and Resolutions 86, ch. 78, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssia0095&i=114 |
| Kansas | 1883 | 1883 Kan. Sess. Laws 159, ch. CV, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssks0111&i=169 |

| | | | |
|---|---|---|---|
| Kentucky | 1859 | Edward Bullock and William Johnson, *The General Statutes of the Commonwealth of Kentucky* 359, art. XXIX, § 1 (1873) | https://heinonline.org/HOL/P?h=hein.sstatutes/gcucky0001&i=371 |
| Louisiana | 1890 | 1890 La. Acts 39, No. 46, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssla0223&i=39 |
| Maryland | 1882 | 1882 Md. Laws 656, ch. 424, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssmd0444&i=656 |
| Mississippi | 1878 | 1878 Miss. Laws 175, ch. XLVI, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssms0207&i=207 |
| Missouri | 1879 | *Revised Statutes of the State of Missouri* 224, § 1274 (1879) | https://heinonline.org/HOL/P?h=hein.sstatutes/ristesm0001&i=320 |
| Nevada | 1885 | 1885 Nev. Stat. 51, ch. LI, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnv0097&i=61 |
| North Carolina | 1893 | 1893 N.C. Pub. L. & Res. 468, ch. 514, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnc0078&i=498 |
| Tennessee | 1856 | 1856 Tenn. Acts 92, ch. 81, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/sstn0249&i=108 |

| Texas | 1897 | 1897 Tex. Gen. Laws 221-22, ch. 155, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sstx0251&i=245 |
|---|---|---|---|
| West Virginia | 1882 | 1882 W. Va. Acts 421-22, ch. CXXXV, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sswv0101&i=421 |
| Wisconsin | 1883 | 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/sswi0136&i=290 |
| Wyoming | 1890 | 1890 Wyo. Sess. Laws 140, § 97 | https://heinonline.org/HOL/P?h=hein.ssl/sswy0076&i=138 |