No. 21-12314

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

COMMISSIONER, FLORIDA DEPARTMENT OF LAW ENFORCEMENT,

*Defendant-Appellee.*

———————————————

On Appeal from the United States District Court
for the Northern District of Florida (No. 4:18-cv-00137)
(Hon. Mark E. Walker, Chief Judge)

———————————————

**EN BANC BRIEF OF EVERYTOWN FOR GUN SAFETY SUPPORT
FUND AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-
APPELLEE AND AFFIRMANCE**

———————————————

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Sana S. Mesiya
Everytown Law
P.O. Box 14780
August 30, 2024                    Washington, DC 20044

No. 21-12314

*National Rifle Association of America, Inc., et al. v. Commissioner, Florida Department of Law Enforcement*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety Support Fund has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

Pursuant to 11th Cir. R. 26.1-1 – 26.1-4, Everytown for Gun Safety Support Fund states that the persons with an interest in the outcome of this case who have not previously been identified in briefs filed in this case (including in the Brief of Everytown for Gun Safety Support Fund filed on October 25, 2021 (Dkt. 36)) are:

1. Mesiya, Sana S., *Counsel for amicus curiae Everytown for Gun Safety Support Fund*
2. Sa, Eleuthera O., *Counsel for amicus curiae Everytown for Gun Safety Support Fund*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................1

STATEMENT OF THE ISSUE............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................2

ARGUMENT ................................................................................5

I.    Reconstruction-Era Evidence Is Critically Important to the Historical Inquiry, Regardless of Which Era Is the Primary Focus ............................5

II.    If this Court Chooses To Resolve the Time Period Question, the Proper Focus Is the Reconstruction Era, Not the Founding Era.............................12

III.    This Court Should Consider Historical Context in Evaluating Florida's Age Restriction.............................................................................21

CONCLUSION..................................................................................26

i

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, No. 23-910, 2024
  WL 3259671 (U.S. July 2, 2024)........................................................13, 14, 24, 25

*Bianchi v. Brown*,
  --- F.4th ---, No. 21-1255, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) (en banc),
  *petition for cert. filed*, No. 24-203 (U.S. Aug. 23, 2024) ....................................22, 23

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ...................................................................................25

*Crawford v. Washington*,
  541 U.S. 36 (2004) ...................................................................................20

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................................3, 4, 5, 6, 12

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................................24

*Espinoza v. Montana Dep't of Revenue*,
  140 S. Ct. 2246 (2020) ............................................................................16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011).................................................................14, 17

*Gamble v. United States*,
  587 U.S. 678 (2019) ................................................................................16

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ....................................................................14

*Jones v. Bonta*,
  705 F. Supp. 3d 1121 (S.D. Cal. 2023)....................................................10, 11

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019)....................................................................2, 10

*Kipke v. Moore*,
  695 F. Supp. 3d 638 (D. Md. 2023) ...........................................................15

*Kipke v. Moore*,
No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024) ........................................................15

*LaFave v. Cnty. of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024) .........................
.................................................................................7, 13, 15, 21, 25

*Lara v. Comm'r Pennsylvania State Police*,
91 F.4th 122 (3d Cir. 2024), *petition for cert. filed*, No. 24-93 (U.S. July 30, 2024) .15

*McCullen v. Coakley*,
573 U.S. 464 (2014) ...............................................................................23

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ............................................................................4, 13

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) .......................................................................................14

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir.), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023) ...................................................4, 5, 9, 12, 13, 17, 20, 21, 22, 23

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ...........................................................................9, 20

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ..........................2, 3, 4, 5, 6, 7, 9, 12, 14, 16, 19, 20, 25

*Planned Parenthood S. Atl. v. Kerr*,
95 F.4th 152 (4th Cir. 2024) ..................................................................13

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ...........................................................................16, 20

*Rupp v. Bonta*,
No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024) .........................................................15, 16

*Timbs v. Indiana*,
586 U.S. 146 (2019) ................................................................................20

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012)...................................................................14

*United States v. Jackson*,
110 F.4th 1120 (8th Cir. 2024) ...........................................................................10

*United States v. Meyer*,
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)..................19, 20

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024) .............................................................................10

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .......................................2, 3, 4, 7, 8, 16, 19, 20, 23, 24, 25

*United States v. Rowson*,
652 F. Supp. 3d 436 (S.D.N.Y. 2023)................................................................25

