**No. 21-12314**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
_____

**NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.,** *et al.*,

*Plaintiffs-Appellants*,

**v.**

**COMMISSIONER, FLORIDA DEPARTMENT OF LAW ENFORCEMENT,**

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:18-cv-00137-MW-MAF
_____

## PLAINTIFFS-APPELLANTS' EN BANC REPLY BRIEF
_____

John Parker Sweeney
James W. Porter, III
W. Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

*National Rifle Association of America, Inc. v. Commissioner*, No. 21-12314

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Plaintiffs-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Baum, Christopher J. (Counsel for Defendant-Appellee)

2. Bell, Daniel (Counsel for Defendant-Appellee)

3. Blair, Connor M. (Counsel for Plaintiffs-Appellants)

4. Bondi, Pam, in her official capacity as Attorney General of Florida (Defendant-Appellee, substituted by Defendant-Appellee Moody who was dismissed by the District Court)

5. Bradley Arant Boult Cummings LLP (Law firm representing Plaintiffs-Appellants)

6. Fant, Radford (Plaintiff-Appellant, dismissed on appeal by this Court's panel on motion to substitute Plaintiff-Appellant Kelsey)

7. Fitzpatrick, Hon. Martin A. (United States Magistrate Judge)

8. Glass, Mark, in his official capacity as Florida Department of Law Enforcement Commissioner (Defendant-Appellee, substituted for Defendant-Appellee Swearingen on appeal)

9. Kelsey, Dominic (Plaintiff-Appellant, dismissed on appeal by this Court's panel on motion to substitute Plaintiff-Appellant Stefano)

10. Lamar, William Chadwick (Counsel for Plaintiffs-Appellants)

*National Rifle Association of America, Inc. v. Commissioner*, No. 21-12314

11.    Moody, Ashley, in her official capacity as Attorney General of Florida (Defendant-Appellee, dismissed by the District Court)

12.    National Rifle Association of America, Inc. (Plaintiff-Appellant)

13.    Newhall, Timothy (Counsel for Defendant-Appellee)

14.    Percival, James H. (Counsel for Defendant-Appellee)

15.    Porter, James W. (Counsel for Plaintiffs-Appellants)

16.    Stefano, Brooke (Plaintiff-Appellee, substituted for Plaintiff-Appellant Kelsey)

17.    Swearingen, Rick, in his official capacity as Commissioner of the Florida Department of Law Enforcement (Defendant-Appellee, substituted by Defendant-Appellee Glass on appeal)

17.    Sweeney, John Parker (Counsel for Plaintiffs-Appellants)

18.    Teegen, Elizabeth (Counsel for Defendant-Appellee)

19.    Walker, Mark E., Hon. (United States District Judge below)

20.    Whitaker, Henry (Counsel for Defendant-Appellee)

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: September 20, 2024        */s/ John Parker Sweeney*
                                 John Parker Sweeney

                                 *Counsel for Plaintiffs-Appellants*

iii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................4

    I.      The State does not dispute that the Second Amendment's plain text presumptively prohibits the Young Adult Ban. ....................................5

    II.     The State has failed to prove that the Young Adult Ban is consistent with the Nation's historical tradition of firearm regulation .................6

          A.     The Founding Era evidence confirms that young adults have a constitutional right to purchase firearms..................................6

          B.     The State's 19th-century evidence is too late and otherwise insufficient to justify the Young Adult Ban.............................16

          C.     The State's evidence, "taken together," does not evince a justifying historical tradition of regulation ..............................26

    III.    The Young Adult Ban is facially unconstitutional.............................28

CONCLUSION .....................................................................................29

CERTIFICATE OF COMPLIANCE.......................................................28

CERTIFICATE OF SERVICE ...............................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023) ...................................................................6

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011)...........................................................11, 12, 15, 16

*\* District of Columbia v. Heller*,
   554 U.S. 570 (2008)...........................................................10, 14, 19, 22

*Fraser v. ATF*,
   672 F. Supp. 3d 118 (E.D. Va. 2023) ...................................................20

*Espinoza v. Mont. Dep't of Rev.*,
   591 U.S. 464 (2020)................................................................................22

*Gamble v. United States*,
   587 U.S. 678 (2019)................................................................................23

*Graham v. Florida*,
   560 U.S. 48 (2010)..................................................................................25

*Hirschfeld v. ATF*,
   5 F.4th 407 (4th Cir. 2021) ..................................................3, 7, 11, 14

*Jones v. Bonta*,
   34 F.4th 704 (9th Cir. 2022) .........................................3, 5, 7, 11, 14

*Lara v. Commissioner Penn. State Police*,
   91 F.4th 122 (3d Cir. 2024) ................................... 3, 7, 11, 13, 14, 15, 17, 23, 28

*Luis v. United States*,
   578 U.S. 5 (2016).....................................................................................5

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ...........................................................10

v

*McDonald v. City of Chicago*,
   561 U.S. 731 (2010) ............................................................................9

\* *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ............... 1, 2, 5, 6, 8, 10, 17, 18, 19, 20, 21, 22, 23, 25, 26, 28

*NRA v. ATF*,
   714 F.3d 334 (5th Cir. 2013) ......................................................11, 20

*Stanford v. Kentucky*,
   492 U.S. 361 (1989) ........................................................................25

*Roper v. Simmons*,
   543 U.S. 551 (2005) ........................................................................23