*We the Patriots, Inc. v. Lujan Grisham*,
697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal docketed*, No. 23-2166 (10th Cir. Oct.
20, 2023) ..............................................................................................................15

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024) ............................................................................15

## Statutes and Rules

Fla. Stat. § 790.065(13) ...........................................................................................1, 2

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............19, 20

Brief for Independent Institute As Amicus Curiae, *New York State Rifle & Pistol Ass'n
v. Bruen*, No. 20-843 (U.S. July 20, 2021) .............................................................7

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
Charleston L. Rev. 205 (2018)...............................................................................7

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....17

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the
Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8
Geo. J.L. & Pub. Pol'y 1 (2010)...................................................................17, 18

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15,
2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now
published at 97 Ind. L.J. 1439) ...................................................................19, 20

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)........................................................................................18

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049 (2024) ....................................................11, 22

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ....................................................................................17

Patrick J. Charles, *Armed in America: A History of Gun Violence from Colonial Militias to Concealed Carry* (2018) ......................................................................................22

*Put Down That Pistol*, Monongahela Valley Republican, Jul. 1, 1880 ......................22

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008).........................................................................................17

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ......................................17

*The News This Morning*, New-York Tribune, Aug. 23, 1884.....................................22

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ...........................................................................................17

W.H. Kennedy, *Carrying Concealed Weapons*, New-York Tribune, Jul. 26, 1884 ......22

## STATEMENT OF INTEREST

Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown for Gun Safety was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## STATEMENT OF THE ISSUE

Whether Section 790.065(13) of the Florida Statutes, which restricts those under the age of 21 from purchasing firearms, is constitutional under the Second and Fourteenth Amendments.

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Florida legislature enacted the Marjory Stoneman Douglas High School Public Safety Act in 2018, after a 19-year-old gunman in Parkland murdered fourteen students and three staff members and wounded seventeen more. That Act, among other things, restricts those under 21 years of age from purchasing firearms. See Fla. Stat. § 790.065(13).

Florida's age restriction is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024). The historical support for Florida's law stretches back to the founding era, when legislatures "categorically disarmed groups whom they judged to be a threat to the public safety," *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). In the Reconstruction era, as firearms became more dangerous and more readily available to young people, that tradition manifested in a host of states enacting laws restricting the ability of those under 21 to access or use firearms. "Taken together," *Rahimi*, 144 S. Ct. at 1901, the founding- and Reconstruction-era laws firmly establish the constitutionality of the Act. The Reconstruction-era laws, in particular, are close to historical "twin[s]" of the Act and are thus even stronger evidence of constitutionality than *Bruen* or *Rahimi* require. *See Bruen*, 597 U.S. at 30; *Rahimi*, 144 S. Ct. at 1903.

Everytown submits this amicus brief to expand on the critical importance of Reconstruction-era history in Second Amendment methodology. The Supreme Court has expressly left open the question of what time period should be the central focus of Second Amendment analysis: the founding era, when the Second Amendment was ratified, or the Reconstruction era, when the people made it applicable to the states through the Fourteenth Amendment. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 144 U.S. at 1898 n.1. Although the relevance of Reconstruction-era history is beyond question regardless of which period is the central focus, *see, e.g.*, *District of Columbia v. Heller,* 554 U.S. 570, 614-19 (2008); *Bruen*, 597 U.S. at 21, 34; *Rahimi*, 144 S. Ct. at 1900; *infra* p. 7, litigants advancing Second Amendment challenges continue to dispute its role. This brief discusses three functions 19th-century (and later) history plays in informing our understanding of the Second Amendment.

*First*, such history can "liquidate ambiguous constitutional provisions" and "provide persuasive evidence of the original meaning." *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring); *see Bruen*, 597 U.S. at 35-36. Indeed, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text," making such history a "proper and important tool to help constitutional interpreters." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring).

3

*Second*, history surrounding the ratification of the Fourteenth Amendment illuminates how the people understood the right to keep and bear arms when they made it applicable to the states in 1868. And, as the panel correctly explained in upholding Florida's law, "because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States," this Reconstruction-era history is even "more probative" than history from the founding era—and thus should control if there were a conflict between the two. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir.) (looking to *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008), *McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010), and *Bruen*, 142 S. Ct. at 2132), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023). Here, however, there is no such conflict, and no need for this Court to decide between founding- and Reconstruction-era evidence.