*United States v. Miller*,
   307 U.S. 174 (1939) ..........................................................................7

\* *United States v. Rahimi*,
   144 S. Ct. 1889 (2024) ................................. 1, 5, 9, 12, 20, 22, 23, 24, 25, 27, 28

*Worth v. Jacobson*,
   108 F.4th 677 (8th Cir. 2024) ...................................3, 5, 10, 14, 16, 28

**Statutes and Constitutional Provisions**

18 U.S.C. § 922 ....................................................................................12

1883 Kan. Stat. 159 ..............................................................................26

1883 Wis. Stat. 290 ..............................................................................26

1885 Nev. Stat. 51 ................................................................................26

2018 Fla. Laws 10 ................................................................................24

Fla. Stat. § 790.065 ...............................................................................3

Fla. Stat. § 743.07 ...............................................................................10

U.S. Const. amend. XXVI .....................................................................10

**Other Authorities**

1 John Bouvier, *Institutes of American Law* (1851) ...................................................9

2 James Kent, *Commentaries on American Law* (1827) .........................................8

4 William Blackstone, *Commentaries on the Laws of England* (1765) ...........20, 25

Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135 (1991) ......................................................................................................16

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495 (2019) ..............................7, 11, 18

Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 HOFSTRA L. REV. 547 (2000) ...........................................................................11

*The Exclusion of Young Adults from Juries: A Threat to Jury Impartiality*, 66 J. CRIM. L. & CRIMINOLOGY 150 (1975)...................................12

# INTRODUCTION

The State's response brief points to only one conclusion: the State has not met its burden to prove that Florida's Young Adult Ban—prohibiting all 18-to-20-year-old adults from purchasing any firearm for any reason—is consistent with our Nation's historical tradition. The ban is facially unconstitutional.

The State concedes that the Second Amendment's text presumptively precludes the Young Adult Ban. The State does not dispute that: (1) young adults are among "the people"; (2) the ban regulates "Arms"; and (3) a law that prohibits purchasing a firearm for lawful purposes including self-defense "infringes" protected conduct as a matter of plain text. The Young Adult Ban is unconstitutional unless the State has "affirmatively prove[d]" based on "historical precedent" that the ban is consistent with an "enduring" and "comparable tradition of regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19, 27, 67 (2022); *see also United States v. Rahimi*, 144 S. Ct. 1889 (2024) (same). But history is not on Florida's side, and the State has failed to carry its burden.

At the Founding, as the State admits, young adults were permitted and even required to acquire, possess, and use firearms. It concedes that no law prohibited young adults from purchasing firearms. The only Founding Era laws that the State could muster demonstrate that the Founders sought to **ensure** young adults' access

to firearms notwithstanding any side-effects of their status as legal minors at the time. Of course, young adults in Florida today are legal adults who undoubtedly enjoy the fully vested rights of citizenship, including the right to keep and bear arms; only the Young Adult Ban stands in the way of their purchasing firearms. Our Nation's Founding Era tradition of permitting, obligating, and ensuring young adults' access to firearms—including through purchase—"demands our unqualified deference," *Bruen*, 597 U.S. at 26, and that tradition cannot be cast aside for Reconstruction Era laws that fail to demonstrate a comparable tradition of regulation and are, in any event, too late in time to shed light on unambiguous Founding Era tradition, let alone contradict it, *id.* at 66.

The State offers no defense of the panel's exclusive reliance on laws from the Reconstruction Era, or its categorical rejection of Founding Era history. The State agrees that "the Founding-era understanding of that age group's rights" is what matters, (State's Br. at 47–48), but it doggedly relies on mid-to-late 19th-century evidence that "is simply too late," *Bruen*, 597 U.S. at 82 (Barrett, J., concurring). And that evidence is also "too little," *id.*, because it contradicts our Nation's Founding Era history and, even in a vacuum, does not come close to evidencing a comparable tradition of regulation.

2

With no real controversy regarding the Nation's relevant historical tradition, it is no surprise that courts are consistently striking as unconstitutional laws restricting the purchase or even public carry of a firearm by young adults. *See, e.g.*, *Worth v. Jacobson*, 108 F.4th 677, 698 (8th Cir. 2024) (holding that Minnesota's law prohibiting young adults from publicly carrying handguns is unconstitutional), *pet. for reh'g en banc denied*, 2024 WL 3892865 (8th Cir. Aug. 21, 2024); *Lara v. Comm'r Penn. State Police*, 91 F.4th 122, 140 (3d Cir. 2024) (invalidating law banning young adults from public carry during state-of-emergency), *pet. for cert. docketed*, No. 24-93 (U.S. July 30, 2024); *Jones v. Bonta*, 34 F.4th 704, 723 (9th Cir. 2022) (holding that California law restricting sales of most firearms to young adults is unconstitutional), *op. vacated in light of Bruen*, 47 F.4th 1124 (9th Cir. 2022); *Hirschfeld v. ATF*, 5 F.4th 407, 434 (4th Cir. 2021) (concluding that "state and federal militia laws show that 18-year-olds had a right to keep and bear arms" and holding that the federal ban on selling handguns to people under 21 is unconstitutional), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). This Court should do the same: the Young Adult Ban is facially unconstitutional.