*Third*, post-ratification history—whether post-1791 or post-1868—also provides insight into how legislatures historically have responded to new and evolving social problems. That evidence, in turn, can contextualize earlier legislative inaction. Because legislatures historically have not "maximally exercised their power to regulate," *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring), courts should assess modern-day regulations in light of "the principles underlying the Second Amendment" rather than searching for a "historical twin," *id.* at 1898 (majority opinion). Historical practice beginning around when a problem was first

4

recognized—here, a rise in firearm violence among young people, coupled with societal changes that removed barriers that had previously prevented young people from acquiring firearms without parental involvement—can be particularly informative of the scope of constitutionally permissible legislative responses, and can resolve any doubts about whether earlier regulations are analogous enough to a modern-day law.

## ARGUMENT

### I.    Reconstruction-Era Evidence Is Critically Important to the Historical Inquiry, Regardless of Which Era Is the Primary Focus

Which time period is central to the Second Amendment analysis—the Reconstruction era or the founding era—remains an open question. *See supra* pp. 19-20.[2] But regardless of which period is the primary focus, the Supreme Court—in *Heller*, *Bruen*, and now *Rahimi*—has made clear that 19th-century and Reconstruction-era evidence is a critically important part of the analysis.

*Heller* and *Bruen* confirmed that examining post-ratification sources is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). *Bruen* also explained that "a regular course of practice" following the enactment of a constitutional provision "can liquidate [and] settle the meaning

---

[2] As the prior panel opinion correctly explained, *see Bondi*, 61 F.4th at 1322-24, if this Court decides to address the time-period question, it should prioritize evidence from the period surrounding 1868. *See infra* Part II.

of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up). Both decisions then extensively canvassed 19th-century evidence, including through Reconstruction. *See, e.g.*, *id*. at 21 (recounting that *Heller* had considered, among other things, "19th-century cases that interpreted the Second Amendment," the "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and the work of "post-Civil War commentators" (quoting *Heller*, 554 U.S. at 610, 614, 616-19); *id.* at 51-57 (discussing mid-19th-century cases and statutes); *id.* at 60 (surveying "public discourse surrounding Reconstruction" as demonstrating "how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens").

Examining Reconstruction-era evidence is also consistent with the passage in *Bruen* instructing lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- and *19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, *id.* at 30 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws

6

restricting guns in any of the three locations the Court listed were from the *late* 19th century.[3]

Most significantly, *Rahimi* has now put the importance of 19th-century sources to the Second Amendment analysis beyond any question, by resting its decision *upholding* a challenged law in significant part on laws that were passed between 1836 and 1868. *See* 144 S. Ct. at 1900 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws). It is impossible to reconcile *Rahimi* with the position of plaintiffs-appellees (collectively, the "NRA") that only founding-era historical evidence counts. *See* Dkt. 94 ("NRA Br.")16, 28-36. And the NRA's puzzling assertion that *Rahimi* "did not cite a single Reconstruction Era law," *id.* at 15, is simply wrong.

Relying on 19th-century evidence is therefore entirely consistent with—indeed, compelled by—the Supreme Court's decisions. *See, e.g.*, *LaFave v. Cnty. of*

---

[3] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. As Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

*Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *7 (E.D. Va. Aug. 23, 2024) (noting that "*Bruen* and *Rahimi* both make clear that the analysis need not be restricted to the Founding Era," and instead "favor[] a more flexible approach," which includes examination of "Reconstruction Era history and tradition"). As Justice Kavanaugh put it, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (confirming that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions" and "provide persuasive evidence of the original meaning").[4]

Recognizing that 19th-century history can provide "persuasive evidence" of 18th-century understanding accords not only with Supreme Court caselaw, but with common sense. If a regulation passed in the decades around Reconstruction— *within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in

---

[4] In other areas of law as well, the Supreme Court has often relied on post-ratification history, including history from long after the founding, in resolving constitutional ambiguities. *See id.* at 1918-19 (Kavanaugh, J., concurring) (citing cases).

the decades prior, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later tradition also reflects the founding-era understanding. After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S at 37. To take that position while adhering to interpretive principles based in original public understanding, the Court must have presumed, at least as a general matter, that the understanding of constitutional rights remained consistent between 1791 and 1868.