3

**ARGUMENT**

The State has not disputed that the Second Amendment's plain text presumptively prohibits the Young Adult Ban. This case boils down to whether the State has proven that the ban is consistent with this Nation's historical tradition of firearm regulation, against the backdrop of Founding Era laws requiring young adults to acquire and use firearms and the complete absence of any law from the Founding Era that prohibited young adults from purchasing a firearm. In the face of unanimous agreement of every single court of appeals to have considered a challenge during this decade to any prohibition on purchasing or carrying a firearm by young adults, it is clear that the State has failed to meet its burden.

The State asks this Court to find a justifying historical tradition in young adults' Founding Era status as legal minors, a few university *in loco parentis* regulations, and noncomparable mid-to-late 19th-century restrictions. That is wrong. Florida's Young Adult Ban, which makes it a felony punishable by imprisonment for any young adult to purchase any firearm from any source for any reason, contradicts our historical tradition, and the State's evidence does not prove otherwise. The Court should hold that the Young Adult Ban facially violates the Second Amendment and reverse the judgment of the district court.

4

**I.    The State does not dispute that the Second Amendment's plain text presumptively prohibits the Young Adult Ban.**

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; at that point, a state law regulating protected conduct is unconstitutional unless the State "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also Rahimi*, 144 S. Ct. at 1897–98 (similar).

The State's response brief abandons the panel decision and skips right over the textual inquiry. And understandably so. The Second Amendment's plain text elements are undoubtedly satisfied, and the textual inquiry reveals a robust and unequivocal right. Young adults aged 18 to 20 are among "the people" who fully enjoy the Second Amendment's presumptive protections. *See, e.g.*, *Worth*, 108 F.4th at 689. The Young Adult Ban bars the purchase of all firearms, plainly including within its sweep protected "Arms." And the plain text protects the right of the people to acquire protected arms, including through purchase. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional Rights thus implicitly protect those closely related acts necessary to their exercise."); *Jones*, 34 F.4th at 716 ("[L]aws that burden the ability to purchase arms burden Second Amendment rights."). This Court should hold that each textual element is satisfied and that the State "has only one way to defend the regulation—by proving that it is

5

'consistent with this Nation's historical tradition of firearm regulation.'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023).

## II.  The State has failed to prove that the Young Adult Ban is consistent with the Nation's historical tradition of firearm regulation.

The State attempts to justify the Young Adult Ban by conjuring a cloak of ambiguity surrounding 18-to-20-year-olds' status as legal minors at the Founding—deploying adverbs like "generally," "largely," "typically," and "effectively"—to suggest incorrectly that young adults could not purchase firearms. It then tries to buttress this argument by pointing to a few university regulations, as well as Reconstruction Era laws that are too late and prove far too little. And, all the while, the State cannot overcome the complete absence of any early American laws that barred young adults from purchasing firearms and the ubiquitous presence of Founding Era laws ensuring and even requiring that young adults had access to firearms. The State has assuredly not met its burden to prove that the Young Adult Ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

### A.  The Founding Era evidence confirms that young adults have a constitutional right to purchase firearms.

The Supreme Court in *Bruen* made clear that the "traditions of the American people . . . demand[] our unqualified deference." *Id.* at 26. Our Founders permitted,

6

required, and ensured young adults' access to firearms, including through purchase. That Founding Era historical tradition compels the conclusion that the Young Adult Ban violates the Second Amendment.

1.      At the Founding, young adults were expected and obligated to acquire arms for use in the militia, *see, e.g.*, *United States v. Miller*, 307 U.S. 174, 179 (1939); *Jones*, 34 F.4th at 721; *Hirschfeld*, 5 F.4th at 428–29, which demonstrates "that founding-era lawmakers believed those youth could, and indeed should, keep and bear arms." *Lara*, 91 F.4th at 136. The State does not dispute that "there were no age-based arms restrictions" during the Colonial Era, the Founding Era, or the days of the early republic, much less restrictions that targeted 18-to-20-year-olds or any legal adult. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 596 (2019). It instead pivots to a novel theory that because the common law imposed a "practical" hurdle on the ability of an 18-to-20-year-old to purchase a firearm using credit instead of money, those individuals can be completely prohibited from purchasing a firearm today. (State's Br. at 24–29). But that argument misconstrues history and cannot justify the ban.

The State tries to reconceptualize the power of minors at the Founding to repudiate their commercial contracts upon reaching adulthood as comparable to a

complete ban on firearm purchases by 18-to-20-year-olds.[1] But the State concedes that young adults certainly could purchase a firearm with up-front money. (*Id.* at 29). The State also concedes that minors could purchase a firearm on credit, so long as the seller was willing to bear the risk that the contract would be voided later. (*Id.* at 27). After all, "contracts made, in infancy," were "voidable only, and not absolutely void." 2 James Kent, *Commentaries on American Law* 191 (1827). And the State does not produce evidence that this hypothetical impediment actually prevented firearm purchases by young adults. Because neither common law nor positive law prevented young adults from purchasing a firearm with money or credit, the State fails to advance a Founding Era tradition of regulation that could support the Young Adult Ban. The State fails to explain how financial impediments to purchasing firearms at the Founding might differ from financial impediments to young adults that exist today, or how those considerations even affect the Second Amendment right to acquire a firearm.

---

[1] New York tried the same proof-by-reconception in *Bruen* with Northampton-style going-armed laws. 597 U.S. at 47 ("Respondents, their *amici*, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."). If it did not work there, it cannot work here.