Accordingly, this Court should consider Reconstruction-era evidence in assessing Florida's law. And, as the panel explained, doing so easily resolves this case in favor of the Commissioner. *See Bondi*, 61 F.4th at 1327 (discussing "the flurry of state regulations, enacted soon after the Fourteenth Amendment's ratification, that banned the sale of firearms to all 18-to-20-year-olds"). Moreover, Florida's law is also consistent with the long historical tradition of disarming

individuals "whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *United States v. Perez-Garcia*, 96 F.4th 1166, 1189 (9th Cir. 2024).[5]

The NRA nevertheless argues that this Court should disregard all Reconstruction-era history in this case because it purportedly "contradicts" founding-era militia laws that, the NRA claims, "support[] young adults' traditional right to the acquisition, possession, and carry of firearms." NRA Br. 49. But, as detailed in Everytown's prior amicus brief in this appeal, there is no such contradiction. *See* Dkt. 36 at 15-20 (explaining the many deficiencies in NRA's militia-based argument); *see also, e.g.*, *Jones v. Bonta*, 705 F. Supp. 3d 1121, 1138 (S.D. Cal. 2023) (rejecting the "proposition that militia service for individuals under the age of 21 equates to a general right to independently commercially acquire firearms for individual use for any purpose").

The NRA points, in particular, to a supposed "enduring tradition that young adults almost universally were required to acquire firearms to participate in the militia." NRA Br. 40-41. But that is not so. As one court recently noted, "over a

---

[5] *See also, e.g.*, *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.").

third of state militia statutes in the Founding Era enacted laws requiring parents or guardians to provide firearms to militia members under the age of 21 who were under their charge." *Jones*, 705 F. Supp. 3d at 1138 (cleaned up) (relying on expert declaration of Prof. Saul Cornell). And, indeed, in a litigation challenging a similar age-restriction law in California, a historian reviewed the militia laws of the first thirteen states, and found that, "without exception," these founding-era militia laws reflected minors' incapacity to purchase arms for themselves. *See* Expert Report and Decl. of Prof. Holly Brewer, *Chavez v. Bonta*, No. 3:19-cv-01226, (S.D. Cal. Mar. 15, 2024), Dkt. 134-6, ¶ 46; *see id.* ¶¶ 21-36 (finding that militia laws of each of the original 13 States included a provision exempting under-21 militia members from providing their own arms, providing alternative means for firearms to be procured for them, or exempting the under-21 member from punishment for failure to appear with the appropriate arms at muster).[6]

In sum, regardless of which period (founding or Reconstruction) this Court determines to be the most relevant, it should accept that the "practice" thereafter—including that "at least nineteen states and the District of Columbia banned the sale and even the giving or loaning of handguns and other deadly

---

[6] *See also, e.g.*, Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049, 3077 (2024) ("Minors did not arm themselves for militia service; they depended on parents and guardians to outfit them with the necessary arms, and, in some instances, depended on local government or the state to provide arms.").

weapons to 18-to-20-year-olds by the close of the nineteenth century," *Bondi*, 61 F.4th at 1331—"settle[s]" the meaning of the right, *see Bruen*, 597 U.S. at 35-36, and demonstrates that Florida's law is constitutional.

## II.    If this Court Chooses To Resolve the Time Period Question, the Proper Focus Is the Reconstruction Era, Not the Founding Era

For the reasons just set out, this Court should consider 19th-century evidence and uphold Florida's age restriction regardless of whether the Reconstruction era or the founding era is the most relevant time period. But if it chooses to address that time-period question, it should conclude, as the panel did, that the inquiry centers on the Reconstruction era and 1868. *See Bondi*, 61 F.4th at 1322-24.

To begin, because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*), focusing on 1868 in a case against a state is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? After all, the Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 37. As the panel recognized, "it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—

that they did not share when they ratified the Fourteenth Amendment." *Bondi*, 61 F.4th at 1324.