Even if there were some scant relevance to the practical hurdle that Founding Era young adults hypothetically may have faced when trying to purchase a firearm on credit, that still cannot justify the Young Adult Ban. There is no similarity at all in "why" or "how" the voidability of minors' contracts "burdens the right." *Rahimi*, 144 S. Ct. at 1898. The justification is noncomparable because any common law limitation was based on the hypothetically perceived risk of voidance, but a young adult today would be fully liable for the obligation. And the burden is noncomparable because the Young Adult Ban prohibits all purchases, far "beyond what was done at the founding." *Id.*

The State's heavy reliance on young adults' legal status as minors at the Founding reveals a deeper flaw in its argument: any Founding Era regulation of 18-to-20-year-olds as legal minors under the protection of their parents (which did not restrict firearm purchase) has no application to Florida's modern law prohibiting legal adults 18-to-20-years-olds from purchasing a firearm.  Any Founding Era limitation on the ability of 18-to-20-year-olds was grounded in their status as legal minors. (*See* State's Br. at 24–26). But any 18-to-20-year-old in Florida is a legal adult "in the full enjoyment of his civil and political rights," 1 John Bouvier, *Institutes of American Law* 148 (1851). Young adults enjoy a preexisting "inherent" and "natural right of resistance and self-preservation" which entitles citizens to

armed self-defense, *District of Columbia v. Heller*, 554 U.S. 570, 594, 628 (2008), and was enshrined in the Second Amendment, *id.* at 599–600. Whatever hypothetical hurdles young adults faced at the Founding on account of their status as legal minors, they were indelibly removed as a result of Florida removing "[t]he disability of nonage" for anyone "18 years of age or older," *see* Fla. Stat. § 743.07, and the Nation fixing the age of political majority at 18, U.S. Const. amend. XXVI. The State cannot rely on Founding Era regulation of that age group as minors to justify a modern regulation on that group of legal adults responsible for their own self-defense.

Nor can the State argue that young adults lack Second Amendment rights merely because they were considered minors at the Founding. Courts "do not interpret constitutional rights this way." *Worth*, 108 F.4th at 690 (rejecting similar argument at textual stage and quoting *Heller*, 554 U.S. at 582). The Founders instead ratified a Second Amendment "intended to endure for ages to come," *Bruen*, 597 U.S. at 28 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)), which "can, and must, apply to circumstances beyond those the Founders specifically anticipated," *id.* So even if young adults were not legal adults at the Founding, they were then and are now fully entitled to Second Amendment protections. In light of the Founding Era understanding that young adults could, and should, possess firearms, it remains "inconceivable" to suggest "that 18-to-20-year

10

olds were not considered, at the time of the founding, to have full rights regarding firearms." *Jones*, 34 F.4th at 719 (quoting *NRA v. ATF*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc)).

2.     The State is also wrong to suggest that the Young Adult Ban is justified because the Founders imposed age limits on some "activities that required judgment and reason." (State's Br. at 39–40 (relying on Justice Thomas's dissent in *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011)). This is just a repackaged age-of-majority argument, and it again does not establish any tradition of firearm regulation.

There is no evidence that the Founders believed that 18-to-20-year-olds lacked adequate judgment to acquire, have, and use firearms. The opposite is true: the Founders ubiquitously required 18-to-20-year-olds to acquire and bring their own firearms to participate in the militia, *Jones*, 34 F.4th at 721; *Hirschfeld*, 5 F.4th at 428–29; Kopel & Greenlee, *supra*, at 613, which reflects the Founders' view that young adults "could, and indeed should, keep and bear arms," *Lara*, 91 F.4th at 136. The State ignores the accepted understanding that the age of majority was set at 21 as a result of the medieval determination that 21-year-old males were strong enough to carry armor, not because of established reservations about mental judgment.[2] The

_____

[2] Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 Hofstra L. Rev. 547, 558 (2000) ("The common law age of majority was twenty-one, apparently because, in the Middle Ages, most men were presumed capable of carrying armor at this

11

State's unsupported assertion that the age of majority at the Founding demonstrates that 18-to-20-year-olds lack the decision-making ability to have firearms is simply unsupported by the historical record. Nor can it be squared with Florida's granting 18-to-20-year-olds all rights of adulthood, including rights that Justice Thomas wrote in his *Brown* dissent were tied to "judgment and reason," 564 U.S. at 834 (Thomas, J., dissenting), including voting, jury service, and testifying in a criminal case. And, in any event, the Supreme Court has already held that a person cannot be disarmed merely "because he is not 'responsible,'" *Rahimi*, 144 S. Ct. at 1903. *Rahimi* upheld 18 U.S.C. § 922(g)(8) based on two comparable historical analogues that evidenced a tradition of temporary disarmament and imprisonment following individualized determinations of dangerousness, 144 S. Ct. at 1901–02, not because of anything to do with "responsibility." *Rahimi* forecloses the State's euphemistic argument that 18-to-20-year-olds lack judgment—that is, are irresponsible. And it demonstrates why the Young Adult Ban, lacking any comparable historical analogue, violates the Second Amendment.

---

age."); *The Exclusion of Young Adults from Juries: A Threat to Jury Impartiality*, 66 J. Crim. L. & Criminology 150, 158 n.69 (1975) ("[The] change in the minimum age for knighthood, [was not due] to any recognition of increased maturity or competency, but to the increased weight of armor and need for extra training in combat skills and chivalry. This age was then carried over into the common law.").