Moreover, applying the 1791 public understanding of the right to keep and bear arms against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding around 1868. *See McDonald*, 561 U.S. at 770-78 (plurality op.); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk v. Chiumento*, 89 F.4th 271, 305 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (granting certiorari, vacating judgment, and remanding to Second Circuit for further consideration in light of *Rahimi*).[7]

That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in

---

[7] The Supreme Court's grant, vacate, and remand (GVR) order in *Antonyuk* is not a determination on the merits. *See, e.g.*, *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) (recognizing that "the issuance of a GVR does not speak to the underlying merits of the case"). Courts have continued to rely on *Antonyuk* since the GVR, including on this time-period question. *See, e.g.*, *LaFave*, 2024 WL 3928883, at *7 n.6, *8.

time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").[8]

The panel was not alone in prioritizing Reconstruction-era evidence in cases involving state laws. Multiple courts since *Bruen*, faced with challenges to state laws, have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See, e.g.*, *Antonyuk*, 89 F.4th at 305, 318 n.27 (observing that "evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era"); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582 (D. Md. 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the

---

[8] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts and their step-one analyses remain, as a general matter, good law. *Bruen* removed the second step (means-end scrutiny) of the pre-*Bruen* framework from the analysis, but explained that "[s]tep one of [the prior framework] is broadly consistent with *Heller*." 597 U.S. at 19.

Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023);

*Rupp v. Bonta*, No. 8:17-cv-00746, 2024 WL 1142061, at *9, 31-32 (C.D. Cal. Mar.

15, 2024) (concluding that "ratification of the Fourteenth Amendment is the

operative period from which to discern the public understanding of the Second

Amendment"), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024).[9]

 This Court should not, as the NRA urges, *see* NRA Br. 3, 35, 37, follow the

Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th

122 (3d Cir. 2024), *petition for cert. filed*, No. 24-93 (U.S. July 30, 2024). Instead of

engaging with originalist principles, the Third Circuit based its conclusion on the

"general assumption" in several Supreme Court cases cited by *Bruen*. *See Lara*, 91

F.4th at 133 (citing *Bruen*, 597 U.S. at 37). In *Worth v. Jacobson*, 108 F.4th 677, 697

(8th Cir. 2024), the Eighth Circuit pointed to this same assumption in the case law

to similarly conclude that Reconstruction-era laws "carry less weight than

Founding-era evidence." But those Supreme Court cases cited by *Bruen* did not

address the significance of the Fourteenth Amendment's ratification for the

---

[9] *See also, e.g.*, *Kipke v. Moore*, 695 F. Supp. 3d 638, 651 (D. Md. 2023) (agreeing with *Maryland Shall Issue*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at *5 (D. Md. Aug. 2, 2024) (affirming prior reasoning on summary judgment), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall Issue*), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023); *LaFave*, 2024 WL 3928883, at *8 (observing a "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era").

question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 144 S. Ct. at 1898 n.1. Thus, because *Lara* and *Worth* relied on an assumption and cannot be squared with originalist principles, they are not persuasive. *See Rupp*, 2024 WL 1142061, at *32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and … the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning").[10]

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. When asked by Justice Thomas about the correct time period during oral argument in *Bruen*, former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, responded with the Reconstruction era.[11] As the panel observed, leading scholars of

---

[10] The NRA likewise suggests that *Gamble v. United States*, 587 U.S. 678 (2019), *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), and *Ramos v. Louisiana*, 590 U.S. 83 (2020), have resolved this time-period issue in favor of 1791. *See* NRA Br. 33. But, once again, none of those cases addressed the significance of the Fourteenth Amendment's ratification and thus cannot have resolved an issue that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 144 S. Ct. at 1898 n.1.

[11] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the

originalism take the same position. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702); *see, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) (explaining that 1868 is "the proper temporal location for applying a whole host of rights to the states" and that interpreting the Second Amendment "as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev.

---

history at the time of Reconstruction … and giving preference to that over the founding.").

1, 23 (2022).[12] In sum, originalist analysis compels applying the 1868 understanding of the right in a case challenging a state law.[13]

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between initial ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. 597 U.S. at 37. Accordingly, it appears that originalists

---

[12] *See also, e.g.,* Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

[13] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the *federal* government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, *supra*, at 51-52.

must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) in all cases.

Existing doctrine does not resolve this choice between 1791 and 1868. Contrary to the NRA's assertion, *see* NRA Br. 32, *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791," 597 U.S. at 37 (citing Sixth, Fourth, and First Amendment cases). If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38.[14] *Bruen* then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at

---

[14] In *Rahimi*, the Court again recognized that debate and reiterated that "under the circumstances, resolving the dispute was unnecessary to decide the case." 144 S. Ct. at 1898 n.1 (2024).