3.      The State cannot justify the Young Adult Ban by reference to 18-to-20-year-olds' supposed reliance on their parents to acquire firearms at the Founding. The State concedes that Congress and the states required 18-to-20-year-olds to be enrolled in the militia, almost universally with self-supplied firearms. (State's Br. at 30–31). But the State attempts to show a tradition of restriction on the rights of 18-to-20-year-olds to acquire those firearms, including through purchase, based on evidence that: (1) 18-to-20-year-olds would in some cases rely upon their parents to acquire those firearms and (2) two states exempted minors from the obligation to acquire firearms while several others held parents liable to ensure their young adults' obligation to acquire firearms. (*Id.*).

Neither of those arguments suggests that young adults had anything less than full Second Amendment rights, including the right to purchase firearms. For one, neither young adults' reliance on their parents nor Founding Era militia laws obligating parents to supply arms for their young adults suggests that young adults themselves "could not purchase or otherwise acquire their own guns." *Lara*, 91 F.4th at 137 (rejecting the same argument as to public carry). As explained above, and as the State concedes, they could legally do so. *Supra* at 7–8. For another, these militia laws demonstrably prove that the Founders were committed to ensuring young adults' access to firearms, notwithstanding any side-effects of their status as legal

13

minors. The Founders thus believed that young adults "could, and indeed should, keep and bear arms," *Lara*, 91 F.4th at 136, and even passed some measures to overcome any impediment that may be caused by their minority. This historical evidence does nothing to suggest that young adults' ability to purchase a firearm at the Founding was restricted in a similar way and for a similar reason. Courts consistently have rejected the argument that Founding Era militia laws support restrictions on the ability of young adults to acquire and use firearms. *See, e.g.*, *id.* at 136–37; *Hirschfeld*, 5 F.4th at 433–34; *see also Worth*, 108 F.4th at 695; *Jones*, 34 F.4th at 721 (concluding that militia laws implied "at least that young adults needed to have their own firearms"). This Court should, too.

The State tries to overcome the Founding Era militia laws—even though it also relies on these laws—by misapplying the notion that the Second Amendment's individual right is "unconnected with militia service." (State's Br. at 44). Plaintiffs-Appellants agree that the right is not limited to those eligible for militia duty, but "[l]ogic demands that there be a link between the stated purpose" of militia preservation and "the command" that the right to keep and bear arms shall not be infringed. *Heller*, 554 U.S. at 577. Founding Era militia laws reflect the Founders' view that the Second Amendment's individual right applies at least to those expected to serve in the militia. Even *Lara*, which the State cites to support its argument,

14

explains that militia laws are "good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed." 91 F.4th at 137.

4.    The State tries to support the Young Adult Ban by relying on parents' historical authority over their 18-to-20-year-old children. (State's Br. at 20, 24–26). But these arguments say nothing about whether the government historically has regulated young adults' access to firearms in a way comparable to Florida's ban. The State relies on Justice Thomas's dissent in *Brown*, where he would have upheld a California law restricting minors' access to "violent video games" because parents historically have had authority to restrict what their children hear. 564 U.S. at 824–35 (Thomas, J., dissenting). But the majority disagreed with Justice Thomas and, instead, drew a sharp distinction between permissible exercises of "*governmental* authority" and the enforcement of "*parental* authority." *Id.* at 795 n.3 (majority op.). As the majority explained, a decision in that vein would create (as would the State's argument here) an indefensible precedent of conditioning the exercises of constitutional rights on the consent of parents. *Id.* There is no justification for a rights-by-parental-consent doctrine even for those under the age of majority; *a fortiori* no such doctrine can govern the rights of any class of legal adults.

15

5.    The State's final Founding Era argument is that "regulation of firearms in colleges" supports a historical tradition of prohibiting 18-to-20-year-olds from purchasing firearms. (State's Br. at 32). But university restrictions are not similar in justification: public and private "universities had guardianship authority *in loco parentis*," and as a result universities could enforce restrictions "that if compelled by the government, would have violated students' constitutional rights." *Worth*, 108 F.4th at 695. Universities governed their students' conduct because those students were under their care and protection, not because of the students' age, just like the authority and duty of protection that a parent holds over a child in the home. For that reason, these rules applied to 25-year-olds, 16-year-olds, and 18-to-20-year-olds alike.[3] In *Brown*, Justice Thomas's dissent offered the same *in loco parentis* argument in defense of California's parental-consent law and the Supreme Court ignored it altogether. 564 U.S. at 830 (Thomas, J., dissenting). That argument cannot help Florida in this case, either. In any event, university restrictions are also materially different in burden: they applied to students but not other members of the public, they applied to students below 18 and above 20, they did not regulate the acquisition of firearms but instead only where they could be kept and carried, and

---

[3] Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1136 n.5 (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of age and younger.").

16

violation of these university restrictions would not result in a young adult's imprisonment.

* * *

Nothing from the Founding Era "evinces a comparable tradition of regulation." *Bruen*, 597 U.S. at 27. Nothing in common law or positive law prohibited young adults from purchasing firearms—much less imposed an age-based restriction on any class of legal adults. Any practical limitation stemming from common law contract principles applicable to minors was noncomparably justified by the fear of voidance (rather than a judgment about whether young adults should have access to firearms) and did not impose a comparable burden (because young adults still could purchase firearms through money, or on credit at the seller's risk).