97 Ind. L.J. 1439)); *see also, e.g., United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that *Bruen* "signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government. *See, e.g., Meyer*, 2023 WL 3318492 at *2 n.4 (citing Akhil Reed Amar, *The Bill of Rights* 243 (1998)). More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.[15]

---

[15] The NRA contends that prioritizing the Reconstruction-era understanding of the right would "work a radical shift in constitutional jurisprudence." NRA Br. 33. But, to the contrary, "[r]eliance on post-ratification history 'has shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe.'" *Rahimi*, 144 S. Ct. at 1918 (Kavanaugh, J., concurring) (citation omitted); *see id.* at 1918-19 (citing cases). Indeed, even in cases the NRA relies on, the Court has routinely looked at a wide span of history, including from the Reconstruction era, in assessing constitutional claims. *See, e.g., Carrigan*, 564 U.S. at 122-25 (in interpreting First Amendment, finding consistent tradition from founding era through 20th century); *Ramos*, 590 U.S. at 90-92 (looking to sources from 14th through late-19th centuries to determine meaning of Sixth Amendment right to jury trial); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (looking to sources from 16th through 19th centuries to determine

This Court need not resolve the choice between 1791 and 1868 because, as discussed *supra* pp. 10-11, there is no conflict between the founding-era and Reconstruction-era understandings with respect to age restrictions. But to the extent this Court concludes otherwise, it should hold that sources surrounding the ratification of the Fourteenth Amendment are more probative of the meaning of the right than sources from the founding era. The extensive 19th-century tradition of regulating access to firearms by those under 21, *see Bondi*, 61 F.4th at 1333 (appendix of Reconstruction-era laws), establishes that Florida's law is constitutional.

## III.   This Court Should Consider Historical Context in Evaluating Florida's Age Restriction

Reconstruction-era history—including not just laws, but the historical context surrounding them—plays a role in Second Amendment analysis in another way as well: it provides important insight into how legislatures historically have responded to new and evolving social problems. And such evidence can also help contextualize earlier legislative inaction. As one court recently put it, "[i]f a societal condition did not exist in the relevant period a court is examining, then self-

---

meaning of Confrontation Clause); *Timbs v. Indiana*, 586 U.S. 146, 150-53 (2019) (looking to sources from Magna Carta to colonial era to Reconstruction to present day in interpreting Eighth Amendment Excessive Fines Clause and finding that it applies against the states). Thus, confirming that the Reconstruction era is the central focus, as the panel correctly did, *see Bondi*, 61 F.4th at 1322-24, would work no "radical shift." *See also supra* pp. 7-9.

evidently there will be no historical firearms laws addressing that condition in that period—making the consideration of later history particularly crucial." *LaFave*, 2024 WL 3928883, at *7. That is precisely the situation in this case.

As scholars have noted, "[c]oncerns over the dangers guns posed to minors increased dramatically during the era of the Civil War," partially as a result of "the technological development of firearms" as well as the "proliferation of small pistols, some expressly marketed to young people." Walsh & Cornell, *supra* note 6, at 3094, 3111; *see also, e.g.*, *Bianchi v. Brown*, --- F.4th ---, No. 21-1255, 2024 WL 3666180, at *21 (4th Cir. Aug. 6, 2024) (en banc) (explaining that "[i]mprovements in weapons technology contributed to [a] rise in interpersonal violence" during the 19th century), *petition for cert. filed*, No. 24-203 (U.S. Aug. 23, 2024). Newspapers and other 19th-century sources regularly documented the rise in gun violence perpetrated by boys and young men.[16] The panel opinion likewise recounted several Reconstruction-era incidents of gun violence perpetrated by individuals

---

[16] *See, e.g.*, *Put Down That Pistol*, Monongahela Valley Republican, Jul. 1, 1880, at 3 ("The revolver, like the segar [*sic*], has come to be considered an essential part of the outfit of a boy, and he seems to be expected and privileged to use one about as freely as the other."); W.H. Kennedy, *Carrying Concealed Weapons*, New-York Tribune, Jul. 26, 1884, at 4 (New York coroner writing "[a] good deal of the crime in this city can be traced to the habit of boys and young men carrying pistols"); *The News This Morning*, New-York Tribune, Aug. 23, 1884, at 4 ("The notion that to refuse the hand of an objectionable suitor should be instantly made a capital offence is becoming far too common among a certain class of young men, who always go armed and are always ready to use their weapons."); *see also* Walsh & Cornell, *supra* note 6, at 3094 & nn.194-95.