And Founding Era militia laws demonstrate the Founders' belief that young adults "could, and indeed should, keep and bear arms." *Lara*, 91 F.4th at 136. The Founding Era evidence therefore confirms that 18-to-20-year-olds have a right to acquire, keep, and use firearms "[in]distinguishable from that of the general community." *Bruen*, 597 U.S. at 70 (citation omitted). Because the Founding Era "traditions of the American people . . . demand[] our unqualified deference," *id.* at 26, this Court should hold that the Young Adult Ban violates the Second Amendment.

17

**B.    The State's 19th-century evidence is too late and otherwise insufficient to justify the Young Adult Ban.**

Although the State does not defend the panel's holding about the primacy of Reconstruction Era understandings, 61 F.4th 1317, 1332 (11th Cir. 2023), it nevertheless resorts to the same motley assortment of noncomparable Reconstruction Era laws between 1855 and 1897 that are far too late and otherwise cannot justify the Young Adult Ban under *Bruen*'s historical-tradition mode of analysis. The State alludes to "dramatic [societal] changes" (State's Br. at 47) and suggests that it is merely offering "confirmation" of Founding Era understandings (*id.* at 34, 48), but the State's effort to backdoor belated historical analogues into the analytical fold should be rejected. And, even if the State could negate the robust and consistent Founding Era understandings, its Reconstruction Era evidence fails to justify the Young Adult Ban.

1.    The State artfully tries to overcome the absence of "age-based arms restrictions" at the Founding, Kopel & Greenlee, *supra*, at 596, that is fatal to its defense under *Bruen*'s straightforward analysis, by trying to invoke the alternative, nuanced analysis. (State's Br. at 47). But its proffered rationales for disregarding the absence of Founding Era regulation defy *Bruen* and *Heller* and misconstrue the relevant history.

18

The State argues that there would have been no reason for states to enact age-based restrictions targeting young adults because "[u]rban areas simply did not exist" at the Founding and "few firearms homicides occurred in urban areas in 1791." (*Id.* at 34, 46). That unsupported assertion cannot be reconciled with *Heller* and *Bruen*, which recognized that "firearm violence in densely populated communities" (or "urban area[s]") is a societal problem that "the Founders themselves" confronted. *Bruen*, 597 U.S. at 27 (discussing and quoting *Heller*, 554 U.S. at 631). Nor is the State's urban density assertion factually correct: the Philadelphia area's population density by 1800 "far exceed[ed] density in American cities today,"[4] and Manhattan's population density in 1800 was 92.7 people per hectare (1/100th of a square kilometer), which was roughly the "density of Beijing in 1999."[5] The Court should not ignore the absence of Founding Era historical tradition on account of the State's inaccurate assertion about urban areas at the Founding.

---

[4] Paul Sivitz & Billy G. Smith, *Essays: Philadelphia and its People in Maps: The 1790s*, The Encyclopedia of Greater Phila. (2012), https://philadelphiaencyclopedia.org/essays/philadelphia-and-its-people-in-maps-the-1790s/ (last visited Sept. 20, 2024).

[5] Shlomo Angel & Patrick Lamson-Hall, *The Rise and Fall of Manhattan's Densities, 1800-2010*, NYU Marron Inst. of Mgmt., Working Paper 18 (Nov. 2014), https://marroninstitute.nyu.edu/uploads/content/Manhattan_Densities_High_Res,_1_January_2015.pdf  (last visited Sept. 20, 2024).

The State also inaccurately contends that there is no evidence that young adults posed a societal problem that the Founders would have sought to address. (State's Br. at 46–47). But the State itself has argued that young adults have "lack[ed] reason and decisionmaking ability" since the Founding. (*Id.* at 40). And yet the historical evidence is clear that young adults had unsupervised access to firearms. *See supra* at 7–9. Moreover, courts repeatedly have acknowledged longstanding societal issues related to the misbehavior of young adults dating back at least to the Founding. *See, e.g.*, *NRA*, 714 F.3d at 342 (Jones, J., dissenting from the denial of rehearing en banc) ("The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar."); *Fraser v. ATF*, 672 F. Supp. 3d 118, 145 (E.D. Va. 2023) ("Since time immemorial, teenagers have been, well, teenagers."); *see also* 61 F.4th at 1332 ("firearm violence among some 18-to-20-year-olds is nothing new"). And Blackstone discussed many examples of children being tried and executed for violent felonies including murder and arson. 4 William Blackstone, *Commentaries on the Laws of England* 23 (1765). Though none of these examples necessarily involved misuse of firearms, the State's assertion that "[y]outh crime was not a pressing problem" bears little basis in fact. (State's Br. at 47). And instead of banning young adults from acquiring, possessing, or carrying firearms, the Founders chose instead to entrust them with the armed

20

defense of their homes, towns, cities, and Nation. And that is the historical backdrop that should inform any consideration of the Second Amendment rights of young adults. *Bruen*, 597 U.S. at 26.