under the age of 21. *See Bondi*, 61 F.4th at 1319; *see also id.* at 1329 (noting that "lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of firearm-related injuries at the hands of minors" (quoting Patrick J. Charles, *Armed in America: A History of Gun Violence from Colonial Militias to Concealed Carry* 156 (2018)). Moreover, around the same time period, barriers that had previously prevented young people under 21 from acquiring weapons without parental involvement lessened, thus increasing their access to firearms. *See* Appellee's En Banc Br., Dkt. 97, 24-25 (explaining that, "[i]n America's new economy" of the mid-1800s, "minors had access to cash, which unburdened them from the legal disability imposed by the common law and allowed them to buy firearms on their own").

It should thus come as no surprise that the "flurry" of state laws prohibiting the sale of firearms to those under 21 did not emerge until "soon after the Fourteenth Amendment's ratification." *Bondi*, 61 F.4th at 1327. Governments are not expected to "regulate for problems that do not exist" in their jurisdictions. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted); *cf., e.g.*, *Bianchi*, 2024 WL 3666180, at *20, 25 (explaining that, throughout this Nation's history, there is "a definable arc of technological innovation and corresponding arms regulation," and that "legislatures, since the time of our founding, have responded

23

to the most urgent and visible threats posed by excessively harmful arms with responsive and proportional legislation").

Nor do governments legislate to the constitutional limit. *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (dismissing "flawed" assumption that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"); *see also id.* at 1905 (Sotomayor, J., concurring) (rejecting dissent's approach, under which "the legislatures of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary"). Indeed, the Supreme Court recognized this in *Dobbs v. Jackson Women's Health Organization*, issued a day after *Bruen*, when it explained that "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." 597 U.S. 215, 253 (2022). *See also Antonyuk*, 89 F.4th at 301 ("Reasoning from historical silence is … risky; it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms."). And *Rahimi* itself makes this clear, by upholding a modern law prohibiting individuals under domestic violence restraining orders from possessing firearms, even though the founding

24

generation—who were well aware of domestic violence—did not pass laws specifically disarming domestic abusers. *See* 144 S. Ct. at 1900.

Instead, *Rahimi* upheld the modern law because history supports restrictions on firearm access by those who pose a threat to others. *See id*. at 1889. Similar principles support Florida's decision, in the wake of a horrific mass shooting by a 19-year-old gunman, to protect against firearm violence by those under the age of 21. But to the extent this Court has any doubts about whether the founding-era historical tradition is "analogous enough" to Florida's law, *id*. at 1898 (quoting *Bruen*, 597 U.S. at 30), the widespread Reconstruction-era tradition of restricting firearm purchase by those under 21 should put those doubts to rest. Here, where the societal problem that the challenged Florida law and similar age restrictions address did not emerge as a serious danger until Reconstruction, Reconstruction-era history is "particularly crucial." *LaFave*, 2024 WL 3928883, at *7.[17] And a "more nuanced approach" to history, *Bruen*, 597 U.S. at 27, including "a broader search for historical analogies," *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023), is thus fully warranted.[18] "Taken together," *Rahimi*, 144 S. Ct. at

---

[17] *Cf., e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022) (rejecting a First Amendment challenge to a local law regulating off-premises billboards, and noting that history and tradition supported the law because although "[o]ff-premises billboards of the sort that predominate today were not present in the founding era," regulation of such signs followed "as large outdoor advertisements proliferated in the 1800s").

[18] *See, e.g.*, *LaFave*, 2024 WL 3928883, at *7 (noting that "firearms

1901, the historical record in this case demonstrates that Florida's law is constitutional.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

Dated:  August 30, 2024       <u>Janet Carter</u>

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Sana Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044

---

prohibitions about societal conditions that did not exist at the founding … demand a more expansive approach to historical analogy"); *see also Antonyuk*, 89 F.4th at 359 n.78 ("Though the historical analogues here are 'relatively simple to draw,' the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen.*" (quoting *Bruen*, 597 U.S. at 28)).

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 6,392 words.

2.     This document also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

Dated:  August 30, 2024          Janet Carter

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Sana Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044