The State tries to portray Plaintiffs-Appellants as demanding "dead-ringers," (State's Br. at 46), rather than applying *Bruen*'s "straightforward" reasoning, 597 U.S. at 26. But Plaintiffs-Appellants simply contend that the State has failed to carry its burden. The enduring societal problems of "firearm violence in densely populated communities" and young adult misbehavior, and the complete absence of any similar prohibition targeting young adults, contrasted against the mountain of Founding Era laws requiring young adults to acquire and possess firearms in defense of home and country, is overwhelming evidence that the Young Adult Ban is unconstitutional.

2.    The State's reliance on Reconstruction Era laws is also improper because those laws cannot establish a Founding Era understanding of the scope of the Second Amendment. There is no disagreement that the Second Amendment's meaning and scope are grounded in the public understanding of the right at the Founding in 1791—not Reconstruction in 1868. (*See* Opening Br. at 42–47; State's Br. at 47–48). The State instead asks the Court to consider its 1855–1897 evidence as both "demonstrative" and "confirmatory" of Founding Era understandings.

(State's Br. at 21, 47–48). Neither attempt to backdoor Reconstruction Era laws works here.

Using Reconstruction Era history as "demonstrative" evidence of Founding Era understandings fails from the starting line: The Supreme Court has already explained that reliance on practices that "arose in the second half of the 19th century" cannot "evince a tradition that should inform our understanding of" constitutional rights. *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 482 (2020) (free exercise). Citing *Espinoza*, Justice Barrett explained in her *Bruen* concurrence that "if 1791 is the benchmark," then "Reconstruction-era history would fail for the independent reason that this evidence is simply too late." 597 U.S. at 82 (Barrett, J., concurring). To be sure, post-enactment history can "illuminate[] the meaning of the enacted law," but reliance on "[h]istory (or tradition) that long postdates ratification does not serve that function." *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring).

Nor can Reconstruction Era history serve as "confirmation" of Founding Era understandings in this case. As *Bruen* and *Heller* already explained, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 (citing *Heller*, 554 U.S. at 614). The State's mid-to-late 19th-century evidence surely contradicts the Founding Era record, which lacks any age-based restrictions and

22

otherwise reflects the Founders' belief that young adults "could, and indeed should, keep and bear arms." *See Lara*, 91 F.4th at 136. Thus, the State's evidence from 1855 to 1897 should be set aside consistently with the Supreme Court's jurisprudence, *Gamble v. United States*, 587 U.S. 678, 702 (2019) (rejecting reliance on post-enacted treatises because, unlike in *Heller*, it was not confirmatory), as well as Second Amendment circuit jurisprudence, *Lara*, 91 F.4th at 134–35 ("set[ting] aside" Reconstruction Era analogues).

3.    Even if it were relevant, the State's 19th-century evidence does not evince a "comparable tradition of regulation," *Bruen*, 597 U.S. at 27, nor is it otherwise "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898.

Just as the panel did, 61 F.4th at 1325–26, the State cites three pre-Civil War statutes from Alabama (1855), Tennessee (1856), and Kentucky (1859). (State's Br. at 37). But these laws applied only to pistols and cannot support a broader prohibition applicable to all firearms. *Rahimi*, 144 S. Ct. at 1898, 1902; *Bruen*, 597 U.S. at 38 (holding that restrictions on "intent" or "manner of carry" and "the exceptional circumstances under which one could not carry arms" did not support law "broadly prohibiting" all public carry). Nor did these laws regulate the young adult by banning purchase; instead, each banned third parties from providing a pistol to a young adult.

23

Unlike Florida's Young Adult Ban, none of these laws subjected young adults to any punishment, much less a felony and imprisonment. *Rahimi*, 144 S. Ct. at 1902 (discussing the critical importance of an imprisonment sanction within its comparability analysis). Nor did these laws have a comparable justification. The Tennessee and Kentucky laws were enacted "in tandem with laws that prohibited giving spirits to minors," 61 F.4th at 1326–27, which suggests that these laws were passed more to protect the young adult rather than, like the Young Adult Ban, to mitigate the risk that young adults would use firearms against others, 2018 Fla. Laws 10.

The State also cites—as the panel did—laws by 16 states and the District of Columbia between 1875 and 1897. (State's Br. at 37). But even beyond their dispositive temporal distance from the Founding, these laws do not reflect a comparable tradition of regulation. All but two—Missouri (1879) and Delaware (1881)—applied only to pistols. Only the 1885 Nevada statute criminalized any conduct by the minor, and it was a noncomparable ban on concealed carry.

Focusing on Plaintiffs-Appellants' opening argument that none of these laws subjected young adults to imprisonment for purchasing a firearm, the State inaccurately asserts that historically "[m]inors were generally not subject to criminal punishment" because they lacked the "legal capacity" to be prosecuted. (State's Br.

24

at 43). The Supreme Court, however, has explained that history counsels otherwise: "the common law set the rebuttable presumption of incapacity to commit any felony at 14, and theoretically permitted capital punishment to be imposed on anyone over the age of 7." *Stanford v. Kentucky*, 492 U.S. 361, 368 (1989) (citing, among other sources, Blackstone's *Commentaries*), *overruled on other grounds*, *Roper v. Simmons*, 543 U.S. 551 (2005); *see also Graham v. Florida*, 560 U.S. 48, 106 n.3 (2010) (Thomas, J., dissenting) (same). Blackstone's *Commentaries* provide that "[t]he law of England does in some cases privilege an infant, under the age of twenty-one, as to common misdemeanors, so as to escape fines, imprisonment, and the like." 4 Blackstone, *Commentaries* 21. That privilege applied principally to "cases of omission," and never applied to "any notorious breach of the peace." *Id.* The State, then, is wrong to suggest as some categorical historical truth that 18-to-20-year-olds were immune from punishment "in most cases." (State's Br. at 43 (purporting to summarize Blackstone's *Commentaries*)). That clearly was not the case. The State's unbridled "speculat[ion]" that there were no criminal restrictions on 18-to-20-year-olds purchasing firearms because they would be immune from prosecution cannot satisfy the State's burden. *Bruen*, 597 U.S. at 58 n.25. Nor could the State reconcile its argument with late-19th-century examples of laws targeting young adults—including with imprisonment—for other kinds of firearm-related

25

conduct. *See, e.g.*, 1885 Nev. Stat. 51 (subjected minors to a "fine" or "imprisonment in the county jail" for violating concealed carry restriction); 1883 Kan. Stat. 159 (subjected minors in "possession [of] any pistol, revolver, or toy pistol" to a fine); 1883 Wis. Stat. 290 (deeming it unlawful for any minor to "go armed with any pistol or revolver" and subjecting the minor to confiscation). Florida punishing young adults with prison time for buying a firearm—as no government did in the 18th or 19th century—is convincing evidence that Florida's modern law violates the Second Amendment.

The State's evidence from the mid-to-late 19th-century is far too late to shed light on Founding Era understandings of the Second Amendment rights of young adults. Even if it could, that evidence only provides further proof that the Young Adult Ban is an "outlier[] that our ancestors never would have accepted." *Bruen*, 597 U.S. at 30 (citation omitted).

## C. The State's evidence, "taken together," does not evince a justifying historical tradition of regulation.

The State claims that its speculation that Founding Era limitations on the ability of young adults to purchase on credit constrained their ability to purchase firearms, along with Reconstruction Era laws prohibiting others from providing pistols to young adults, collectively evinces a tradition that justifies the Young Adult Ban. (State's Br. at 39–49). That is not so.

26

As to the "how" of the comparability analysis, at no point in our Nation's history have young adults been subjected to the burden of imprisonment for simply purchasing a firearm. The common law near the Founding imposed practical hurdles on young adults purchasing anything on credit but did not prohibit young adults from purchasing firearms. And the law at the Founding otherwise imposed no age-based restrictions on access to firearms. Reconstruction Era laws are dispositively too late to evidence a historical tradition but those laws, if anything, prove that the Young Adult Ban goes far "beyond what was done" at any point in our Nation's history. *Rahimi*, 144 S. Ct. at 1898.

As to the "why," the State contends that Founding Era laws, the too-late Reconstruction Era laws, and the Young Adult Ban all target "protect[ing] both minors and the public from their poor decisionmaking and impulsivity." (State's Br. at 40). But this assertion is not supported by the evidence and, at its core, is just as broad and vague as the government's reliance on "responsibility" that was unanimously rejected in *Rahimi*, 144 S. Ct. at 1903; *id.* at 1945 (Thomas, J., dissenting). Indeed, the Founders did not express the view that young adults were too immature to have and use firearms; rather, they expressed the opposite by trusting young adults with the armed defense of the nation and the right to purchase

27

firearms to do so. The Young Adult Ban is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

### III.    The Young Adult Ban is facially unconstitutional.

The State offers no other historical defense of the Young Adult Ban. Lacking an "enduring," "representative," and "comparable tradition of regulation" of 18-to-20-year-olds, *id.* at 27, 30, 69, the Young Adult Ban is unconstitutional in all applications and thus is facially invalid. *See, e.g.*, *Worth*, 108 F.4th at 685 (holding law banning young adults from public carry facially unconstitutional because it was invalid in "all its applications to 18 to 20-year olds"); *Lara*, 91 F.4th at 127 n.4, 140 (holding that Pennsylvania's state-of-emergency ban on young-adult public carry was facially unconstitutional).

The State musters a few conclusory statements that its ban "is constitutional in most, if not all, of its applications," (*see, e.g.*, State's Br. at 21), but it has not "demonstrate[d] that [the Young Adult Ban] is constitutional in" any application. *Rahimi*, 144 S. Ct. at 1898. As the district court explained, the Young Adult Ban "functions as a total ban" on firearm purchase by law-abiding, responsible young adults unable to acquire a firearm from their parents and most likely to "actually need firearms to defend themselves." App.232. That includes, for example, prohibiting "the 20-year-old single mother living on her own [from] obtain[ing] a

firearm for self-defense [while allowing] a 20-year-old living with their parents [to] easily obtain one." App.232–33. The Young Adult Ban cannot be upheld.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this Court reverse the judgment of the district court and remand the case with instruction to enter judgment for Plaintiffs-Appellants.

Dated: September 20, 2024      Respectfully Submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
W. Chadwick Lamar, Jr.
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-719-8316
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 because it contains 6,494 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and type-style requirements of Rule 32(a) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 20, 2024.

*/s/ John Parker Sweeney*
John Parker Sweeney

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2024, a copy of the foregoing was served via electronic delivery to all parties' counsel via the Court's appellate CM/ECF system, which will forward copies to Counsel of Record.

*/s/ John Parker Sweeney*
John Parker Sweeney

*Counsel for Plaintiffs-Appellants*